UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 1 7 2001

Michael N. Milby
Clerk of Court

B -01- 009

MARTIN TORRES-CASTILLO,       )
    PETITIONER,               )
                              )
v.                            )
                              )
E.M. TROMINSKI, INS DISTRICT  )
    DIRECTOR, and             )
Hon. JANET RENO, U.S. ATTORNEY)
    GENERAL, RESPONDENTS.     )
——————————————————————————————)

POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

Martin Torres-Castillo, by and through the undersigned, files the
instant Points and Authorities, In Support of His Petition for Writ
of Habeas Corpus, asserting claims which have not been addressed
either by the U.S. Court of Appeals for the Fifth Circuit, or by
the Board of Immigration Appeals.

Attached herewith, (and incorporated by reference as Petitioner's
Exhibit E), is a copy of the full pleading filed with the Fifth
Circuit, and served on opposing counsel, arguing, *inter alia,* that
in order to fulfill the requirements of the Suspension Clause, the
Court would have to carry the jurisdictional issue with the merits.

Respectfully Submitted,

*Lisa S. Brodyaga*

Lisa S. Brodyaga
REFUGIO DEL RIO GRANDE
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226
Fed. ID: 1178
Texas State Bar: 03052800

## CERTIFICATE OF SERVICE

I certify that a courtesy copy of the foregoing, with Exhibit E, was personally served on the office of Lisa Putnam, SAUSA, 1709 Zoy St., Harlingen, Texas, on January 17, 2001.

2

FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARTIN TORRES-CASTILLO,          )
    PETITIONER,              )
                             )
v.                               )
                             )
E.M. TROMINSKI, INS DISTRICT     )
    DIRECTOR, and            )
Hon. JANET RENO, U.S. ATTORNEY   )
    GENERAL, RESPONDENTS.    )
——————————————————————————————————)


EXHIBIT "E" IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


MARTIN TORRES-CASTILLO          )
                                )
v.                              )        No. 00-60738
                                )
JANET RENO, UNITED STATES       )
    ATTORNEY GENERAL.           )
_____  )


---

PETITIONER'S MOTION TO CARRY RESPONDENT'S MOTION TO DISMISS
FOR LACK OF JURISDICTION WITH THE MERITS OF THE CASE,

AND, IN THE ALTERNATIVE,
OPPOSITION TO SAID MOTION TO DISMISS,

AND ADVISAL THAT THE PROCEDURAL ISSUES RAISED BY RESPONDENT'S
MOTION RENDER IT A RELATED CASE TO *GUERRERO-VELASQUEZ v. RENO,*
No. 99-60891.

---


Lisa S. Brodyaga
Attorney at Law
REFUGIO DEL RIO GRANDE
17891 Landrum Park Road
San Benito, TX  78586
(956) 421-3226

December 1, 2000

Petitioner Martin Torres-Castillo, ("Mr. Torres"), by and through the undersigned, files the instant opposition to Respondent's motion to dismiss for lack of jurisdiction.   Mr. Torres also requests that this Honorable Court carry said motion with the merits of the case.   Finally, he would advise the Court that the procedural issues raised by Respondent's motion, render it a related case to *Guerrero-Velasquez v. Reno,* No. 99-60891. [1]

## I.  FACTS AND PROCEDURAL HISTORY OF THE CASE AT BAR

Martin Torres-Castillo is a native and citizen of Mexico, who entered the United States as a lawful permanent resident on or about October 25, 1991.   On May 26, 1995, pursuant to his plea of *nolo contendere,* Mr. Torres was placed under community supervision for a period of eight years, without adjudication of guilt, in connection with a charge of sexual assault. *See,* Respondent's Exhibit 2. At that time, such proceedings did not constitute a "conviction" for immigration purposes, and did not render Mr.

---

[1]   In both cases, the issues raised by the merits are co-extensive with the jurisdictional questions. It is Petitioner's assertion that a determination of the merits of the case in the context of a motion to dismiss for lack of jurisdiction, where there is an incomplete record, and no opportunity for hearing factual issues, (e.g., on Mr. Torres' claim that he was innocent of the underlying charges), or to engage in full briefing, is **not** equivalent to the review which could be obtained in habeas corpus. Therefore, both Petitioners argue that this limited form of review does not satisfy *Swain v. Pressley,* 430 U.S. 372 (1977) (substitution of new, collateral remedy for habeas corpus does not violate the Suspension Clause where the remedy is co-extensive with the review which would be provided by habeas corpus, and is not "inadequate or ineffective" to test the legality of the detention); *See also, Max-George v. Reno,* 205 F.3d 194, 200-201 (5th Cir. 2000).

Torres deportable. *See, Martinez-Montoya v. INS,* 904 F.2d 1018 (5th Cir. 1990). Mr. Torres relied on this fact in determining how to proceed in the criminal case. And, as a result, he was not placed under deportation proceedings. *See,* Petitioner's brief to the BIA, (herein incorporated by reference as Petitioner's Exhibit A).

However, on August 6, 1997. INS issued a Notice to Appear, alleging that Mr. Torres had been convicted of said offense, and that he was deportable under 8 U.S.C. §§1227(a)(2)(A)(i) and (iii). He denied the allegations, and contested removability. Nonetheless, the Immigration Judge found that he was deportable, and, on July 29, 1998, summarily ordered him removed from the United States to Mexico. The Judge did not even specify which of the two charges of deportability he had found to be sustained. Although the factual allegations had been denied, and deportability was contested, the Immigration Judge did not hold a "merits hearing." He also issued only an "Order of the Immigration Judge," without an accompanying oral or written decision, as required by 8 C.F.R. §240.12: [2]

§240.12 Decision of the immigration judge.

(a)--Contents. The decision of the immigration judge may

---

[2]   In its motion to dismiss, (hereinafter cited as (INS:__), at page 2, INS characterizes its Exhibit 3 as the "Decision and Order of the Immigration Court." However, said document neither contains the word "decision," nor the required elements thereof. Further, INS' Exhibits 1 and 3, (transcript, at page 71), show that Mr. Torres denied the allegations, and contested removability. Yet the Judge's Order asserts that he determined that Mr. Torres was subject to removal "on the basis of the respondent's admissions."

2

be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. The formal enumeration of findings is not required. The decision shall also contain reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b)--Summary decision. Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to §240.10(b) and the respondent does not make an application under §240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision or, if voluntary departure is granted, a summary decision with an alternate order of removal.

Even assuming that this Order is construed to be a "decision," it is, at best, a "summary decision." However, under subparagraph (b) such a "summary" decision is permissible only where deportability is determined "on the pleadings." This did not occur herein.

A timely appeal followed. On appeal, Mr. Torres raised a number of issues. He argued that the case should be remanded, pursuant to *Matter of A-P-,* Interim Decision 3375 (BIA 1999) ("A summary decision pursuant to 8 C.F.R. § 240.12(b) (1998) may properly be issued by an Immigration Judge in removal proceedings in lieu of an oral or written decision only when the respondent has expressly admitted to both the factual allegations and the charges of removability..."). He also urged that the deferred adjudication proceedings did not constitute a final "conviction" under the new definition of that term, where there had been a plea of *nolo*

CutePDF - www.tsvia.com

*contendere*, in the context of a plea bargain for deferred adjudication, and in reliance on *Martinez-Montoya, supra*. [3]

To avoid "mouse-trapping" unsuspecting immigrants, in *Matter of Soriano*, 21 I&N Dec. 516 (BIA 1996; AG 1997), the Attorney General allowed LPRs who had conceded deportability at a time when §212(c) relief was available to reopen proceedings and contest the charges. For the same reasons, Mr. Torres asserted that it constituted "mouse-trapping," and that it would violate Due Process, to apply the new definition of "conviction" to him, where he had made such important tactical decisions, based precisely on the immigration consequences of those choices. Since it is incumbent upon the BIA

_____

[3]    This Court later held that, under IIRIRA, deferred adjudication does constitute a conviction. *Moosa v. INS*, 171 F.3d 994 (5th Cir. 1999), However, the alien therein had entered his plea *prior to Martinez-Montoya, supra,* when the law was the same as under IIRIRA, so the Court did not reach the question of whether the new definition could be applied where, as here, there had been actual reliance on *Martinez-Montoya. Id.* at 497:

> Next, Moosa asserts that applying the new definition of "conviction" to him presents retroactivity concerns because it increases his liability for past conduct. He asserts that he agreed to the deferred adjudication plea agreement "with an entirely different understanding of the immigration consequences of his plea". This assertion is not borne out by the facts. When Moosa entered into the plea agreement in January 1990, Martinez-Montoya had not been issued and Matter of M (a 1989 decision) was still the law. It was not until July 1990, several months after Moosa pled guilty, that Martinez-Montoya was decided. In short, the current definition of conviction is, in fact, the same as the definition when Moosa pled guilty.

CVisPDF - www.fineprint.com

to seek a manner of interpreting a statute which avoids serious constitutional infirmities, under *Webster v. Reproductive Health Services*, 109 S.Ct. 3040 (1989), he urged that the statute be interpreted as not applying to him.

On September 29, 2000, Board Member Heilman, acting alone, issued a decision purporting to "affirm[], without opinion, the results of the decision below," in accordance with 8 C.F.R. §3.1(a)(7), which provides, in its entirety, as follows:

> (7)--Affirmance without opinion.
>
> (i)--  The Chairman may designate, from time-to-time, permanent Board Members who are authorized, acting alone, to affirm decisions of Immigration Judges and the Service without opinion.  The Chairman may designate certain categories of cases as suitable for review pursuant to this paragraph.
>
> (ii)--  The single Board Member to whom a case is assigned may affirm the decision of the Service or the Immigration Judge, without opinion, if the Board Member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that
> > (A)--  the issue on appeal is squarely controlled by existing Board or federal court precedent and does not involve the application of precedent to a novel fact situation; or
> > (B)--  the factual and legal questions raised on appeal are so insubstantial that three-Member review is not warranted.
>
> (iii)--  If the Board Member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. See 8 CFR 3.1(a)(7)." An order affirming

CVisPDF - www.fsvia.com

without opinion, issued under authority of this provision, shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the Immigration Judge or the Service were harmless or nonmaterial.

(iv)-- If the Board Member determines that the decision is not appropriate for affirmance without opinion, the case will be assigned to a three-Member panel for review and decision. The panel to which the case is assigned also has the authority to determine that a case should be affirmed without opinion.

II.  SUMMARY OF ISSUES PRESENTED BY THE INSTANT PETITION

A.  ISSUANCE OF A DECISION BY A SINGLE BOARD MEMBER, UNDER 8 C.F.R. §3.1(a)(7), DEPRIVED MR. TORRES OF DUE PROCESS, TO HIS SUBSTANTIAL PREJUDICE, AS IT DEPRIVED HIM OF ANY MEANINGFUL OPPORTUNITY TO BE HEARD WITH RESPECT TO THE VERY SUBSTANTIAL QUESTIONS RAISED HEREIN.

   1.  SUMMARILY AFFIRMING THE "RESULT" OF THE IMMIGRATION JUDGE'S ORDER, WITHOUT CONSIDERING THE NOVEL ISSUES RAISED ON APPEAL, IS A DENIAL OF MR. TORRES' DUE PROCESS RIGHT TO BE HEARD.

   2.  UNDER THIS COURT'S PRECEDENT, MR. TORRES HAS ALSO SHOWN SUBSTANTIAL PREJUDICE

B.  BECAUSE THIS COURT SHOULD NOT ASCRIBE TO CONGRESS AN INTENT TO "MOUSE-TRAP" AN LPR WHO WAS INNOCENT OF ANY CRIMINAL CONDUCT, BUT WHO, IN RELIANCE ON THIS COURT'S PRECEDENT IN *MARTINEZ-MONTOYA v. INS,* AND IN ORDER TO AVOID IMMIGRATION PROBLEMS, ACCEPTED A PLEA BARGAIN INVOLVING DEFERRED ADJUDICATION, AND ENTERED A PLEA OF NOLO CONTENDERE, THE COURT SHOULD FIND THAT, UNDER *MOOSA v. INS,* THERE HAS BEEN NO "CONVICTION" FOR PURPOSES OF 8 U.S.C. §1101(a)(48)(A).

C.  AN ALTERNATIVE CONSTRUCTION WOULD RENDER 8 U.S.C. §§1101(a)(48)(A) AND 1227(a)(2)(A)(iii) VOID FOR VAGUENESS.

6

## III.   SUMMARY OF ARGUMENTS TO BE MADE ON FULL BRIEFING

**A.   ISSUANCE OF A DECISION BY A SINGLE BOARD MEMBER, UNDER 8 C.F.R. §3.1(a)(7), DEPRIVED MR. TORRES OF DUE PROCESS, TO HIS SUBSTANTIAL PREJUDICE, AS IT DEPRIVED HIM OF ANY MEANINGFUL OPPORTUNITY TO BE HEARD WITH RESPECT TO THE VERY SUBSTANTIAL QUESTIONS RAISED HEREIN.**

> **1.   SUMMARILY AFFIRMING THE "RESULT" OF THE IMMIGRATION JUDGE'S ORDER, WITHOUT CONSIDERING THE NOVEL ISSUES RAISED ON APPEAL, IS A DENIAL OF MR. TORRES' DUE PROCESS RIGHT TO BE HEARD.**

Mr. Torres first urges that, as applied to him, the One-Board-Member procedure of 8 C.F.R. §3.1(a)(7) is unconstitutional.  He has no means of knowing the "categories of cases [designated by the Chairman] as suitable for review pursuant to this paragraph."  Nor can he challenge, therefore, whether his case falls within one of these categories.   And even under the criteria set forth in §3.1(a)(7), the single Board Member erred in purporting to affirm the non-existent decision of the Immigration Judge.   As shown above, the issues on appeal are **not** "squarely controlled by existing Board or federal court precedent," and **do** "involve the application of precedent to a novel fact situation."   Nor were the issues raised "insubstantial," as required for summary affirmance.

Furthermore, the Decision of Board Member Heilman makes no sense. It purports to affirm "the results of the decision below." However, there was no "decision" below, only an "order."  In fact, this was one of Mr. Torres' complaints to the BIA.   It is well

7

established that, while "[t]he BIA need not write an exegesis on every contention.... its opinion must reflect that it has heard and thought and not merely reacted." *Opie v. INS*, 66 F.3d 737, 740 (5th Cir. 1995), quoting *Ghassan v. INS*, 972 F.2d 631, 636 (5th Cir.1992), cert. denied, 507 U.S. 971 (1993).

The opinion herein falls far short of this requirement. This is a violation of Due Process, the essence of which is notice and an opportunity to be heard. Where significant legal issues have been raised, virtually by definition, by invoking 8 C.F.R. §3.1(a)(7) the Board all but conclusively demonstrates that it has "merely reacted," and has NOT "heard and thought" about the arguments and claims before it. To the contrary, these claims were considered to be "so insubstantial" that three-Member review was not warranted. This is a clear denial of the opportunity to be heard.

## 2.   UNDER THIS COURT'S PRECEDENT, MR. TORRES HAS ALSO SHOWN SUBSTANTIAL PREJUDICE

Moreover, under these circumstances, "substantial prejudice" is also established. *Chike v. INS,* 948 F.2d 961, 962 (5th Cir. 1991):

> By showing that he was denied the opportunity to be heard before the Board of Immigration Appeal, Petitioner has shown substantial prejudice.   This defect " 'impinged upon the fundamental fairness of the hearing in violation of the fifth amendment.' " Ramirez-Durazo v. INS, 794 F.2d 491, 500 (9th Cir.1986) (quoting Magallanes-Damian v. INS, 783 F.2d 931, 933 (9th Cir.1986))

8

Alternatively, Mr. Torres urges that he has demonstrated prejudice on the grounds that, contrary to the implicit conclusion of the single Board Member who decided the case, had the case reached a full panel, or the Attorney General, it might well have been held that, as in *Matter of Soriano, supra,* to avoid "mouse-trapping," the proceedings herein did not constitute a "conviction."

**B. BECAUSE THIS COURT SHOULD NOT ASCRIBE TO CONGRESS AN INTENT TO "MOUSETRAP" AN LPR WHO WAS INNOCENT OF ANY CRIMINAL CONDUCT, BUT WHO, IN RELIANCE ON THIS COURT'S PRECEDENT *IN MARTINEZ-MONTOYA v. INS,* AND IN ORDER TO AVOID IMMIGRATION PROBLEMS, ACCEPTED A PLEA BARGAIN INVOLVING DEFERRED ADJUDICATION, AND ENTERED A PLEA OF NOLO CONTENDERE, THE COURT SHOULD FIND THAT, UNDER *MOOSA v. INS,* THERE HAS BEEN NO "CONVICTION" FOR PURPOSES OF 8 U.S.C. §1101(a)(48)(A).**

It is true that Congress can retroactively make specific criminal conduct grounds for deportation, *Moosa v. INS, supra.* However, this power is limited by the Constitutional requirement that there be separate justification for such retroactivity, absent which, retroactivity violates Due Process. *Pension Benefit Guaranty Corp. v. Gray,* 467 U.S. 717, 729-30 (1984) (internal citations omitted):

> [R]etroactive legislation does have to meet a burden not faced by legislation that has only future effects. "It does not follow ... that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." ... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

9

No such separate justification exists herein. There is no "rational legislative purpose" fulfilled by "mouse-trapping" an innocent man into accepting a plea bargain which neither involves an admission of guilt, nor a "conviction," (either for State or immigration purposes), and, therefore which carries no immigration consequences, and then retroactively changing the rules of the game, such that he is later considered to have been "convicted" for immigration purposes. This is particularly true where the consequences of the new rules are so harsh, as they subject him to mandatory deportation, with no possibility of relief, or any hope of lawfully returning to the United States at a later date.

Because the reliance occurred, and the trap was set, at the guilt or innocence stage of the criminal proceedings, ascribing such an intent to Congress would be worse, even, than in the cases where various Courts have refused to accept that Congress would "mouse-trap" immigrants into conceding deportability with the hope of obtaining §212(c) relief, only to withdraw such relief. *See, for example, Tasios v. Reno,* 204 F.3d 544,551 (4th Cir. 2000); *LaGuerre v. Reno,* 164 F.3d 1035,1041 (7th Cir. 1998).

For these reasons, Mr. Torres asserts that Congress did not *intend* for the new definition of "conviction" to include persons such as he. Here, Mr. Torres never even tendered a plea of guilty. This is a case of a person who has consistently claimed innocence, who,

10

when faced with serious, but unfounded charges, (quite reasonably) decided that it was in his best interest to accept a plea bargain involving deferred adjudication, precisely in order to avoid any potential immigration problems, and who now finds himself in a situation where he is not only subject to removal as a result thereof, but has no possibility of relief, or of ever returning lawfully to the United States.  There could be no clearer violation of both procedural, and substantive, Due Process. [4]  Consequently, the statute should be read, as in *LaGuerre, supra,* to avoid this result.  *See also, Webster v. Reproductive Health Services, supra.*

### C.  AN ALTERNATIVE CONSTRUCTION WOULD RENDER 8 U.S.C. §§1101(a)(48)(A) AND 1227(a)(2)(A)(iii) VOID FOR VAGUENESS.

In the alternative, Mr. Torres urges that, as applied herein, 8 U.S.C. §§1101(a)(48)(A) and 1227(a)(2)(A)(iii) would also be void for vagueness, under *Jordan v. DeGeorge,* 341 U.S. 223, 230-31 (1951) (internal citations omitted) (emphasis added):

> The essential purpose of the 'void for vagueness' doctrine is to warn individuals of the criminal

---

[4]  It would violate Substantive Due Process as a result of the interference with familial relationships caused by deportation. *See, Landon v. Plasencia,* 459 U.S. 21,34 (1982):

> Further, she may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual.  See, e.g., Moore v. City of East Cleveland, 431 U.S. 494, 499, 503-504, 97 S.Ct. 1932, 1935, 1937-1938, 52 L.Ed.2d 531 (1977) (plurality opinion); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972).

11

> consequences of their conduct. ...  This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law.... *It should be emphasized that this statute does not declare certain conduct to be criminal. Its function is to apprise aliens of the consequences which follow after conviction and sentence of the requisite two crimes.*
>
> Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case. We do this in view of the grave nature of deportation.  The Court has stated that 'deportation is a drastic measure and at times the equivalent of banishment or exile * * *. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty.' ...  We shall, therefore, test this statute under the established criteria of the 'void for vagueness' doctrine.

If a given statute, the function of which is to "apprise aliens of the consequences which follow after conviction," can be void for vagueness, and therefore violate Due Process, a statute which purports to retroactively turn a given procedure into a "conviction," when the person had relied on the fact that it was not, at that time, so characterized, is even worse.

## III.  REQUEST THAT RESPONDENT'S MOTION BE CARRIED WITH THE MERITS

These are serious issues, and should not be decided in the summary context of a motion to dismiss for lack of jurisdiction. Therefore, Petitioner urges that Respondent's motion to dismiss for lack of jurisdiction be carried with the merits of the case.

12

## A. WHERE JURISDICTION IS CLOSELY INTERTWINED WITH THE MERITS OF THE CASE, THIS COURT HAS HELD THAT PREMATURE DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION WOULD BE INAPPROPRIATE.

Particularly where, as here, jurisdiction is closely intertwined with the merits of a case, this Court commonly carries motions to dismiss for lack of jurisdiction with the merits of the case. *See, for example, Christo v. Padgett,* 223 F.3d 1324, 1328,n.2 (5th Cir. 2000) ("Carried with this appeal was Padgett's motion to dismiss the appeal for want of jurisdiction..."); *Lerma de Garcia v. INS,* 141 F.3d 215 (5th Cir. 1998) (where INS' motion to dismiss for lack of jurisdiction was also carried with the merits); *Nguyen v. INS,* 208 F.3d 528,531 (5th Cir. 2000) ("The INS has filed a motion to dismiss this appeal for lack of jurisdiction, and this court ruled that the motion should be carried with the case."). *See also, Brown v. Slenker,* 220 F.3d 411 (5th Cir. 2000) (Whether Louisiana Commissioner of Insurance proved facts necessary to establish jurisdiction over Virginia attorney who allegedly agreed to represent Commissioner in certain cases was for jury; jurisdictional issues were intertwined with merits and should have been reserved until hearing on the merits); *Sciambra v. Graham News Co.,* 841 F.2d 651,656 (5th Cir. 1988) ("[I]t is a 'well-established principle in this Circuit that premature dismissals ... for lack of subject matter jurisdiction are not favored 'where the factual and jurisdictional issues are completely intermeshed....' ' Chatham

13

Condominium Ass'ns, supra, 597 F.2d at 1011 (quoting McBeath v. Inter-American Citizens for Decency Committee, 374 F.2d 359, 363 (5th Cir.), cert. denied, 389 U.S. 896 (1967))").

Here, the jurisdictional issues are not only "completely intermeshed," they are virtually co-extensive, with the merits. And, they are complex issues, which are of first impression in this judicial circuit. Petitioner had barely a week in which to prepare his response to INS' motion to dismiss; not nearly enough to adequately brief such novel and complex questions.

> **B. DISMISSAL ON MOTION FOR LACK OF JURISDICTION WOULD ALSO BE INAPPROPRIATE WHERE THIS COURT HAS UNDERTAKEN ORIGINAL JURISDICTION, EVEN WHERE THERE ARE CLEAR STATUTORY BARS TO JUDICIAL REVIEW, AS A SUBSTITUTE FOR CONSTITUTIONALLY MANDATED HABEAS CORPUS REVIEW.**

It must also be remembered that this Court has undertaken the equivalent of habeas corpus review of disputed orders of removal. It is hornbook law that, when challenging orders of deportation, all non-citizens, and particularly, lawful permanent residents, may invoke the protection of the Suspension Clause, and, absent an equivalent alternative, may seek redress in Habeas Corpus. *See, Heikkila v. Barber,* 345 U.S. 229, 235 (1953) ("Now, as before, [an alien] may attack a deportation order only by habeas corpus").

In *Requena-Rodriguez v. Pasquarell,* 190 F.3d 299 (5th Cir. 1999),

14

this Court held that, at least in transitional cases, habeas corpus jurisdiction under 28 U.S.C. §2241 survived the 1996 amendments of IIRIRA to the Immigration Act.   In so doing, the Court relied upon Supreme Court case law from a prior epoch, such as discussed in *Heikkila v. Barber, supra*, when Congress had attempted to immunize deportation orders from judicial scrutiny to the fullest extent permitted by the Constitution. *Id.*, at 306:

> Thus, this court joins the majority of other circuits and holds that § 2241 habeas jurisdiction remains in transitional cases where § 1252(g) does not apply. [5] This jurisdiction is broad enough to encompass Requena's retroactivity claim and his equal protection claim--both of which would have been cognizable even at the lowest pre-IIRIRA ebb of immigration habeas jurisdiction. *See, United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77, 77 S.Ct. 618, 621, 1 L.Ed.2d 652 (1957); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 74 S.Ct. 499, 502, 98 L.Ed. 681 (1954).

If the deferred adjudication proceedings at issue herein were properly characterized as a "conviction," statutory review of the instant order would be barred by 8 U.S.C. §1252(a)(2)(C).   Further, in *Max-George v. Reno, supra*, at 198, this Court held that the "notwithstanding any other provision of law" language of IIRIRA was sufficiently specific to conclude that Congress intended to repeal habeas corpus jurisdiction for aliens convicted of certain offenses.   Under such circumstances, the substitute review this Court has undertaken to conduct must be at least as thorough as

---

[5]    There is no contention herein that §1252(g) applies.

15

that which would have been provided in a habeas action. *Swain v. Pressley,* 430 U.S. 372 (1977) (substitution of new, collateral remedy for habeas corpus does not violate the Suspension Clause where the remedy is co-extensive with the review which would be provided by habeas corpus, and is not "inadequate or ineffective" to test the legality of the detention.).

*See also, Zadvydas v. Underdown*, 185 F.3d 279,285-86 (5th Cir. 1999); *Boz v. U.S.,* 228 F.3d 1290,1293 (11th Cir. 2000); *Pack v. Yusuff,* 218 F.3d 448,453 (5th Cir. 2000) ("Other circuits have indicated that a defendant may invoke the "savings clause" exception only when the Constitution demands it, or where otherwise Congress would violate the Suspension Clause by imposing a conviction or sentence without allowing for section 2241 relief"); *Molo v. Johnson,* 207 F.3d 773,775 (5th Cir. 2000) ("The 1-year limitations period of the AEDPA does not violate the Suspension Clause unless it 'renders the habeas remedy 'inadequate or ineffective' to test the legality of detention.'").

It is respectfully submitted that a procedure whereby a petitioner is given just a few days to respond to a motion to dismiss, and where the motion is to be decided on an incomplete record, with no opportunity for an evidentiary hearing on pertinent factual questions, and the Court is not required to give any reason or explanation for granting such a motion, is not equivalent to the

review which would be conducted in a habeas proceeding, and would be "inadequate or ineffective" within the meaning of *Swain* and its progeny, to test the legality of Mr. Guerrero's detention.

**IV. IN THE ALTERNATIVE, RESPONDENT'S MOTION SHOULD BE DENIED.**

In the alternative, for the above-stated reasons, Respondent's motion should be denied outright.

WHEREFORE, it is respectfully urged that Respondent's motion to dismiss for lack of jurisdiction be carried with the merits of the instant case; and

IN THE ALTERNATIVE, it is urged that said motion be denied.

Respectfully Submitted,

Lisa S. Brodyaga
REFUGIO DEL RIO GRANDE
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226

CERTIFICATE OF SERVICE

I certify that, on December 1, 2000, a copy of the foregoing, with Exhibit A, was sent Airborne Express, No. 3003 337 6612, for delivery on Monday, December 4, 2000, to Kurt Larson, Attorney, OIL, USDOJ, 1331 Pennsylvania Ave., N.W., Washington, D.C. 20044.

17

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


MARTIN TORRES-CASTILLO              )
                                   )
v.                                 )        No. 00-60738
                                   )
JANET RENO, UNITED STATES          )
     ATTORNEY GENERAL.             )
_____)


EXHIBIT "A" IN SUPPORT OF

PETITIONER'S MOTION TO CARRY RESPONDENT'S MOTION TO DISMISS
FOR LACK OF JURISDICTION WITH THE MERITS OF THE CASE,

AND, IN THE ALTERNATIVE,
OPPOSITION TO SAID MOTION TO DISMISS,

AND ADVISAL THAT THE PROCEDURAL ISSUES RAISED BY RESPONDENT'S
MOTION RENDER IT A RELATED CASE TO *GUERRERO-VELASQUEZ v. RENO*,
No. 99-60891.

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BEFORE THE BOARD OF IMMIGRATION APPEALS


In re

MARTIN TORRES-CASTILLO
A42 919 172


RESPONDENT'S BRIEF ON APPEAL

Comes Respondent, by and through the undersigned, and files the
instant brief, in support of his appeal from the order of the
Immigration Judge, issued on July 29, 1998, [1] finding that he had
been convicted of sexual assault, and that he was therefore
deportable under both §§237(a)(2)(A)(i) (crime involving moral
turpitude) and 237(a)(2)(A)(iii) (aggravated felony) of the Act.


I.   THE FACTS

Martin Torres-Castillo, (hereinafter, "Mr. Torres"), is a native
and citizen of Mexico, who entered the United States as a lawful
permanent resident on or about October 25, 1991.  On May 26, 1995,
pursuant to his plea of *nolo contendere*, Mr. Torres was placed
under community supervision for a period of eight years, without
adjudication of guilt, in connection with a charge of sexual
assault.  Exhibit 2.  At that time, such proceedings did not
constitute a "conviction" for immigration purposes, and did not
render Mr. Torres deportable, and Mr. Torres relied on this fact in
determining how to proceed in the criminal case.  *See, Martinez-
Montoya v. INS*, 904 F.2d 1018 (5th Cir. 1990).

_____

[1]   Although Mr. Torres denied the allegations, and contested
deportability, (T:72) (April 27, 1998), no oral or written decision
was issued.  *See,* 8 C.F.R. § 240.50(a); *Matter of A-P-*, I.D. 3375
(BIA 1999).

CMSPDF - www.faxles.com

However, due to a change in the law, on or about August 6, 1997. INS issued a Notice to Appear, alleging that said proceedings constituted a conviction. Mr. Torres denied the allegations, and contested removability. (T:72) (April 27, 1998). Nonetheless, the Immigration Judge determined that he was deportable as charged, and, on July 29, 1998 ordered Mr. Torres removed from the United States to Mexico. (T:73)(July 29, 1998). A timely appeal followed.

## II.   ISSUES PRESENTED

A.   IN LIGHT OF THE FACT THAT THE IMMIGRATION JUDGE NEGLECTED TO ISSUE EITHER A WRITTEN OR ORAL DECISION, AS IS REQUIRED BY 8 C.F.R. §240.50(a), THE CASE SHOULD BE REMANDED PURSUANT TO *MATTER OF A-P-*, INTERIM DECISION 3375 (BIA 1999), FOR THAT PURPOSE.

B.   IN THE ALTERNATIVE, MR. TORRES WOULD PRESERVE HIS CLAIM THAT *MATTER OF PUNU*, I.D. 3364 (BIA 1999) IS INCORRECTLY DECIDED.

C.   IN THE FURTHER ALTERNATIVE, IT WOULD CONTRAVENE THE INTENT OF CONGRESS, AND VIOLATE DUE PROCESS TO APPLY THE NEW DEFINITION OF "CONVICTION," AND *MATTER OF PUNU*, TO CASES WHERE, PRIOR TO THE CHANGE IN THE LAW, AND IN RELIANCE ON *MARTINEZ-MONTOYA, SUPRA,* THE RESPONDENT MADE THE TACTICAL DECISION TO ACCEPT DEFERRED ADJUDICATION, AND NOT SUBJECT HIMSELF TO THE POSSIBILITY OF DEPORTATION, RATHER THAN FIGHT THE CHARGES, AND RISK BOTH GOING TO JAIL, AND SUBJECTING HIMSELF TO POSSIBLE DEPORTATION.

## III.   ARGUMENT

A.   IN LIGHT OF THE FACT THAT THE IMMIGRATION JUDGE NEGLECTED TO ISSUE EITHER A WRITTEN OR ORAL DECISION, AS IS REQUIRED BY 8 C.F.R. §240.50(a), THE CASE SHOULD BE REMANDED PURSUANT TO *MATTER OF A-P-*, INTERIM DECISION 3375 (BIA 1999), FOR THAT PURPOSE.

Mr. Torres first argues that the case should be remanded to the Immigration Judge, for the issuance of a proper decision, pursuant to *Matter of A-P-, supra.* In the case at bar, there was no decision, oral or written, or even the type of summary decision

2

presented in *A-P-*.  The case should therefore be remanded for the issuance of a decision which conforms thereto.

B.    IN THE ALTERNATIVE, MR. TORRES WOULD PRESERVE HIS CLAIM THAT *MATTER OF PUNU*, I.D. 3364 (BIA 1999) IS INCORRECTLY DECIDED.

Subsequent to the Judge's order herein, the Board issued *Matter of Punu*, I.D. 3364 (BIA 1998), holding that deferred adjudication proceedings constitute a final "conviction" under the new definition of that term.  Mr. Torres considers that this decision is in error, and would preserve his right to challenge it in judicial proceedings, if necessary.

Furthermore, and for the same reasons that, in *Matter of Soriano*, I.D. 3289 (BIA 1996; AG 1997), the Attorney General has allowed those who conceded deportability on the basis of prior law to reopen proceedings and contest the charges, Mr. Torres asserts that it would violate Due Process to apply the new definition of "conviction" to his case, where he made important tactical decisions based on the immigration consequences of these choices.

It is therefore incumbent upon the Board to seek a manner of interpreting the statute which avoids these constitutional infirmities, to wit, by applying the new definition only to cases wherein the "conviction" occurred prior to the enactment of IIRIRA. *Webster v. Reproductive Health Services*, 109 S.Ct. 3040 (1989) (where fairly possible, statutes must be interpreted to avoid constitutional problems),  For the reasons explained below, Mr. Torres asserts that this is a viable alternative.

C.  IN THE FURTHER ALTERNATIVE, IT WOULD CONTRAVENE THE INTENT OF CONGRESS, AND VIOLATE DUE PROCESS, TO APPLY THE NEW DEFINITION OF "CONVICTION," AND *MATTER OF PUNU*, *SUPRA*, TO CASES WHERE, PRIOR TO THE CHANGE IN THE LAW, AND IN RELIANCE ON *MARTINEZ-MONTOYA*, *SUPRA*, THE RESPONDENT MADE THE TACTICAL DECISION TO ACCEPT DEFERRED

3

ADJUDICATION, AND NOT SUBJECT HIMSELF TO THE POSSIBILITY OF
DEPORTATION, RATHER THAN FIGHT THE CHARGES, AND RISK BOTH GOING TO
JAIL, AND BEING DEPORTED.

Mr. Torres also would assert that would contravene the intent of
Congress, and violate Due Process, to apply the new definition of
"conviction" retroactively, to proceedings which predated its
enactment, and did not, at that time, result in a "conviction."

At the time of the criminal proceedings, Mr. Torres faced a choice.
He could accept the State's offer of deferred adjudication, and
place himself under community supervision for a period of eight
years, or he could go to trial.  Under the former, he would face no
immigration consequences, *Martinez-Montoya v. INS, supra*, but would
have to accept the limitations, and costs, associated with
community supervision.  The latter choice would subject him to the
vagaries of trial.  If he won his case, he would face no
consequences, either from Immigration, or the criminal justice
system.  But if he lost the case, the consequences from both could
be disastrous.  He could both go to jail, and lose his residency.

Faced with such a choice, he quite reasonably opted for the former
alternative.  Consistent with the fact that he did not consider
himself guilty of the offense charged, the Court accepted his plea
of *nolo contendere*, and placed him under community supervision.  He
is now being told that the consequences of his decision have been
retroactively changed, and that he is now not only deportable, but
ineligible for any form of relief, as a result thereof.  It is
respectfully submitted that this violates the most fundamental
principles of due process.  *See generally,* Nancy Morawetz,
*"Rethinking Retroactive Deportation Laws and the Due Process
Clause,"* N.Y.U. Law Review, April 1998, pp. 97-161.

As noted above, Mr. Torres would argue that the new definition does

4

not, by its terms, apply to him.  The amended definition, added by
§322 of the Illegal Immigration Reform and Immigrant Responsibility
Act of 1996, ("IIRIRA"), has the following effective date:

> (c)   EFFECTIVE DATE. - The amendments made by
> subsection (a) shall apply to convictions and sentences
> entered before, on, or after the date of the enactment of
> this Act. ...

It is undisputed that, prior to IIRIRA, the instant proceedings did
not constitute a "conviction."  Therefore, these proceedings were
not a "conviction[] ... entered before ... the date of enactment of
this Act."  Had Congress intended that the new definition apply to
proceedings such as those at bar, which occurred prior to the new
definition, then the effective date would have had to read as
follows (emphasis added):

> (c)   EFFECTIVE DATE. - The amendments made by
> subsection (a) shall apply to convictions and sentences,
> *and to proceedings which would be considered convictions
> or sentences under subsection (a)*, entered before, on, or
> after the date of the enactment of this Act.

It would constitute "bootstrapping" to apply the new definition to
something which was *not* a conviction, before the enactment of
IIRIRA.  It would also violate the principle that ambiguities in
deportation statutes must be construed in favor of the alien.  *INS
v. Cardoza-Fonseca,* 480 U.S. 421 (1987), as well as that of
interpreting statutes to avoid constitutional difficulties. *Webster
v. Reproductive Health Services, supra.*

Furthermore, such an interpretation would violate the principles of
*Landgraf v. USI Films*, 114 S.Ct. 1483 (1994), since there is no
clear directive from Congress, let alone a specific justification
for making §322(a) retroactive. *Id.  See also, Lindh v. Murphy*, 117
S.Ct. 2059 (1997); *Hughes Aircraft Co. U.S. ex rel Schumer*, 117

S.Ct. 1871 (1997).

*Landgraf v. USI Film Products, supra*, delineated the approach to be taken in determining the temporal effect of any new legislation. [2] First, courts review the provision to determine whether there are any constitutional bars to retroactive implementation. Second, they ascertain whether the statute itself manifests express congressional design favoring retroactivity. Finally, where courts can divine no explicit prohibition or design, they must determine the time that the legislation comes into effect, keeping in mind that the default rule is against retroactive application. With IIRIRA §322(a), Congress expressed no clear intent favoring retroactivity, and constitutional bars may well exist.

### 1. CONSTITUTIONAL BARRIERS TO RETROACTIVITY

The Constitution is infused with the common-law aversion to retroactivity. As held in *Landgraf, supra*, 114 S.Ct. 1497 (citations and footnotes omitted) (emphasis added):

> It is ... not surprising that the antiretroactivity principle finds expression in several provisions of our Constitution. The Ex Post Fact Clause flatly prohibits retroactive application of penal legislation. Article I, § 10, cl. 1 prohibits States from passing another type of retroactive legislation, laws "impairing the Obligation of Contracts." The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a "public use" and upon payment of "just compensation." The prohibitions on "Bills of Attainder" in Art. §§ 9-10 prohibit legislation from singling out disfavored persons and meeting out summary punishment for past conduct... The Due Process Clause also protects the interest in fair notice and repose that may be

---

[2]   The undersigned acknowledges that this section is taken, almost verbatim, if slightly condensed, from the opinion of Judge Weinstein in *Mojica v. Reno*, 970 F.Supp. 130 (E.D.N.Y. 1997).

> compromised by retroactive legislation; a justification
> sufficient to validate a state's prospective application
> under the Clause "may not suffice" to warrant its
> retroactive application.

Of all the constitutional arguments that might be made against

retroactive application of IIRIRA §322(a), the Due Process argument

is the strongest, and is the one relied upon herein.

The heart of the Due Process requirement for retroactive

legislation is "conditioned upon a rationality requirement beyond

that applied to other legislation." *Bowen v. Georgetown Univ.*

*Hospital*, 488 U.S. 204, 223 (1988) (Scalia, J., concurring). Like

any aspect of legislation, retroactive characteristics must meet

the basic Due Process requirement of being "supported by a

legitimate legislative purpose furthered by a rational means."

*Pension Benefit Guaranty Corp v. R.A. Gray & Co.*, 467 U.S. 717, 729

(1984). With retroactive legislation, there must be an independent

rationale for retroactivity. *See id*, 467 U.S. at 730. A purpose

that supports a law's prospective characteristics is not

sufficient, in itself, to support retroactivity. *Id*.

In the present case, Congress offered no purpose for retroactivity

itself, and no such purpose is apparent. The Supreme Court's

recognition of the need to separately evaluate the rationality of

retroactivity post-dates older cases upholding retroactive

deportation laws. Even those older deportation cases identified a

congressional purpose in the retroactivity itself.  For example, in
*Harisiades v. Shaugnessy*, 342 U.S. 580 (1951), and *Galvan v. Press*,
347 U.S. 522 (1952), the Court identified congressional security
interests in the deportation of past and current members of the
Communist Party.  As explained in *Harisiades*, 342 U.S. at 593, the
Party's action to "drop aliens from membership, at least in form,
in order to immunize them from the consequences of their party
membership" made the distinction between past and present
membership meaningless and required a statute that looked to past
membership.  The statute considered in *Marcello v. Bonds*, 349 U.S.
302 (1955) and *Lehmann v. U.S.*, 77 S.Ct. 1022 (1957), was also
plainly intended to be retroactive.  The Court's decisions,
however, did not address the question of whether this clearly
stated congressional policy satisfied Due Process requirements, but
referred only to Ex Post Facto objections.  In the case at bar, the
Board would be left to guess what purpose could possibly be served
by applying IIRIRA §322(a) retroactively.  With no guidance from
Congress, it is tempting to analogize to discover possible
purposes.  Such an exercise in hypotheticals is generally not
permissible.  *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,*
*supra,* 104 S.Ct. At 2718.  In any event, the prospective scheme
created by IIRIRA bears little relationship to the way the law
would work if applied retroactively.

First, as applied prospectively, IIRIRA §322(a) serves to provide

8

notice of the severe and certain deportation consequences that will flow from the commission of certain crimes enumerated, and may well have a deterrent effect.  By contrast, when applied retroactively to offenses that were previously treated leniently, both by INS and the criminal justice system, the statute only serves to upset and frustrate settled expectations.

Retroactive application would create a situation in which people who have lived in the community, have established themselves as valuable members of society, and who are needed to support their families, are summarily deported without regard to the present and future interests of their families of the community at large.

The arbitrariness of retroactive application is illustrated by the fact that it tends to target not only those whose offenses were previously not grounds for deportation, but also those whom the INS once decided not to place in deportation proceedings, frequently because they were considered excellent candidates for waivers, while those who were promptly detained and charged may long since have had their day in court, and, if worthy, been forgiven their transgressions.

The irrationality of such a construction is further evidenced by the fact that the BIA is required under this construction to order the deportation of aliens in proceedings where the Immigration Judge has already weighed the evidence and concluded that it is in

9

the best interest of the country for the immigrant to remain.    In some cases, deportation might even result where the Board has granted §212(c) relief, but INS certified the case to the Attorney General.    These are cases where the offense was minor, the person has shown rehabilitation, and there are dependent family members.

### 2.    MANIFEST CONGRESSIONAL DESIGN

Without manifest congressional design expressed in clear statutory language, the default rule in statutory interpretation requires prospective implementation.    *Landgraf, supra* 114 S.Ct. at 1501. See also, *Lindh v. Murphy, supra,* 117 S.Ct. at 2062, *Hughes Aircraft v. U.S. ex rel Schumer, supra*, 117 S.Ct. at 1876.

Where it agrees upon and purposely enacts provisions meant to have retroactive effect, Congress has no trouble finding the words to do so.    The following is a listing of the AEDPA Title IV provisions which Congress elected to apply to pre-Act conduct or events: §401(f); §413(g); §421(b); §435(b); §440(f) and §441(b).    These provisions, not involved herein, show that where Congress chose to deviate from the principle of prospectivity, it singled out a specific situation where it wanted to change the legal consequences of pre-Act events and specified the degree of retroactivity.    In contrast to these various formulations for retroactive application, by implication Congress intended §322(a) to be prospective only. *See, Lindh v. Murphy, supra* at 2065 (Negative implications raised

10

by disparate provisions are strongest when portions of statute treated differently had been joined together and were being considered simultaneously when language raising implication was inserted). In this sense, the situation with §322(a) is no different than one described by the Supreme Court over twenty-five years ago: "Obviously ... when Congress wished to provide [for retroactive application], it knew how to do so expressly." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1970).

## 3. APPLYING THE DEFAULT RULE AGAINST RETROACTIVITY

As the *Landgraf* Court explained, 114 S.Ct. at 1499 (citations and internal quotation marks omitted):

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment... Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extend of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will likely leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound instincts ... and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

The *Landgraf* Court's reasoning supporting the presumption against retroactivity sheds further light on how courts are to fulfill

11

their role in resolving "disagreement in hard cases" of statutory
interpretation.  *Id* at 1497:

> The legislature's unmatched powers allow it to sweep away
> settled expectations suddenly and without individualized
> consideration.  Its responsivity to political pressures
> poses a risk that it may be tempted to use retroactive
> legislation as a means of retribution against unpopular
> groups or individuals.

Courts determining the potential retroactive effect of new
legislation must review the totality of the circumstances with a
solid sense of traditional American notions of fairness and
justice.  Id. (citations and internal quotation marks omitted):

> Elementary considerations of fairness dictate that
> individuals should have an opportunity to know what the
> law is and to conform their conduct accordingly; settled
> expectations should not be lightly disrupted ... In a
> free, dynamic society ... a rule of law that gives people
> confidence about the legal consequences of their actions
> is a fundamental engine driving the engine of society

A court must have an eye toward the particularly harsh consequences
for "unpopular groups or individuals" unlucky enough to be the
targets of fleeting politically motivated passionate outbursts.
There are few groups so routinely ostracized and so voiceless in
our democracy as non-enfranchised, non-citizen immigrants, even
though they form a vibrant and integral part of American society.

The government's argument can be reduced to a syllogism: the
*Landgraf* presumption applies only when there is retroactivity;

12

deportation for past conduct is never retroactive, therefore the *Landgraf* presumption is irrelevant. Whether deportation statutes can be removed from *Landgraf* analysis through this syllogism requires review of *Landgraf* and the constitutional and statutory interpretation doctrine in which it is rooted. *Landgraf* reaffirmed some 200 years of precedent that recognizes that retroactive laws are presumptively unjust. *Id*, 114 S.Ct. at 1499-1500; *U.S. v. Heth*, 7 U.S. (3 Cranch) 413, 2 L.Ed. 479 (1806). The *Landgraf* Court stated, 114 S.Ct. at 1500: "Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations."

Although *Landgraf* is about statutory interpretation, it expressly refers to the Supreme Court's constitutional jurisprudence to inform its discussion of the statutory presumption against retroactivity and unfair retroactive effects. The Court had occasion to revisit this constitutional backdrop this term in *Lynce v. Mathis*, 117 S.Ct. 891 (1997); see also, *Lindh v. Murphy*, *supra*, (habeas corpus changes not applicable to pending cases). Quoting *Landgraf*, the Court explained in *Lynce*, 117 S.Ct. at 895, that the presumption against retroactivity "is deeply rooted in our jurisprudence and embodies a legal doctrine centuries older than the Republic." *Lynce* proceeded to explain, *Id.*, that:

13

> in both the civil and criminal contexts, the Constitution
> places limits on the sovereign's ability to use its law-
> making power to modify bargains it has made with its
> subjects.  The basic principle is one that protects not
> just the rich and the powerful, but also the indigent
> defendant engaged in negotiations that may lead to an
> acknowledgment of guilt and a suitable punishment.

The longstanding case law on what makes a criminal statute retroactive provides helpful analogies.  Any change from a discretionary system to a system of mandatory penalties for prior crimes is retroactive.  This is because the individual is deprived of the ability to bring equitable circumstances to bear on her case.  *See, Warden, Lewisburg Penitentiary v. Marrero*, 94 S. Ct. 2432, 2538 (1974) (statute taking away parole eligibility for offenses subject to parole according to the law at the time they were committed could be found constitutionally impermissible as an ex post facto law); *Lindsay v. Washington*, 57 S.Ct. 797 (1937) (statute changing maximum sentence to mandatory sentence for offense committed prior to enactment is impermissible ex post facto law).  Retroactivity depends on when the crime is committed, and not on any later date.  In a system of law people have a right to know the possible consequences of their actions and to know that these consequences will not lightly be changed.

Even if retroactivity is measured from the conviction rather than the commission of the crime it is suspect.  Once the individual is accused of a crime and has to make choices during criminal proceedings, he or she begins actual reliance on expectations of

14

the law. In criminal proceedings the accused faces a number of choices. The defendant may (1) plead guilty (or nolo contendere) as charged; (2) plead guilty to a lesser offense in exchange for dropping a more serious charge; or (3) contest the charge and go to trial. If convicted the defendant may choose to appeal, or waive appeal. A defendant who plea bargains must choose among various possible dispositions, weighing possible sentencing outcomes and other consequences. These consequences include whether the plea will lead to deportation.

These choices are faced by the innocent as well as the guilty. Though innocent, an individual accused of a crime may choose to plead guilty to a lesser charge in order to get out of jail (with a sentence of "time served" only), or, even if out on bail, in order to avoid any jail time. Of the non-citizens convicted in United States district courts during 1994, 92.3 percent entered guilty pleas. J. Scalia, Non-citizens in the Federal Criminal Justice System, 1984-94, U.S. Department of Justice, Bureau of Justice Statistics Special Report (Aug. 1996). For a non-citizen, the choice to forego trial and plead guilty is often critically dependent on information regarding possible immigration consequences. *See, U.S. v. Del Rosario*, 902 F.2d 55, 61 (D.C.Cir. 1990) (Mikva, J., concurring), cert den. 498 U.S. 941 (1990) ("The possibility of being deported can be - and frequently is - the most important factor in a criminal defendant's decision how to plead."); *Williams v. State*, 641 N.E.2d 44 (Ind. 1994) ("The

15

possibility of deportation ... is a consequence which undoubtedly would enter into the decision-making process of a defendant concerning a plea bargain."); *People v. Pozo*, 746 P.2d 523, 529 (Colo. 1987) ("In cases involving alien criminal defendants, for example, thorough knowledge of fundamental principles of deportation law may have significant impact on a client's decisions concerning plea negotiations and defense strategies"); *see also*, *Costello v. INS*, 84 S.Ct. 580, 586 (1964) (noting that if immigrant had been aware that he faced deportation, he could have offered to plead to charges that would not have made him deportable).

The importance of immigration consequences of pleas in criminal cases cannot be underestimated. Deportation to a country where a legal permanent resident has not lives since childhood, or where the immigrant has no family or means of support; or where s/he would be permanently separated from a spouse, children and other loved ones, is surely a consequence of serious proportions that any immigrant would consider in entering a plea. As Justice Black wrote, "To banish [an immigrant] from home, family and adopted country is punishment of the most drastic kind." *Lehmann v. U.S.*, 77 S.Ct. 1022, 1025 (1957) (Black, J., concurring).

Recognizing this central role of deportation consequences, the criminal courts in at least thirteen states, including Texas, require deportation advisories as part of the court's plea

16

allocution. See, e.g., California Penal Code §1016.5; Connecticut Gen. Stat. Ann. §54-Ij; Massachusetts Gen. Laws Ann. Ch. 278, §29D; New York Crim. Proc. Law §220.50(7); Ohio Rev. Code Ann. §2943.03.1; Oregon Rev. Stat. §135.385; Texas Code Crim. Proc. Ann. Art. 26.13; and Washington Rev. Code Ann. §10.40.200.

A number of courts have also imposed on criminal defense counsel a duty to advise clients properly of the immigration consequences of pleading guilty. *See, e.g., Michel v. U.S.*, 507 F.2d 461, 465-466 (2nd Cir. 1974) (recognized defense counsel's obligation to advise about the "indirect consequences the guilty plea may trigger," including deportation); *Williams v. State, supra*, ("attorney's duties to a client are [not] limited by a bright line between the direct consequences of a guilty plea and those consequences considered collateral"); *People v. Soriano*, 194 Cal. App.3d 1470 (1987) (citing ABA standards); *People v. Pozo, supra*; and *People v. Corea*, 485 N.E. 2nd 307 (1985).

Bar and defender associations counsel criminal defense lawyers to advise non-citizen clients of immigration consequences of criminal convictions. The National legal Aid and Defendant Association has recognized the duty of defense counsel to "make sure the client is fully aware of ... consequences of conviction such as deportation." NLADA Performance Guidelines for Criminal Defense Representation (1994), guideline 6.2(a)(3); ABA Standards for Criminal Justice,

17

Pleas of Guilty, Std. 14-3.2 (2nd Ed. 1982), commentary at 75.

In sum, state legislatures, courts, and criminal defense lawyers
consider it a duty to give proper advice to a criminally accused
non-citizen of immigration consequences of the disposition of the
criminal case.   Given this recognition, surely an unauthorized
interpretation of the immigration laws affecting the calculus of
risks and relevant rights must be seen as attaching a new and
unfair legal consequence to the choices reasonably made by an
affected individual relying on the then law.

The  instant  situation  is  even  more  grave  than  the  issues  of
retroactivity  involved  in  AEDPA  §440(d).    In  such  cases,  the
government  argued  that  the  long  existing  statutory  right  of  a
permanent  resident  to  seek  relief  was  "purely  discretionary,"  and
that  eliminating  the  statutory  right  could  be  characterized  as
merely  altering  jurisdiction  or  the  availability  of  future
prospective  relief.    *Matter of Soriano, supra.*    Even  there,  the
federal  courts  almost  without  exception  found  that  the  mere  label
of  relief  as  discretionary  was  irrelevant  to  retroactivity
analysis.    It  is  well-established,  for  example,  that  changing  a
maximum  sentence  to  a  mandatory  sentence  has  retroactive  effect,
even  though  the  court  always  had  discretion  to  impose  the  maximum.
*Lindsay v. Washington, supra.*    Similarly,  changing  the  possibility
of  deportation  to  automatic  deportation  radically  alters  the
consequences  immigrants  face.    If  a  person's  crime  were  minor,  and

18

her equities great, the established practice would suggest a strong likelihood of there being no deportation consequences to a conviction. Although no lawyer could promise a client that relief would be granted, s/he could often give informed advice, based on a realistic assessment of the individual's chances. The Attorney General dismissed this argument in *Soriano* by saying that no such advice could reasonably be given because for "the past forty years, the law has been settled that Congress may legislate to alter the immigration consequences of past criminal convictions or acts." *Matter of Soriano, supra*, Slip Opinion at 7.

In the case at bar, the argument is even stronger. It is not a case of turning a possibility into a certainty. Rather, it is one of changing what was previously a "safe" plea, i.e., one with no immigration consequences, into one for which deportation is mandatory. This *Soriano* response to this argument begs the question. Whenever a court is faced with a *Landgraf* issue, the question is whether Congress acted clearly to upset expectations, and the issue is therefore always one of expectations that Congress arguably has the right to override. *Landgraf* stands for the proposition that people are entitled to rely on the law, even when Congress has the power to make laws that dash expectations.

Acceptance of INS' claim that the restrictions are not retroactive because deportation operates "prospectively" would undercut the

19

CMPDF - www.fesno.com

Court's analysis of the provisions at issue in the *Landgraf* case itself. The damage remedies which were found impermissibly retro-active in *Landgraf* operated "prospectively" in the same sense, as they would also have been paid in the future. Similarly, although deportation would occur in the future, it would be based on past conduct that previously did not carry the same consequences.

In summary, the reality is that, if interpreted to operate retroactively, §322(a) would effect a drastic change in the law relating to the immigration consequences for lawful permanent residents of accepting deferred adjudication when charged with certain offenses. By interpreting such proceedings as final convictions, the new law would make deportation automatic in situations where it previously was not even a possibility. This is just the sort of retroactive effect that flies in the face of the anti-retroactivity principles expressed in *Landgraf*.

> D. THE ADMINISTRATIVE INTERPRETATION OF IIRIRA §322(a)
> AT ISSUE HEREIN VIOLATES THE CANONS OF STATUTORY
> CONSTRUCTION THAT, WHERE FAIRLY POSSIBLE, A STATUTE MUST
> BE CONSTRUED TO AVOID CONSTITUTIONAL DIFFICULTIES, AND
> THAT LINGERING AMBIGUITIES IN A DEPORTATION STATUTE MUST
> BE CONSTRUED IN FAVOR OF THE ALIEN.

The administrative interpretation of IIRIRA §322(a) at issue herein, *to wit, Matter of Punu*, if applied retroactively, violates two fundamental maxims of statutory interpretation. Insofar as it would lead to serious questions as to the constitutionality of

20

IIRIRA §322(a) as applied herein, an alternative construction, avoiding these difficulties, must be sought. *Webster v. Reproductive Health Services, supra.* See also *U.S. v. Lovett*, 66 S.Ct. 1073, 1085-86 (1946) (Frankfurter, J., concurring) (internal citations omitted):

> The approach appropriate to such a case as the one before us was thus summarized by Mr. Justice Holmes in a similar situation: '* * * the rule is settled that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act. Even to avoid a serious doubt the rule is the same...

The Supreme Court has also repeatedly held that any ambiguities in immigration statutes must be resolved to avoid deportation consequences. *See, INS v. Cardoza-Fonseca*, supra, 480 U.S. at 449 (discussing the "longstanding principle of construing lingering ambiguities in deportation statutes in favor of the alien"); and *Costello v. INS, supra*, 376 U.S. at 128.

The Court has applied this principle to issues relating to the temporal reach of deportation legislation, finding that "[i]n the absence of a clear and definite expression, we are not at liberty to conclude that Congress intended that any alien, no matter how long a resident of this country, or however well disposed toward our government, must be deported, if at any time in the past, no matter when, or under what circumstances, or for what time, he was a member of the described organization." *Kessler v. Strecker*, 307

21

U.S. 22, 30 (1939) (interpreting statute providing for deportability based on membership in a subversive organization).

Moreover, the vast majority of federal courts which have addressed the retroactivity question in the context of AEDPA §440(d) have found that it was not intended to be so applied. *See, for example, Henderson v. INS*, 157 F.3d 106 (2nd Cir. 1998), *pet. for cert. filed sub nom, Navas v. Reno,* 67 U.S.L.W. 3409 (U.S. Dec. 17, 1998); *Goncalves v. Reno*, 144 F.3d 110 (1st Cir. 1998), *pet. for cert. filed*, 67 U.S.L.W. 3364 (U.S. Nov. 18, 1998).

It is therefore urged that:

1.  The instant case be remanded to the Immigration Judge for the issuance of an oral or written decision that comports with *Matter of A-P-, supra*; or that,

2.  The Board conclude that IIRIRA §322(a) was not intended to apply to Texas deferred adjudication proceedings conducted prior to its enactment, and terminate the instant removal proceedings.

Respectfully Submitted,

22

Thelma O Garcia, Attorney
301 E. Madison
Harlingen, Texas 78550
(956) 425-3701

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed to the
Office of the INS General Attorney, Box 1711, Harlingen, Texas,
78551, on February 19th, 1999.

AIRBORNE EXPRESS.
SHIPMENT NO. 3003 337 6516   SHIPMENT DATE 12/1/00   WEIGHT

FROM (COMPANY NAME) REFUGIO del Rio Grande
ADDRESS 17891 Landrum Park Rd
CITY San Benito   STATE TX   ZIP CODE (REQUIRED) 78586
SENT BY (NAME/DEPT) Lisa Brodyaga   PHONE 956 421 3226
TO (COMPANY NAME) US Court of Appeals
ADDRESS 600 Camp St
CITY New Orleans   STATE LA   ZIP CODE (REQUIRED) 70130
ATTN (NAME/DEPT) Office of The Clerk   PHONE 504 589 6514

REMOVE SENDERS COPY - FLIGHT READY LETTER

AIRBORNE EXPRESS.
SHIPMENT NO. 3003 337 6612   SHIPMENT DATE 12/1/00   WEIGHT

FROM (COMPANY NAME) REFUGIO
ADDRESS 17891 Landrum Park Rd
CITY San Benito   STATE TX   ZIP CODE (DECLARED) 78586
SENT BY (NAME/DEPT) Lisa Brodyaga   PHONE (956) 421 3226
TO (COMPANY NAME) Office of Imm. Litigation USDOJ
ADDRESS 1331 Penn. Ave NW
CITY Wash. DC 20044   STATE   ZIP CODE (REQUIRED) 20044
ATTN (NAME/DEPT) Kurt Larson, Atty   PHONE (20) 353 9321

REMOVE SENDERS COPY - FLIGHT READY LETTER

23