*14*

United States District Court
Southern District of Texas
FILED

DEC 0 3 2001

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARTIN TORRES-CASTILLO          )
                                )
v.                              )          CA B-01-009
                                )
E.M. TROMINSKI, et al           )
                                )

POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR HABEAS CORPUS

TABLE OF CONTENTS

I.   THE FACTS AND PROCEDURAL HISTORY ..................... 1

II.  JURISDICTION........................................ 4

III. ISSUES PRESENTED ................................... 4

IV.  ARGUMENT ........................................... 4

     A.  UNDER THE HEIGHTENED CLARITY REQUIREMENT OF *INS v. ST. CYR, SUPRA*, THERE EXISTS SUFFICIENT AMBIGUITY IN §322(c) OF IIRIRA TO TRIGGER THE *LANDGRAF* RETROACTIVITY ANALYSIS, WHICH, IN TURN, PRECLUDES APPLICATION OF THE NEW DEFINITION OF "CONVICTION" HEREIN, INSOFAR AS IT WOULD HAVE GENUINE RETROACTIVE EFFECT............ 4

          1. SECTION 322(c) OF IIRIRA, ESTABLISHING THE EFFECTIVE DATE FOR §1101(a)(48)(A), IS AT LEAST AS AMBIGUOUS AS THE PROVISIONS EXAMINED IN *ST. CYR*. .......................... 6

          2. APPLICATION OF THE NEW DEFINITION OF CONVICTION TO MR. TORRES WOULD HAVE GENUINE RETROACTIVE EFFECT.................... 10

     B.  IT WOULD VIOLATE DUE PROCESS TO APPLY THE NEW DEFINITION OF "CONVICTION" RETROACTIVELY WHERE CONGRESS ARTICULATED NO "RATIONAL LEGISLATIVE PURPOSE" TO SUCH RETROACTIVE APPLICATION........ 11

     C.  AN ALTERNATE CONSTRUCTION WOULD CREATE VAGUENESS PROBLEMS. 14

**D.  IN THE FURTHER ALTERNATIVE, PETITIONER MUST BE ALLOWED TO APPLY FOR §212(c) RELIEF, UNDER *INS v. ST. CYR, SUPRA.* ........... 14**

**E.  IN THE FINAL ALTERNATIVE, GIVEN THE PROCEDURAL FLAWS IN THE MANNER IN WHICH THE INSTANT DECISION WAS ISSUED, THE CASE SHOULD BE REMANDED WITH INSTRUCTIONS THAT THE IMMIGRATION JUDGE ISSUE A DECISION, SPECIFYING THE GROUNDS OF REMOVABILITY, AND THAT IN ANY APPEAL THEREFROM, THE BIA COMPLY WITH 8 C.F.R. §3.1(a)(7) .... 17**

**V.  CONCLUSION** ............................................ **17**

## TABLE OF AUTHORITIES
### CASES

*Calcano v. INS,*
    121 S.Ct. 2268 (2001)  . . . . . . . . . . . . . . . . . 4

*Chevron U.S.A., Inc. v. NRDC,*
    467 U.S. 837 (1984)  . . . . . . . . . . . . . . . . . . 7

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952)  . . . . . . . . . . . . . . . . . 12

*Hays County Guardian v. Supple,*
    969 F.2d 111 (5th Cir. 1992)  . . . . . . . . . . . . . 8

*In re Hanserd,*
    123 F.3d 922 (6th Cir. 1997)  . . . . . . . . . . . . . 7

*INS v. Cardoza-Fonseca,*
    480 U.S. 421(1987)  . . . . . . . . . . . . . . . . . 16

*INS v. St. Cyr,*
    121 S.Ct. 2271 (2001)  . . . . . . . . . . . . . 1, PASSIM

*Jideonwo v. INS,*
    224 F.3d 692 (7th Cir. 2000)  . . . . . . . . . . . 5, 13

ii

*Jordan v. DeGeorge,*
    341 U.S. 223 (1951) . . . . . . . . . . . . . . 14, 18

*LaGuerre v. Reno,*
    164 F.3d 1035 (7th Cir. 1998) . . . . . . . . . 13

*Landgraf v. USI Films,*
    511 U.S. 244 (1994) . . . . . . . . . . . . 4-6, 15, 16

*Lindh v. Murphy,*
    521 U.S. 320 (1997) . . . . . . . . . . . . . . . 7

*Loa-Herrera v. Trominski,*
    231 F.3d 984 (5th Cir. 2000) . . . . . . . . . . . 5

*Martinez-Montoya v. INS,*
    904 F.2d 1018 (5th Cir. 1990) . . . . . . . . . 1, 2, 8

*Max-George v. Reno,*
    205 F.3d 194 (5th Cir. 2000) . . . . . . . . . . . 3

*Mohammed v. Ashcroft,*
    261 F.3d 1244 (11th Cir. 2001) . . . . . . . . . . 9

*Moosa v. INS,*
    171 F.3d 994 (5th Cir. 1999) . . . . . . . . . 10, 11

*Pension Benefit Guaranty Corp. v. Gray,*
    467 U.S. 717 (1984) . . . . . . . . . . . . . 11, 12

*Salahuddin v. Mead,*
    174 F.3d 271 (2[d] Cir. 1999). . . . . . . . . . . 7

*Swain v. Pressley,*
    430 U.S. 372 (1977) . . . . . . . . . . . . . . . 4

*U.S. v. Ridlehuber,*
    11 F.3d 516 (5th Cir. 1993) . . . . . . . . . . . 8

*Webster v. Reproductive Health Services,*
    109 S.Ct. 3040 (1989) . . . . . . . . . . . . . . 3

iii

**STATUTES**

8 U.S.C. §1101(a)(43)(F) . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. §1101(a)(43)(G) . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. §1101(a)(43)(N) . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. §1101(a)(43)(P) . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. §1101(a)(48)(A) . . . . . . . . . . . . . . . . 4, 6, 7

8 U.S.C. §1101(a)(48)(B) . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. §1182(a)(2)(B) . . . . . . . . . . . . . . . 7, 9, 10

8 U.S.C. §1182(c) ["§212(c)"] . . . . . . . . . . . 4, 13, 14, 18

8 U.S.C. §1227(a)(2) . . . . . . . . . . . . . . . . . . . . . 4

8 U.S.C. §1227(a)(2)(A)(i) . . . . . . . . . . . . . . . . . . 2

8 U.S.C. §1227(a)(2)(A)(iii) . . . . . . . . . . . . . . . . . 2

Illegal Immigration Reform and Immigrant Responsibility Act,
           ("IIRIRA")

IIRIRA §304(b) . . . . . . . . . . . . . . . . . . . . . . . 16

IIRIRA §322 . . . . . . . . . . . . . . . . . . . . . . . . . 8

IIRIRA §322(a) . . . . . . . . . . . . . . . . . . . . . 7-10

IIRIRA §322(a)(1) . . . . . . . . . . . . . . . . . . . . . . 7

IIRIRA §322(a)(2) . . . . . . . . . . . . . . . . . . . . . . 7

IIRIRA §322(c) . . . . . . . . . . . . . . . . . 4, 6, 8-10, 17

Immigration Reform and Control Act, ("IRCA")
     §245A . . . . . . . . . . . . . . . . . . . . . . . . . 8

**REGULATIONS**

8 C.F.R. §240.12 . . . . . . . . . . . . . . . . . . . . . 2, 17, 18

8 C.F.R. §240.12(b) . . . . . . . . . . . . . . . . . . . . . 2

8 C.F.R. §3.1(a)(7) . . . . . . . . . . . . . . . . . . . 3, 17, 18

**ADMINISTRATIVE DECISIONS**

*Matter of A-P-,*
    Interim Decision 3375 (BIA 1999) . . . . . . . . . . . . . 2

*Matter of Rojas,*
    Interim Decision 3451 (BIA 2001) . . . . . . . . . . . . . 5

*Matter of Soriano,*
    21 I&N Dec. 516 (BIA 1996; AG 1997) . . . . . . . 2, 6, 11

*Matter of Valdez,*
    21 I. & N. Dec. 703 (BIA 1997) . . . . . . . . . . . . . 6

v

Petitioner, through counsel, respectfully urges that the decision of the Board of Immigration Appeals ("BIA") herein be vacated for the reason that, under *INS v. St. Cyr,* 121 S.Ct. 2271 (2001), he is not subject to removal, and that in the alternative, he is eligible for §212(c) relief.  In support thereof, he would show as follows:

## I.   THE FACTS AND PROCEDURAL HISTORY

Petitioner Martin Torres is a native and citizen of Mexico, who was admitted to the U.S. as a lawful permanent resident on October 25, 1991.  On May 26, 1995, pursuant to his plea of nolo contendere, [1] he was placed on probation for eight years, without adjudication of guilt, on a sexual assault charge.  Such proceedings were not then a "conviction" for immigration purposes, and did not render him deportable. *Martinez-Montoya v. INS,* 904 F.2d 1018 (5ᵗʰ Cir. 1990).

Mr. Torres was innocent of the charges, insofar as the sexual relations at issue were consensual. Shortly before he entered his plea, the court-appointed investigator, Jerry Martinez, obtained a tape-recording of the alleged victim, explaining what "really happened" to her boy-friend, which tape exonerated him. However, Mr. Torres was detained at the time, and anxious to be released, as

---

[1]   The document, Government Exhibit B, is captioned:

COMMUNITY SUPERVISION JUDGMENT-PLEA OF GUILTY/NOLO CONTENDERE DEFERRED ADJUDICATION COMMUNITY SUPERVISION.

At page 1, it states, in relevant part as follows:

> THE DEFENDANT ENTERED HIS PLEA OF NOLO CONTENDERE THERETO ... AND THE COURT HAVING ADMONISHED THE DEFENDANT AS TO THE CONSEQUENCES OF SUCH PLEA, THE DEFENDANT PERSISTED IN ENTERING HIS SAID PLEA OF NOLO CONTENDERE.

> THE COURT ... FINDS THAT THE EVIDENCE SUBSTANTIATES THE DEFENDANT'S PLEA OF GUILTY ...  HOWEVER, THE COURT ... FINDS THAT AN ADJUDICATION OF GUILT SHOULD BE DEFERRED...

It is submitted that the reference to a "plea of guilty" is an error, and is, in any event, overridden by the specific statement that "the defendant entered his plea of nolo contendere ... and ... persisted in entering his said plea of nolo contendere."

his family was awaiting his release to migrate North for the summer. He agreed to the plea bargain upon being assured that upon acceptance thereof by the Court, he would be immediately released from custody, and that upon successful completion of his probation, the charges would be dismissed, and his record cleansed.

On August 6, 1997, INS issued a Notice to Appear, alleging that Mr. Torres was deportable under 8 U.S.C. §§1227(a)(2)(A)(i) and (iii). He denied the allegations, and contested removability. But on July 29, 1998, an Immigration Judge ordered his removal to Mexico. The Judge neither specified which charge of deportability he had sustained, nor issued a oral or written decision, as required by 8 C.F.R. §240.12. [2] Even construing that this Order as a decision, it was, at best, a "summary decision." However, under subparagraph (b), a summary decision is permissible only where deportability is determined "on the pleadings." This did not occur herein.

Mr. Torres appealed, requesting that the case be remanded pursuant to *Matter of A-P-,* I.D. 3375 (BIA 1999) ("A summary decision pursuant to 8 C.F.R. § 240.12(b) (1998) may properly be issued... in lieu of an oral or written decision only when the respondent has expressly admitted to both the factual allegations and the charges of removability..."). He also urged that deferred adjudication was not a conviction where there had been a plea bargain under *Martinez-Montoya.* As in *Matter of Soriano,* 21 I&N Dec. 516 (BIA

---

[2]     Said provision reads, in relevant part:

(a)--Contents. The decision of the immigration judge may be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. ...

(b)--Summary decision. Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to §240.10(b)... the immigration judge may enter a summary decision...

1996; AG 1997), allowing LPRs who conceded deportability when §212(c) relief was available to reopen proceedings and contest the charges, Mr. Torres also asserted that it would constitute "mousetrapping," and violate Due Process, to apply the new definition of "conviction" to him. Since it is incumbent upon the BIA, as well as the federal judiciary, to seek a manner of interpreting a statute which avoids serious constitutional infirmities, under *Webster v. Reproductive Health Services*, 109 S.Ct. 3040 (1989), he urged that the statute be interpreted as not applying to him. But on September 29, 2000, Board Member Heilman, acting alone, issued a decision purporting to "affirm[], without opinion, the results of the decision below," pursuant to 8 C.F.R. §3.1(a)(7). [3]

Pursuant to *Max-George v. Reno,* 205 F.3d 194, 200-201 (5th Cir. 2000) (IIRIRA repealed §2241 habeas jurisdiction of final orders of removal, but "substantial review" of constitutional questions would be conducted by the Fifth Circuit), Mr. Torres filed a timely petition for review. On December 21, 2000, the Fifth Circuit granted INS' motion to dismiss for lack of jurisdiction. INS ordered Mr. Torres to report for deportation on February 8, 2001, and on January 17, 2001, he filed the instant petition. He based jurisdiction on the fact that the review provided by the Fifth

---

[3] 8 C.F.R. §3.1(a)(7) provides in pertinent part as follows:

(ii)-- The single Board Member to whom a case is assigned may affirm the decision of the Service or the Immigration Judge, without opinion, if the Board Member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that
> (A)-- the issue on appeal is squarely controlled by existing Board or federal court precedent and does not involve the application of precedent to a novel fact situation; or
> (B)-- the factual and legal questions raised on appeal are so insubstantial that three-Member review is not warranted.

3

Circuit was not an adequate substitute for habeas corpus under *Swain v. Pressley,* 430 U.S. 372 (1977). He also noted that *certiorari* had been accepted in *INS v. St. Cyr, supra,* and *Calcano v. INS,* 121 S.Ct. 2268 (2001), and that the resolution of these cases would control the jurisdictional issues presented herein.

## II.  JURISDICTION

The Supreme Court found in *St. Cyr* and *Calcano* that statutory habeas was still be available to immigrants such as he. Consequently, this Honorable Court has habeas jurisdiction.

## III.  ISSUES PRESENTED

A.  UNDER THE HEIGHTENED CLARITY REQUIREMENT OF *INS v. ST. CYR, SUPRA*, THERE EXISTS SUFFICIENT AMBIGUITY IN §322(c) OF IIRIRA TO TRIGGER THE *LANDGRAF* RETROACTIVITY ANALYSIS, WHICH, IN TURN, PRECLUDES APPLICATION OF THE NEW DEFINITION OF "CONVICTION" HEREIN, INSOFAR AS IT WOULD HAVE GENUINE RETROACTIVE EFFECT.

B.  IN THE ALTERNATIVE, IT WOULD VIOLATE DUE PROCESS TO APPLY THE NEW DEFINITION OF "CONVICTION" RETROACTIVELY TO ONE WHO RELIED ON THE FACT THAT DEFERRED ADJUDICATION WAS NOT A CONVICTION FOR IMMIGRATION PURPOSES, PARTICULARLY WHERE CONGRESS HAS ARTICULATED NO "RATIONAL LEGISLATIVE PURPOSE" TO SUCH RETROACTIVE APPLICATION.

C.  AN ALTERNATE CONSTRUCTION WOULD RENDER 8 U.S.C. §1101(a)(48)(A) AND §1227(a)(2)(B) VOID FOR VAGUENESS.

D.  IN THE FURTHER ALTERNATIVE, PETITIONER MUST BE ALLOWED TO APPLY FOR §212(c) RELIEF, PURSUANT TO *INS v. ST. CYR, SUPRA.*

E.  IN THE FINAL ALTERNATIVE, IT IS URGED THAT GIVEN THE PROCEDURAL FLAWS IN THE MANNER IN WHICH THE INSTANT DECISION WAS ISSUED, IT SHOULD BE REMANDED TO THE BIA FOR MEANINGFUL CONSIDERATION OF THE ISSUES WHICH THE PETITIONER RAISED ON APPEAL.

## IV.  ARGUMENT

**A.  UNDER THE HEIGHTENED CLARITY REQUIREMENT OF *INS v. ST. CYR, SUPRA*, THERE EXISTS SUFFICIENT AMBIGUITY IN §322(c) OF IIRIRA TO TRIGGER THE *LANDGRAF* RETROACTIVITY ANALYSIS, WHICH, IN TURN, PRECLUDES APPLICATION OF THE NEW DEFINITION OF "CONVICTION" HEREIN, INSOFAR AS IT WOULD HAVE GENUINE RETROACTIVE EFFECT.**

In *INS v. St. Cyr, supra,* the Supreme Court applied a heightened clarity standard for determining whether a deportation statute is sufficiently vague to trigger retroactivity analysis under *Landgraf v. USI Films,* 511 U.S. 244 (1994).  As the Court noted, 121 S.Ct. at 2279 (internal citations omitted) (footnote in original):

> First, as a general matter, when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result. ...  Second, if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is "fairly possible," ... we are obligated to construe the statute to avoid such problems. ...

These principles also apply to the Department of Justice.  As the Fifth Circuit reminded INS in *Loa-Herrera v. Trominski,* 231 F.3d 984, 991 (5ᵗʰ Cir. 2000) (footnote in original):

> [W]e note that the executive branch... has an independent duty to uphold the Constitution, irrespective of whether its actions are subject to judicial review.

*See also, Matter of Rojas,* I.D. 3451, 23 I&N Dec. 117 (BIA 2001), Board Member Lory Rosenberg, dissenting: [4]

---

[4]   The Supreme Court cited Board Member Rosenberg's reliance argument in *St. Cyr, id.* at 2292 (Footnote 51 omitted):

> Relying upon settled practice, the advice of counsel, and perhaps even assurances in open court that the entry of the plea would not foreclose § 212(c) relief, a great number of defendants in Jideonwo's and St. Cyr's position agreed to plead guilty....  Now that prosecutors have received the benefit of these plea agreements, agreements that were likely facilitated by the aliens' belief in their continued eligibility for § 212(c) relief, it would surely be contrary to "familiar considerations of fair notice, reasonable reliance, and settled expectations," ... to hold that IIRIRA's subsequent restrictions deprive them of any possibility of such relief. [FN52]

As I noted in my dissenting opinion in *Matter of Valdez*, 21 I. & N. Dec. 703 (BIA 1997), the canons of statutory construction militate in favor of a restrictive interpretation of a statutory provision "'if a broader meaning would generate constitutional doubts.'".

As is more fully discussed below, the ambiguity involved herein is at least as great as that which the Supreme Court faced in *St. Cyr*. Furthermore, under the *Landgraf* analysis, it is obvious that the retroactive impact is far greater. In *St. Cyr*, the change was from possible deportation to mandatory deportation. Here, it is from no immigration consequences to mandatory deportation. Therefore, under *St. Cyr*, which was decided *after* the decisions of the BIA (and Fifth Circuit) herein, Mr. Torres is not subject to deportation. The instant order must be vacated, and the case remanded to the BIA with instructions to terminate proceedings.

### 1. SECTION 322(c) OF IIRIRA, ESTABLISHING THE EFFECTIVE DATE FOR §1101(a)(48)(A), IS AT LEAST AS AMBIGUOUS AS THE PROVISIONS EXAMINED IN *ST. CYR*.

In *St. Cyr*, INS claimed, *id.*, 121 S.Ct. at 2287 that:

[T]he statute unambiguously communicates Congress' intent to apply the provisions of IIRIRA's Title III-A to all removals initiated after the effective date of the statute, and, in any event, its provisions only operate prospectively and not retrospectively.

---

FN52. The significance of that reliance is obvious to those who have participated in the exercise of the discretion that was previously available to delegates of the Attorney General under § 212(c). See *In re Soriano*, 16 Immig. Rptr. B1-227, B1-238 to B1-239 (BIA 1996) (Lory D. Rosenberg, Board Member, concurring and dissenting) ("I find compelling policy and practical reasons to go beyond such a limited interpretation as the one the majority proposes in this case. All of these people, and no doubt many others, had settled expectations to which they conformed their conduct").

6

But the Supreme Court found their argument unconvincing.  *Id.* at
pp. 2287-2293.   As the Court first noted, *id.* at 2288:

> The standard for finding such unambiguous direction is a
> demanding one.  "[C]ases where this Court has found truly
> 'retroactive' effect adequately authorized by statute
> have involved statutory language that was so clear that
> it could sustain only one interpretation."  *Lindh v.
> Murphy,* 521 U.S. 320, 328, n. 4 ... (1997).

The "sustain[s] only one interpretation" test of *St. Cyr* requires
a higher degree of clarity than the "plain language" standard of
review. [5] This "heightened level of clarity ... is required only to
justify the *retroactive* application of a newly enacted provision."
*Salahuddin v. Mead*, 174 F.3d 271,275 (2nd Cir. 1999). [6]

In the case at bar, as in *St. Cyr,* it is submitted that the statute
**can** sustain more than one interpretation.   IIRIRA §322(a)(1)
defined, for the first time, the meaning of the term "conviction,"
to be codified at 8 U.S.C. §1101(a)(48)(A).  It also enacted a new
section, codified at §1101(a)(48)(B), which provides as follows:

> (B)   Any reference to a term of imprisonment or a
> sentence with respect to an offense is deemed to include
> the period of incarceration or confinement ordered by a
> court of law regardless of any suspension of the
> imposition or execution of that imprisonment or sentence
> in whole or in part.

IIRIRA §322(a)(2) contains certain conforming amendments, to 8
U.S.C. §1101(a)(43)(F), (G), (N) and (P), and to §1182(a)(2)(B).
In other words, IIRIRA §322(a) includes not only the new definition
of "conviction," but also makes substantive modifications to the
manner in which terms of imprisonment and sentences are evaluated,

---

[5] *See, Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).

[6] *See also, In re Hanserd,* 123 F.3d 922,934 (6th Cir. 1997)

7

as well as a number of conforming amendments.  The effective date for IIRIRA §322(a), including all of its subparts, is established by §322(c), which provides as follows: [7]

> Effective Date. - The amendments made by subsection (a) shall apply to convictions and sentences entered before, on, or after the date of the enactment of this Act. ...

Thus, the issue at bar can be framed as follows: is the "deferred adjudication" disposition at issue herein a "conviction[] ... entered before... the date of the enactment of this Act." It is respectfully submitted that it is not.

First, while the term "conviction" had not been defined by Congress prior to IIRIRA, the Fifth Circuit had previously considered precisely the question of whether a Texas "deferred adjudication" was a "conviction" for immigration purposes and concluded that it was not. *Martinez-Montoya, supra* at 1026 ("We therefore hold that Martinez-Montoya has not been convicted within the meaning of section 245A of the IRCA because he has not waived or exhausted his direct appeals, nor has the appeals period lapsed.").  Thus it is beyond question that prior to IIRIRA, deferred adjudication was **not** a conviction.  Consequently, it was not a "conviction[] ... entered before... the date of the enactment of this Act." If it was not a conviction before the enactment of IIRIRA, it cannot be a conviction entered before its enactment. To conclude otherwise would be to indulge in "boot-strapping," or circular reasoning. [8]

_____

[7] For convenience, a copy of IIRIRA §322 is attached hereto.

[8] *See, e.g., U.S. v. Ridlehuber*, 11 F.3d 516, 524 (5th Cir. 1993) ("...Rule 404(b) prevents the government from bootstrapping evidence into this case."); and *Hays County Guardian v. Supple*, 969 F.2d 111,117 (5th Cir. 1992) ("Government property, however, does not automatically cease to be a designated public forum because the government restricts some speech on the property.  Otherwise, the restriction of speech on government property would be self-justifying. The restriction would disprove any intent to create a

The circular aspect of this reasoning distinguishes the instant case from *Mohammed v. Ashcroft*, 261 F.3d 1244 (11th Cir. 2001), retroactively characterizing a pre-IIRIRA **conviction** as an "aggravated felony." The Eleventh Circuit held that the language of that statute met the Supreme Court's "sustain only one interpretation" test. There, Congress had provided, *id.* at 1249-50:

> Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph.

Since the offense in that case *was* a "conviction" prior to the enactment of IIRIRA, this retroactivity language could sustain only one interpretation: it was an "aggravated felony" thereafter.

Nor does the interpretation urged herein read the retroactivity provisions out of the statute. Because §322(a) contains multiple provisions, specifying that the amendments enacted therein apply to "convictions and sentences entered before... enactment" reaches offenses which would not be included, if §322(c) specified only that it applied to "sentences" entered prior to IIRIRA.

Consider, for example, an immigrant with two prior misdemeanor DWI convictions, convicted of felony DWI in 1995. Assume that he was given a five year, suspended sentence, and placed on probation. In short, all three convictions, as well as the five year (suspended) sentence, occurred prior to the enactment of IIRIRA.

Prior to IIRIRA, §1182(a)(2)(B) rendered excludable (inadmissible):

> Any alien convicted of 2 or more offenses ... for which the aggregate sentences to confinement actually imposed

---

designated public forum, and the failure to create a public forum would justify the restriction of speech. The Supreme Court has not adopted such circular reasoning.").

were 5 years or more."

As a result of the amendments enacted by §322(a)(2)(B) of IIRIRA, §1182(a)(2)(B) now renders inadmissible any alien:

> convicted of 2 or more offenses ... for which the aggregate sentences to confinement were 5 years or more.

Prior to IIRIRA, our hypothetical immigrant was therefore clearly not excludable.  And if IIRIRA §322(c) specified only that the amendments of §322(a) applied to "sentences" which pre-dated IIRIRA, (rather than "convictions and sentences"), the retroactivity clause "could sustain [more than] one interpretation."  Specifically, it could have been plausibly argued that §1182(a)(2)(B) rendered immigrants excludable based on certain **convictions**, and that because Congress did not specify that the amendments of IIRIRA §322(a) applied to **convictions** which pre-dated IIRIRA, Congress did not intend that it apply to pre-IIRIRA **convictions**, regardless of when the *sentences* were imposed.

In *Moosa v. INS,* 171 F.3d 994 (5th Cir. 1999), the Court concluded that IIRIRA §322(a) did apply retroactively.  However, Moosa "[did] not contest that the plain language of § 322(c) mandates retroactive application," *id* at 497, and therefore did not show that the interpretation urged herein would *not* "read its retroactivity provision out of the statute," *id*.  Furthermore, the Court utilized the "plain language" standard, rather than the "heightened level of clarity," and thus neither considered the circular aspect of its reasoning, nor examined whether any other interpretation was possible, as is required under *St. Cyr*.

### 2. APPLICATION OF THE NEW DEFINITION OF CONVICTION TO MR. TORRES WOULD HAVE GENUINE RETROACTIVE EFFECT.

Even more importantly, the Court in *Moosa* left open the question of whether the new definition could be applied retroactively where, as here, the plea agreement was made in reliance on its prior decision

in *Martinez-Montoya*.  *Moosa, supra*, 171 F.3d at 497:

> Next, Moosa asserts that applying the new definition of
> "conviction" to him presents retroactivity concerns...
> He asserts that he agreed to the deferred adjudication
> plea agreement "with an entirely different understanding
> of the immigration consequences of his plea".  This
> assertion is not borne out by the facts.  When Moosa
> entered into the plea agreement in January 1990,
> Martinez-Montoya had not been issued and Matter of M (a
> 1989 decision) was still the law.

The opposite is the case herein. When Mr. Torres arranged his plea
bargain, it carried no immigration consequences.  According to INS'
theory, it has now been retroactively converted into an immigration
"death sentence." It is therefore urged that to the extent that
even *Moosa* remains good law, it does not apply to the case at bar.

**B.   IT WOULD VIOLATE DUE PROCESS TO APPLY THE NEW DEFINITION OF
"CONVICTION" RETROACTIVELY WHERE CONGRESS HAS ARTICULATED NO
"RATIONAL LEGISLATIVE PURPOSE" TO SUCH RETROACTIVE APPLICATION.**

The principles urged herein are not new.  As noted above, in *Matter
of Soriano, supra*, LPRs who had conceded deportability when §212(c)
relief was available were allowed to reopen proceedings and contest
the charges. For the same reasons, Mr. Torres asserts that it would
constitute "mouse-trapping," and that it would violate Due Process,
to apply the new definition of "conviction" to him.

It is true that Congress has the power to retroactively make
specific conduct grounds for deportation, *St. Cyr, supra* at 2288
(emphasis added) ("Despite the dangers inherent in retroactive
legislation, it is beyond dispute that, **within constitutional
limits**, Congress has the power to enact laws with retrospective
effect").  Those "constitutional limits" include the requirement
that there be **separate justification for such retroactivity**.
*Pension Benefit Guaranty Corp. v. Gray*, 467 U.S. 717,729-30 (1984)

11

(internal citations omitted) (emphasis added):

> [R]etroactive legislation does have to meet a burden not
> faced by legislation that has only future effects. "It
> does not follow ... that what Congress can legislate
> prospectively it can legislate retrospectively. The
> retroactive aspects of legislation, as well as the
> prospective aspects, must meet the test of due process,
> **and the justifications for the latter may not suffice for
> the former.**" ... But that burden is met simply by showing
> that the retroactive application of the legislation is
> itself justified by a rational legislative purpose. [9]

No such separate justification exists herein. There is no "rational
legislative purpose" fulfilled by "mouse-trapping" an innocent man
into accepting a plea bargain which is neither a "conviction" nor
carries immigration consequences, and then retroactively change the
rules, such that he is later considered to have been "convicted"
and subject to mandatory deportation, with no possibility of relief
or hope of lawfully returning to the U.S. at a later date.

Because the reliance occurred at the guilt or innocence stage of
the proceedings, ascribing such an intent to Congress would be even
worse than in the cases where various Courts (including the Supreme

---

[9] *See, Harisiades v. Shaughnessy*, 342 U.S. 580,593-96 (1952)
where the Supreme Court rejected a constitutional challenge to
legislation specifying that past membership in the Communist Party
was grounds for deportation.. Prior legislation had made only
present Communist Party membership grounds for deportation, and the
Party had thereafter expelled non-citizen members. *Id.* 595-596:

> When the Communist Party as a matter of party strategy
> formally expelled alien members en masse, it destroyed
> any significance that discontinued membership might
> otherwise have as indication of change of heart by the
> individual. Congress may have believed that the party
> tactics threw upon the Government an almost impossible
> burden if it attempted to separate those who sincerely
> renounced Communist principles of force and violence from
> those who left the party the better to serve it.

Court, in *St. Cyr*), have refused to accept that Congress would "mouse-trap" immigrants into conceding deportability with the hope of obtaining §212(c) relief, only to withdraw such relief. *See, for example, LaGuerre v. Reno*, 164 F.3d 1035,1041 (7th Cir. 1998):

> The relevant rule is that statutes which change primary (out of court) duties, for example statutes that impose new tort liabilities, are applied prospectively, while statutes that change merely procedures are applied retroactively. ... The reasoning behind this distinction is that people are much more likely to rely on substantive than procedural law. But this implies that when it is the kind of procedural change that does disturb reasonable expectations, the presumption in favor of retroactive application is reversed. Suppose a person facing deportation conceded deportability in reliance on having a good shot at a waiver of deportability. In that event, to abolish such waiver for his class of deportees after he had relied by forgoing a challenge to deportability would pull the rug out from under him. And in that case we have held that the abolition would not apply to him, would be prospective only. ...

*See also, Jideonwo v. INS*, 224 F.3d 692 (7th Cir. 2000) (alien presented a cognizable due process claim by showing that AEDPA §440(d), rescinding his eligibility for relief under §212(c) of the Immigration Act, had impermissible retroactive effect when applied to him, since he had relied on its availability at the time he pled guilty to the underlying offense); [10]

For these reasons, Mr. Torres asserts that this Court should not ascribe to Congress an *intent* for the definition of "conviction" to include persons such as he, who, when faced with serious charges, decided that it was in his best interest to accept a plea bargain involving deferred adjudication, thereby avoiding immigration

---

[10] *Jideonwo* was one of the cases examined by the Supreme Court in *St. Cyr*, and cited as an example of exactly the type of impermissible retroactivity at issue herein. 121 S.Ct. at 2292.

13

problems, but who is now subject to mandatory and permanent removal. This violates both procedural and substantive Due Process.

## C.  AN ALTERNATE CONSTRUCTION WOULD CREATE VAGUENESS PROBLEMS.

In the alternative, it is urged that, applying IIRIRA §322(c) herein would cause the statute to be void for vagueness, under *Jordan v. DeGeorge,* 341 U.S. 223, 230-31 (1951):

> This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law.... It should be emphasized that this statute does not declare certain conduct to be criminal.  Its function is to apprise aliens of the consequences which follow after conviction and sentence of the requisite two crimes.

> Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case. We do this in view of the grave nature of deportation.  The Court has stated that 'deportation is a drastic measure and at times the equivalent of banishment or exile * * *. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty.' ...  We shall, therefore, test this statute under the established criteria of the 'void for vagueness' doctrine.

If a statute designed to "apprise aliens of the consequences which follow after conviction," can be void for vagueness, and therefore violate Due Process, one which retroactively turns a plea-bargained procedure into a conviction for immigration purposes is far worse.

## D.  IN THE FURTHER ALTERNATIVE, PETITIONER MUST BE ALLOWED TO APPLY FOR RELIEF UNDER §212(c) OF THE ACT, UNDER *INS v. ST. CYR, SUPRA.*

In the alternative, the reasoning of *St. Cyr* mandates that Mr. Torres be allowed to apply for relief under §212(c) of the Act.

As seen above, *St Cyr.* was about retroactivity, not reliance.  The

14

*possibility* of reliance entered only after the Court found that the
retroactivity language could sustain more than one interpretation.
At that point, the Court proceeded to the second step of the
*Landgraf* analysis, determining whether the statute carried genuine
retroactive effect.  In this context, the Court considered that an
immigrant who relied on the prior state of the law could suffer
adverse consequences. But the Court did not limit its ruling to
such cases.  Rather, once it found that the statute would have
genuine retroactive effect (in some cases), the Court concluded
that it could not be applied retroactively.  Period.

A contrary result would be incredibly burdensome on the Courts and
administrative agencies. It would require a mini-trial, in each
case, to determine whether, as applied to the individual at bar,
the statute could be applied retroactively. This is not what
*Landgraf* and its progeny contemplates.  For example, in *Landgraf*,
the Court stated the issue, and its holding, as follows, *id* at 247:

> The Civil Rights Act of 1991 (1991 Act or Act) creates a
> right to recover compensatory and punitive damages for
> certain violations of Title VII of the Civil Rights Act
> of 1964. ...  The Act further provides that any party may
> demand a trial by jury if such damages are sought... We
> granted certiorari to decide whether these provisions
> apply to a Title VII case that was pending on appeal when
> the statute was enacted.  We hold that they do not.

This language covered all cases  pending on appeal when the statute
was enacted.  In *St. Cyr*, the Court considered whether retroactive
application would have "genuine retroactive effect." as applied to
an immigrant who was, at the time of his plea, eligible for §212(c)
relief. In so doing, the Court made the following observation *Id.*
at 2290, (footnote 44 in original)(emphasis added):

> The presumption against retroactive application of
> ambiguous statutory provisions, buttressed by "the
> longstanding principle of construing any lingering
> ambiguities in deportation statutes in favor of the

15

alien," INS v. Cardoza-Fonseca, 480 U.S. 421, 449...
(1987), forecloses the conclusion that, in enacting §
304(b), "Congress itself has affirmatively considered the
potential unfairness of retroactive application and
determined that it is an acceptable price to pay for the
countervailing benefits." [FN44] ...

> FN44. **The legislative history is significant because,
> despite its comprehensive character, it contains no
> evidence that Congress specifically considered the
> question of the applicability of IIRIRA § 304(b) to pre-
> IIRIRA convictions.**

Congress' failure to specifically consider this question precludes
application of IIRIRA §304(b) to pre-IIRIRA convictions. So
§212(c) relief remains available to LPRs with such convictions,
regardless of whether they resulted from guilty pleas, or following
trial. As explained in *Landgraf,* at 272-73 (emphasis added):

> [W]hile the constitutional impediments to retroactive
> civil legislation are now modest, prospectivity remains
> the appropriate default rule. Because it accords with
> widely held intuitions about how statutes ordinarily
> operate, a presumption against retroactivity will
> generally coincide with legislative and public
> expectations. **Requiring clear intent assures that
> Congress itself has affirmatively considered the
> potential unfairness of retroactive application and
> determined that it is an acceptable price to pay for the
> countervailing benefits**.

In other words, where, as here, there is latent ambiguity in the
statute, and where, as here, there is no indication that Congress
affirmatively considered the "potential unfairness" of retroactive
application of a statute, that statute cannot be retroactively
applied, regardless of whether such application would, in an
individual case, have "genuine retroactive effect." This is also
mandated by the principle "'of construing any lingering ambiguities
in deportation statutes in favor of the alien,'" *INS v. Cardoza-
Fonseca,* 480 U.S. 421, 449 (1987), quoted in *St. Cyr, supra* at 247.

**E.   IN THE FINAL ALTERNATIVE, GIVEN THE PROCEDURAL FLAWS IN THE MANNER IN WHICH THE INSTANT DECISION WAS ISSUED, THE CASE SHOULD BE REMANDED WITH INSTRUCTIONS THAT THE IMMIGRATION JUDGE ISSUE A DECISION, SPECIFYING THE GROUNDS OF REMOVABILITY, AND THAT IN ANY APPEAL THEREFROM, THE BIA COMPLY WITH 8 C.F.R. §3.1(a)(7).**

Finally, as seen above, the instant decision is deeply flawed procedurally.  The Immigration Judge issued only an "Order of the Immigration Judge," without an accompanying oral or written decision, as required by 8 C.F.R. §240.12, and failed to specify which of the two charges of removability he found to be sustained. On appeal to the Board of Immigration Appeals, a single Member of the Board issued a summary affirmance, even though the case did not meet the requirements of 8 C.F.R. §3.1(a)(7).

Therefore, in the further, and final, alternative, it is urged that the case be remanded to the BIA, with instructions that it be returned to the Immigration Judge, for the issuance of a proper decision, specifying the grounds of removal which he found to be sustained, and that in any appeal therefrom, the BIA comply with the requirements of 8 C.F.R. §3.1(a)(7).

## V.   CONCLUSION

In conclusion, it is urged that this Court vacate the instant Order, and remand the case to the BIA, with instructions that proceedings be terminated, on the grounds that:

1.   IIRIRA §322(c) can sustain more than one interpretation, without reading it out of the statute.  Specifically, it can reasonably sustain the interpretation, consistent with the plain language thereof, that it applies only to dispositions which **were** considered to be "convictions" prior to the enactment of IIRIRA. Read this way, it would still apply, retroactively, to dispositions of criminal cases which were, prior to IIRIRA, considered to be *convictions*, regardless of when the *sentence* was imposed;

17

2.   An alternate construction would, under *INS v. St. Cyr*, be impermissible, in that it would violate Due Process, since the legislative history does not demonstrate that Congress affirmatively considered the potential unfairness of retroactive application of the new definition to criminal dispositions which were not "convictions" prior to the enactment of IIRIRA; and

3.   An alternate construction would also render the statute void for vagueness, in that it would not adequately "apprise aliens of the consequences which follow" the acceptance of a plea bargain for deferred adjudication, as required by *Jordan v. DeGeorge, supra.*

In the alternative, it is urged that, for the same reasons, the Court vacate the instant Order, and remand the case to the BIA, with instructions that Mr. Torres be given an opportunity to apply for §212(c) relief.

And in the further alternative, it is urged that the Court vacate the instant Order, and remand the case to the BIA, with instructions that it be returned to the Immigration Judge for issuance of an oral or written decision, as required by 8 C.F.R. §240.12, for the reason that the case does not meet the criteria of 8 C.F.R. §3.1(a)(7), allowing for single Member disposition, particularly in the absence of an oral or written decision from the Immigration Judge, specifying, *inter alia,* the grounds of removability which he found to have been sustained.

Respectfully Submitted,

Lisa S. Brodyaga,
REFUGIO DEL RIO GRANDE
17891 Landrum Park Rd.
San Benito, TX 78586

18

(956) 421-3226            Fed. Id:  1178
(956) 421-3423 (fax)      Texas State Bar:  03052800

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was mailed, first class
postage prepaid, to Lisa Putnam, SAUSA, P.O. Box 1711, Harlingen,
Texas 78551, on November 19, 2001.

19

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARTIN TORRES-CASTILLO      )
                            )
v.                          )          CA B-01-009
                            )
E.M. TROMINSKI, et al       )
_____)


ADMINISTRATIVE DECISIONS CITED IN PETITIONER'S
POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR HABEAS CORPUS

1.   *Matter of A-P-,*

     Interim Decision 3375 (BIA 1999)

2.   *Matter of Rojas,*

     Interim Decision 3451 (BIA 2001)


3.   *Matter of Soriano,*

     21 I&N Dec. 516 (BIA 1996; AG 1997)


4.   *Matter of Valdez,*

     21 I. & N. Dec. 703 (BIA 1997)

Matter of A-P-, Respondent
File N.A.
Board of Immigration Appeals
Interim Dec. #3376; 22 I&N Dec. (Interim Dec.) No. 3376
January 26, 1999

**Editorial information: index**

Index: Immigration judge (issuance of summary decision by)


**Editorial information: summary**

## SUMMARY OF ISSUES

SUMMARY DECISION: 8 C.F.R. § 240.12(b); Regulatory requirements for summary decision not met; remanded.


**Editorial information: syllabus**

## BIA SYLLABUS

(1) A summary decision pursuant to 8 C.F.R. § 240.12(b) (1998) may properly be issued by an Immigration Judge in removal proceedings in lieu of an oral or written decision only when the respondent has expressly admitted to both the factual allegations and the charges of removability; and, either the respondent's ineligibility for any form of relief is clearly established on the pleadings; or, after appropriate advisement of and opportunity to apply for any form of relief for which it appears from the pleadings that he or she may be eligible, the respondent chooses not to apply for relief or applies only for, and is granted, the relief of voluntary departure.

(2) A summary decision should adequately link the respondent's admissions to the factual allegations and the charges of removability to the applicable law.

(3) When an Immigration Judge issues an oral decision, the transcribed oral decision shall be included in the record in a manner that clearly separates it from the remainder of the transcript.


**Editorial information: cross-ref**

## CROSS-REFERENCES

Immigration Law and Procedure chap. 3.

**Counsel**

Sandrine Lisk-Anani, Esquire, Wichita, Kansas, for respondent
Richard J. Averwater, Assistant District Counsel, for the Immigration and Naturalization Service

**Judges**

Before: Board En Banc:  SCHMIDT, Chairman; VACCA, HEILMAN, VILLAGELIU, COLE, ROSENBERG,

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

status because the phrase ``when the alien is released [from criminal incarceration]'' should not have any bearing on our interpretation of which aliens are affected by section 236(c) of the Act. I disagree.

The resolution reached by the majority is based on a flawed construction of section 236(c). Our interpretation of the statute must include consideration of the phrase ``when the alien is released'' as an integral part of paragraph (1). That phrase is part of the statutory *description* identifying the aliens whom the Attorney General must take into custody and may not release. We do not need to resort to    contortions concerning what ``described in'' means to obtain a rational interpretation of the plain terms of   this statute. I conclude that the statutory   language does not mandate that this respondent   *necessarily* remain detained, as he is not an alien described in paragraph (1) of section 236(c) of the Act.    Accordingly, I would remand this case to determine whether the respondent's continued detention is   warranted.

## I. STATUTORY LIMITATION ON CHANGE IN IMMIGRATION CUSTODY STATUS

The respondent is a lawful permanent resident who was convicted of possession with intent to sell cocaine and sentenced to a period of criminal incarceration. He is charged with being deportable under sections 237(a)(2)(A)(iii) and (B)(i) of the Act, 8 U.S.C. §§ 1227(a)(2)(A)(iii) and (B)(i) (Supp. V 1999),    and is subject to removal, but he has not been found removable. When he was released from   incarceration, he was not taken into custody by the Immigration and Naturalization Service, but was    returned to the community.

As I indicated in my separate opinion in *Matter of Adeniji,* Interim Decision 3417 (BIA 1999) (Rosenberg,    concurring and dissenting), the language used by Congress in section 236(c) of the Act does not    expressly mandate the detention of every alien who has ever committed a criminal or terrorist offense. *Id.*    at 27-28; *see also Matter   of Noble,* 21 I. & N. Dec. 672, 695-99 (BIA 1997) (Rosenberg,    concurring and dissenting) (addressing the effect of similar language in the Transition Period Custody   Rules (``TPCR''). The legislative mandate to detain is limited to those aliens who are taken into immigration custody when released from criminal incarceration. *Id.*

Detention on the basis that an alien is subject to certain removal charges under the Act constitutes a    deprivation of liberty. If such a restriction can be required at all, it must be imposed only in strict compliance with the statutory mandate, which must be regulatory and not punitive in purpose. *See United States v. Salerno,* 481 U.S. 739, 747 (1987) (``The punitive/regulatory distinction turns on ` ``whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and    whether it appears excessive in relation to the alternative purpose assigned [to it].' '' '' (quoting *Schall v.    Martin,* 467 U.S. 253, 269 (1984) (quoting *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-69 (1963)))). Applying *United States v. Salerno, supra,* section 236(c) will be upheld if the statute   is    regulatory in nature and not excessive   to its purpose. *Welch v. Reno,* 101 F. Supp. 2d 347, 353-55 (D. Md. 2000) (citing *United States v. Salerno, supra,* at 747).

However, the fact that detention is not mandatory does not mean that an alien cannot be held in immigration custody based on an individual examination of the factors warranting such a deprivation. It is undisputed that we retain ample authority to require detention based on case-by-case determinations, when release from the custody of the Service is not warranted.

### A. Interpretation of the Statutory Language

Section 236(c) of the Act has two paragraphs. The first paragraph requires the Attorney General to take    into custody any alien who is inadmissible or deportable due to specified criminal or terrorist offenses ``*when the alien is released,* without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.'' Section 236(c)(1) of the Act (emphasis added). The second paragraph governs the restriction on the Attorney General's authority to consider an alien for release from immigration custody. With few exceptions not relevant here,   that authority depends on whether the alien is *an alien described in*

---

Immigration Precedent Decisions                                                                11
Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved

paragraph (1). See section 236(c)(2) of the Act.

There can be no real dispute over whether the specific language ``*when the alien is released*'' is a part of the text of paragraph (1) of section 236(c). Section 236(c)(1) of the Act (emphasis added). Likewise, there can be no disagreement that ``*an alien described in paragraph (1)*'' is subject to mandatory immigration custody and, with extremely limited exceptions, must remain in such custody. Section 236(c)(2) of the Act. Therefore, we must interpret whether the scope of the reference to ``*an alien described in*'' in section 236(c)(2) includes consideration of ``*when the alien is released*'' in the text of section 236(c)(1).

This language is plain. In *Matter of Noble, supra,* the Board ruled that ``our reading comports with a `plain meaning' statutory construction and is wholly consistent with congressional intent.'' *Id.* at 678; *see also id.* at 690 (Rosenberg, concurring and dissenting) (agreeing that the language is plain, but challenging the majority's interpretation of the language in the TPCR and in section 236(c) of the Act). As I have asserted consistently, the context in which this ``when released'' language appeared in the TPCR, as well as the context in which it appears in the present statute, supports reading these words as referring to the time of an alien's release from criminal incarceration. *Id.* at 695-96; *see also K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988).

The entirety of paragraph (1) is a directive from Congress to the Attorney General. The principal sentence of the section reads, ``The Attorney General *shall take into custody,*'' and then proceeds to describe those aliens who shall be taken into custody. Section 236(c)(1) of the Act (emphasis added). A straightforward reading of this section reflects that paragraph (1) is a mandate. The text following the principal clause refers to the aliens whom the Attorney General shall take into custody when they are released from criminal incarceration. In other words, the paragraph describes which inadmissible or deportable aliens are to be taken into custody by the Attorney General when such aliens are released from criminal incarceration. *See* section 236(c)(1) of the Act.

The word `` `when' [is defined] as `just after the moment that.' '' *Alikhani v. Fasano,* 70 F. Supp. 2d 1124, 1130 (S.D. Cal. 1999) (quoting *Webster's Third New International Dictionary* 2602 (3d ed. 1976)). Therefore, as one court noted, the clear language of the statute requires that ``the mandatory detention of aliens `when' they are released requires that they be detained at the time of release.'' *Alikhani v. Fasano, supra,* at 1130; *see also Velasquez v. Reno,* 37 F. Supp. 2d 663, 672 (D.N.J. 1999) (``This court cannot simply ignore the plain language of the statute which provides that an alien is to be taken into custody `when the alien is released.' ''). As another court noted, ``Congress could have required custody `regardless of when the alien is released' or `at any time after the alien is released,' '' but did not do so. *Alwaday v. Beebe,* 43 F. Supp. 2d 1130, 1133 (D. Or. 1999) (citing *Pastor-Camarena v. Smith,* 977 F. Supp. 1415, 1417-18 (W.D. Wash. 1997) (finding it ``arbitrary and capricious... to interpret the phrase [`when the alien is released'] to include [persons]... who were released from incarceration many years before coming into the custody of the INS for deportation proceedings'')). Yet another court found that ``since Rivera was released from state criminal incarceration in April 1995, over three years *before* he was taken into custody by the INS in May 1998, the prohibitions on release of aliens taken into custody under section 236(c)(1) do not apply to him.'' *Rivera v. Demore,* No. C99-3042-TEH, 1999 WL 521177, at * 4 (N.D. Cal. July 13, 1999). These courts have concluded uniformly that ``the plain meaning of this language is that it applies immediately after release from incarceration, not to aliens released many year[s] earlier.'' *Pastor-Camarena v. Smith, supra,* at 1417-18 (citing *Grodzki v. Reno,* 950 F. Supp. 339, 342 (N.D. Ga. 1996); *Montero v. Cobb,* 937 F. Supp. 88 (D. Mass. 1996)).

Nevertheless, the majority proposes that there is a question as to whether the ``when... released'' phrase in paragraph (1) should be given any effect at all in interpreting the scope of the limitation on the Attorney General's authority to release some aliens from such custody under paragraph (2). *See Matter of Rojas,* 23 I. & N. Dec. 117 (BIA 2001). The majority claims that in interpreting the scope of the Attorney General's authority to release certain aliens from custody under paragraph (2) of section 236(c) of the Act, ``we must determine whether an `alien *described in* paragraph (1)'... *additionally refers* to an alien

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

who is taken into Service custody `when the alien is released.' " *Id.* at 119 (emphasis added).

The term ``described in'' is not a novel reference. Most recently, in *Matter of Vasquez-Muniz,* Interim Decision 3440 (BIA 2000), we construed the use of the phrase ``described in'' in the aggravated felony definition to refer to another federal statute. We found it to be defined in common usage as ``to represent by words written or spoken;... to state in detail the particulars of.'' *Id.* at 7 (quoting *Webster's New International Dictionary* 706 (2d ed. 1959)). We found that ``each usage of the phrase `described in'... clearly refers to *something specifically set forth elsewhere in the statute* or regulation.'' *Id.* at 8 (emphasis added). Paragraph (1) of section 236(c) specifically sets forth the description of aliens who are subject to mandatory custody when they are released from criminal incarceration.

The majority's characterization of the issue strains credulity. The statute does not present the language ``when the alien is released'' as some adjunct to the statute, but as a component part. Nevertheless, the majority contends that there is a question whether the phrase ``'when the alien is released' is *a necessary part* of the description of the alien in paragraph (1).'' *Matter of Rojas, supra,* at 119 (emphasis added). Pared down to its basics, the majority opinion holds that ``'when the alien is released' is *[not] a necessary part* of the description of the alien in paragraph (1).'' *Id.* (emphasis added).

It is not our role to determine whether particular language used by Congress is ``necessary.'' It is our role to implement the statute Congress enacted according to the intent of Congress that is expressed by the language Congress used. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). Indeed, we have previously acknowledged that ``it is assumed that the legislative purpose is expressed by the ordinary meaning of the words... [and] the language of the statute must ordinarily be regarded as conclusive....'' *Matter of Noble, supra,* at 677 (citing *INS v. Cardoza-Fonseca,* 480 U.S. 421, 446 (1987)); *see also Matter of M/V Signeborg,* 9 I. & N. Dec. 6, 7-8 (BIA 1960) (holding that ``the language of the law cannot be enlarged beyond the ordinary meaning of its terms'').

``An alien described in paragraph (1)'' is an alien who comes within the language used by Congress in paragraph (1), i.e., an alien who is inadmissible or deportable under a section of the Act and who is taken into custody upon release from incarceration. This paragraph describes the particular aliens whom the Attorney General is bound to detain. Language should not be construed in a way that renders a term surplusage. *United States v. Menasche,* 348 U.S. 528 (1955). It is simply splitting hairs to assert, as the majority does, that the portion of the paragraph referring to when the designated inadmissible and deportable aliens are to be taken into custody is not part of the description of which aliens are to be detained without possibility of release. [1]

Where Congress' intent is clearly expressed in the language it uses, it must be given effect. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra,* at 842-43. Yet the majority resorts to the same argument it asserted in *Matter of Noble, supra,* contending here that ``the `when released' clause is no more a part of the *description* of an alien who is subject to detention than are the other concluding clauses... [which] address themselves to the statutory command that the `Attorney General shall take into custody' certain categories of aliens, rather than to the description of those categories.'' *Matter of Rojas, supra,* at 121; *cf. Matter of Noble, supra,* at 680. Not surprisingly, the majority fails to provide any reason why characterizing the language as a directive makes it any less a description, particularly when that description is communicated as part of a mandate to the Attorney General.

As I have demonstrated, *all* of paragraph (1) is a directive to the Attorney General to take the described aliens into custody. Paragraph (2) refers to all of these aliens. We have emphasized that in the absence of ``clearly expressed legislative intention ... any *inferences*... are insufficient to override the literal language of the statute.... We are not at liberty to rewrite the literal language... and any changes to the express language must be left to Congress.'' *Matter of Noble, supra,* at 685-86. The majority ignores its own words in concluding that the ``when... released'' phrase is not necessary to the reading of

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

paragraph (1) and is not part of a description of the aliens whom the Attorney General must   detain.

## B. Prior Federal Court Decisions

The majority of the federal district courts that have considered the language at issue under one or another of the statutory enactments invoking such language have not adopted the interpretation advocated by the majority. Although some courts have concluded that mandatory detention is permissible, none has expressly agreed that ``when the alien is released'' is not necessary to an interpretation of the statute and is not a part of the description of which aliens are to be held in custody upon their release from incarceration.

The majority addresses the federal district court's decision in *Pastor-Camarena v. Smith, supra,* as though it were the only federal court decision to contain   a significant analysis in opposition to   that adopted here by the majority. However, prior to 1997, numerous courts held that the language ``upon release of the alien from incarceration'' meant that the statute did not apply to aliens who were both convicted and released from incarceration before the statute was enacted. *See, e.g., Montero v. Cobb, supra,* at 95 (finding that the petitioner was entitled to a bond hearing, in part because section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (``AEDPA''), did not apply to aliens convicted and released prior to its enactment); *Grodzki v. Reno, supra,* at 342-43 (finding that the ``upon release'' language at least implies that Service custody must commence within a reasonable time after release from incarceration and the statute therefore did not apply to the petitioner, who had been released from incarceration 8 years earlier); *DeMelo v. Cobb,* 936 F. Supp. 30, 36 (D. Mass. 1996) (holding that AEDPA § 440(c) could not, by its language, apply to aliens who were convicted and released before the statute was enacted), *vacated,* 108 F.3d 328 (1st Cir. 1997)   (question mooted   by passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (``IIRIRA'')); *Villagomez v. Smith,* No.   C96-1141C, 1996 WL 622451, at * 6 (W.D. Wash. July 31, 1996) (holding that the language of AEDPA § 440(c) supported the conclusion that it did not apply to aliens convicted and released prior to its   enactment).

As these decisions indicate, in enacting section 236(c) of the Act, Congress should have been aware   that the ``upon release'' language of section 440(c) of the AEDPA was consistently being interpreted as   limiting the applicability of the provision to aliens convicted and released after its enactment. ``It is   axiomatic that `identical words used in different parts of the same act are intended to have the same   meaning.' '' *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 203 n.12 (1993) (quoting *Atlantic Cleaners   & Dyers, Inc. v. United States,* 286 U.S. 427, 433 (1932)). If Congress had intended to make the statute   applicable to aliens regardless of when they were released or when they were taken into custody by the   Service, it could easily have included language to that effect. *See McCarthy   v. Bronson,* 500 U.S. 136, 140 (1991) (presuming that Congress was familiar with judicial opinions interpreting particular language relating to the subject matter when it again selected and enacted such language); *see also Velasquez v. Reno, supra,* at 671; *Matter of Adeniji, supra,* at 28 (Rosenberg, concurring and dissenting) (``We have every reason to presume that Congress intended the same term, `released,' to be understood similarly in each provision....'').

Each of the federal district court rulings addressing whether section 236(c) of the Act applies to persons   released from criminal incarceration prior to October 9, 1998, struck down the interpretation of the term   ``released'' that was suggested by our decision in *Matter of Noble, supra. See, e.g., Grant v. Zemski,* 54 F. Supp. 2d 437 (E.D. Pa. 1999); *Aguilar v. Lewis,* 50 F. Supp. 2d 539 (E.D. Va. 1999); *Alwaday v. Beebe,   supra; Velasquez v. Reno, supra; Miranda-Arteaga v. Reno,* CV-99-0949 (M.D. Pa. July 1, 1999);   *Abdel-Fattah v. Reno,* Civ. No. 99-947 (M.D. Pa. June 28, 1999); *Alvarado-Ochoa v. Reno,* 99-0470-IEG   (AJB) (S.D. Cal. May 28, 1999); *Baltazar v. Fasano,* No. 99-CV-380 BTM (S.D. Cal.  Mar. 25, 1999); *Reyes-Rodriguez v. Fasano,* 99-CV-0023 (S.D. Cal. Feb. 26, 1999); *Alves-Curras v. Fasano,* 98-CV-2295 (S.D. Cal. Feb. 22, 1999). These cases all hold that the plain language ``released,'' in both section 236(c) of the Act and section 303(b)(2) of the IIRIRA, 110 Stat. at 3009-586, applies only to   aliens

Copyright (c) 2001 Matthew Bender & Company, Inc , a member of the LexisNexis Group.  All rights reserved.

who are released from criminal incarceration on October 9, 1998, or a later date.

In addition, virtually every federal district court that has addressed the statute following the expiration of the transition rules has ruled that section 236(c) of the Act applies only to aliens ``released'' into immigration custody on October 9, 1998, or later. *See, e.g., Alikhani v. Fasano, supra,* at 1130 (recognizing that section 236(c) ``provides that the Attorney General shall take an alien who has committed certain specified crimes into custody `when the alien is released' ''). ``Given the plain language of the statute,... § 1226(c) does not apply to aliens released from prison prior to the effective date of the statute.'' *Id.* (citing *Velasquez v. Reno, supra; Alwaday v. Beebe, supra); cf. Parra v. Perryman,* 172 F.3d 954 (7th Cir. 1999). As the court in *Rivera v. Demore, supra,* noted, ``By its terms section 236(c) gives the INS a strong incentive to detain criminal aliens immediately after their release from criminal custody: if taken into INS custody immediately, the mandatory detention rules apply, precluding the risk of flight arising from release on bond and avoiding altogether the administrative burden and expense of bond hearings.'' *Id.* at * 4.

In short, the vast majority of federal district courts have universally rejected the majority's reading of the ``release'' language of the TPCR, which was first set forth in *Matter of Noble, supra.* What is more, the majority's reading has been found to be a ``deviation from the plain language of section 303(b)(3)(A).'' *Rivera v. Demore, supra,* at * 5 (``This curious interpretation is then bolstered in the [*Noble*] opinion by a rehearsal of IIRIRA's compelling purpose of providing an expedited mechanism for removing the `growing criminal immigrant population in this country,'... and disbelief that Congress meant to narrow the class of criminal aliens subject to mandatory detention to those taken into custody *when released* from criminal incarceration.'') (citations omitted).

## C. Prior Board Decisions

Moreover, we do not approach the question of the scope of mandatory detention under section 236(c) of the Act in a vacuum. We previously have construed the statute in relation to an alien's release from criminal incarceration in two cases after our decision in *Matter of Noble, supra.* In *Matter of Adeniji, supra,* we held that section 236(c) requires mandatory detention of a criminal alien only if he or she is released from criminal custody after October 8, 1998, the last day that the TPCR were in effect. *See* IIRIRA § 303(b)(2) (providing that section 236(c) of the Act ``shall apply to individuals released after [the expiration of the TPCR on October 9, 1998]''). To reach this result, we were forced to consider *when* the alien was released from criminal incarceration. When the alien was released from criminal incarceration played a significant part in our determination whether section 236(c) applied.

In addition, in *Matter of West,* Interim Decision 3438 (BIA 2000), we ruled that the mandatory custody rules did not apply to an alien who had been released from actual criminal incarceration in 1997, prior to the expiration of the TPCR, and who had only been subject to probation after that time. To reach that conclusion we had to construe the ``released after'' language in the TPCR to include aliens who might otherwise be subject to mandatory detention, but who were released before October 8, 1998. Therefore, we again considered when an alien was released from criminal incarceration in determining whether the mandatory detention provisions of section 236(c) applied.

In each of these cases, we addressed the applicability of mandatory custody provisions not merely by looking to the violations of the Act described in section 236(c)(1) of the Act, but by reviewing the entirety of subsection (c) to determine which aliens were subject to mandatory custody and ineligible to be considered for release. Although the specific question before us is limited to the scope of section 236(c)(2), our prior interpretations clearly recognized that the factor of when an alien is released is an integral part of the mandatory custody directive in the statute. There is no basis to bifurcate the paragraph so that ``when the alien is released'' is somehow severed from the entirety of the paragraph, for purposes of determining which aliens the Attorney General may not release from immigration custody.

## II. STATUTORY LIMITATION IN LIGHT OF CONSTITUTIONAL CONSIDERATIONS

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

As I noted in my dissenting opinion in *Matter of Valdez,* 21 I. & N. Dec. 703 (BIA 1997), the canons of statutory construction militate in favor of a restrictive interpretation of a statutory provision ```if a broader meaning would generate constitutional doubts.' '' *Id.* at 718 (Rosenberg, dissenting) (quoting *United States v. Witkovich,* 353 U.S. 194, 199 (1957)); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445-46 (1988). The interpretation advocated by the majority raises serious constitutional   doubts concerning the statute as applied to the respondent.

The Board does not have jurisdiction to address constitutional issues. However, we certainly may take   note of constitutional issues in construing statutory provisions. The encroachment on the liberty interests   of an alien deemed to be subject to mandatory detention raises questions of constitutional magnitude.   *See Cabreja-Rojas v. Reno,* 999 F. Supp. 493, 496 (S.D.N.Y. 1998); *St. John v. McElroy,* 917 F. Supp. 243, 250 (S.D.N.Y. 1996) (finding the interest in freedom from confinement   to be ``of the highest constitutional import''). A number of courts have held that section 236(c) of the Act, by denying   altogether the possibility of bail and release, violates substantive due process, procedural due process, or   both. *See, e.g., Small v. Reno,* 127 F. Supp. 2d 305 (D. Conn. 2000); *United States ex. rel. Radoncic v.   Zemski,* 121 F. Supp. 2d 814 (E.D. Pa. 2000); *Chukwuezi v. Reno,* No. CIV. A. 3:CV-99-2020, 2000 WL 1372883 (M.D. Pa. May 16, 2000); *Szeto v. Reno,* No. C 00-0531 CRB, 2000 WL 630869 (N.D. Cal. May 5, 2000); *Danh v. Demore,* 59 F. Supp. 2d 994 (N.D. Cal. 1999); *Van Eeton v. Beebe,* 49 F. Supp. 2d 1186 (D. Or. 1999); *Martinez v. Greene,* 28 F. Supp. 2d 1275 (D. Colo. 1998). *But see, e.g., Parra v.   Perryman,* 172 F.3d 954 (7th Cir. 1999); *Lezcano v. Reno,* No. C 99-4894 MJJ, 2000 WL 1175564 (N.D.   Cal. Aug. 4, 2000).

Most courts have concluded that, in light of the fundamental interest involved, the highly deferential standard articulated in *Reno v. Flores,* 507 U.S. 292 (1993), is inappropriate here. *See, e.g., Small v. Reno, supra,* at 314. Rather, the standard applicable to pretrial detention, articulated in *United States v. Salerno, supra,* should apply. *See Welch v. Reno, supra,* at 353-55 (citing *Van Eeton v. Beebe,   supra,* at 1189; *Rogowski v. Reno,* No. Civ. 3:99cv790 (PCD), 1999 WL 1702851, at * 7 (D. Conn. Oct. 28, 1999); *Martinez v. Greene, supra,* at 1278); *see also Grant v. Zemski, supra,* at 442.

Many of the decisions that have found constitutional issues to be present have looked to circumstances   in which an alien has not conceded deportability and has not yet been ordered removed. ``Thus, the   possibility of release on bail in this case is not postponing the inevitable.'' *See Szeto v. Reno, supra,* at * 4 (citing *Bouayad v. Holmes,* 74 F. Supp. 2d 471 (E.D. Pa. 1999) (``Where, as here, a petitioner contests   whether he is removable under 8 U.S.C. § 1227, the option of ending detention by departing this country   does not cure any constitutional infirmity in the mandatory detention provisions.''); *see also Danh v.   Demore, supra,* at 1002-03 (distinguishing *Parra v. Perryman, supra,* on the grounds that petitioners were vigorously challenging their deportability); *Szeto v. Reno, supra,* at * 4 (same; noting that Parra   had conceded the charges).

## III. CONCLUSION

The   stretch of interpretation required by the majority's construction is not supported by the plain language of the statute and is unreasonable. The aliens described in paragraph (1) of section 236(c) of the Act are the ones who are deemed to be inadmissible and deportable for the cited violations and taken into custody when they are released from criminal incarceration. These are the aliens described in paragraph (2) as the ones who may not be released.

The interpretation I reach from a straightforward reading of the plain language of the statute would allow   for a hearing when an individual alien, such as this respondent, has already been released into the community, and it would authorize the detention of such individuals where warranted following an individualized hearing. The alternative interpretation I offer is not only the better one as a matter of statutory construction. It also avoids some of the difficult constitutional questions raised by requiring mandatory prehearing detention, without individualized determinations, of people who already have been released into the community. Accordingly, I dissent.

Copyright (c) 2001 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved

Matter of Victor Leonardo ROJAS, Respondent
File A43 963 762 — Boston
Board of Immigration Appeals May 15, 2001
(Interim Dec. BIA No. 2001 BIA LEXIS 11, 23 I. & N. Dec. 117 (I.I. 2451, BIA 2001))

**Editorial information: index**

Index: Detention of aliens (mandatory)

**Editorial information: summary**

### SUMMARY OF ISSUES

DETENTION: 8 U.S.C. § 1226(c) (Supp. V 1999); A criminal alien who is released from criminal custody after the expiration of the Transition Period Custody    Rules is subject to mandatory detention pursuant to section 236(c) of the Immigration and Nationality    Act, 8 U.S.C. § 1226(c) (Supp. V 1999).

**Editorial information: syllabus**

### BIA SYLLABUS

A criminal alien who is released from criminal custody after the expiration of the Transition Period Custody    Rules is subject to mandatory detention pursuant to section 236(c) of the Immigration and Nationality    Act, 8 U.S.C. § 1226(c) (Supp. V 1999), even if the alien is not immediately taken into custody by the    Immigration and Naturalization Service when released from incarceration.

**Editorial information: cross-ref**

### CROSS-REFERENCES

Immigration Law and Procedure chap. 108.

**Counsel**

FOR RESPONDENT: James C. Dragon, Esquire, Lowell, Massachusetts.

**Judges**

BEFORE: Board En Banc: Scialabba, Acting Chairman; Dunne, Vice Chairman; Heilman, Holmes, Hurwitz, Filppu, Cole, Mathon, Jones, Grant, and Ohlson, Board Members. Concurring and Dissenting Opinion: Moscato, Board Member, joined by Villageliu, Board Member. Dissenting Opinion: Rosenberg, Board Member, joined by Schmidt, Guendelsberger, Miller, Brennan, Espenoza, and Osuna, Board Members.

**Opinion**

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

**Opinion by**

FILPPU, Board Member:

**Opinion**

In a bond order dated October 4, 2000, an Immigration Judge denied the respondent's request for a change in his custody status. The respondent filed a timely appeal. The Immigration Judge's reasons for the bond order are set forth in a memorandum dated December 1, 2000. The respondent's appeal will be dismissed.

## I. BACKGROUND

The bond record as a whole creates some uncertainty regarding the precise dates on which various relevant events took place. It is not critical to resolve these uncertainties, because the relevant sequence of events is not in dispute. For purposes of this bond appeal, we will accept the respondent's factual account.

The respondent is a native and citizen of the Dominican Republic who was admitted to the United States as a lawful permanent resident on December 26, 1992. He was convicted in New Hampshire on March 3, 1998, of the offense of possession of a controlled substance (cocaine) with intent to sell, and he was sentenced to imprisonment for a term of 2 1/2 to 5 years. The Immigration and Naturalization Service initiated removal proceedings against the respondent by issuance of a Notice to Appear (Form I-862), which was served on March 25, 1998. The Service charges that the respondent is subject to removal pursuant to section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. V 1999), as an alien convicted of an aggravated felony, and pursuant to section 237(a)(2)(B)(i) of the Act, as an alien convicted of a controlled substance violation.

The respondent was released from the custody of the State of New Hampshire on parole. On July 26, 2000, the second day of his release on criminal parole, he was taken into custody by the Service. The respondent requested a review by an Immigration Judge of the Service's custody determination. The respondent argues that he is not subject to mandatory detention under section 236(c) of the Act, 8 U.S.C. § 1226(c) (Supp. V 1999), because he was not taken into custody ``when... released'' from incarceration, but rather was free in the community before being detained by the Service.

## II. IMMIGRATION JUDGE'S DECISION

The Immigration Judge concluded that the respondent, who is deportable by reason of having committed an offense covered in sections 237(a)(2)(A)(iii) and (B)(i) of the Act, is subject to the mandatory detention provisions of section 236(c) of the Act. The Immigration Judge rejected the respondent's argument that he is not subject to section 236(c) because the Service failed to apprehend him at the time of his release, instead waiting 2 days before taking him into custody. The Immigration Judge therefore concluded that he did not have jurisdiction to redetermine the custody conditions imposed by the Service in this case. *See* 8 C.F.R. § 3.19(h)(2)(i)(D) (2001).

## III. STATUTE AT ISSUE

The question before us involves the interpretation of section 236(c) of the Act, which provides, in relevant part, as follows:

(1) CUSTODY.–The Attorney General shall take into custody any alien who--

(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2),

---

Immigration Precedent Decisions

2

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

     (B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D),

     (C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year,   or

     (D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) RELEASE.--The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides... that release of the alien from custody is necessary [for certain witness protection matters], and the alien satisfies the Attorney General that the   alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

## IV. ISSUE PRESENTED

     The first paragraph of section 236(c) of the Act directs the Attorney General to assume custody over   certain categories of criminal and terrorist aliens. The second paragraph of section 236(c) governs the   ``release'' of these aliens. It specifies that the Attorney General may release ``an alien described in paragraph (1)'' only if certain strict conditions are met. The mandatory detention aspects of the statute, therefore, derive from the language of section 236(c)(2). Consequently, we must determine whether the respondent is ``an alien described in paragraph (1)'' of section 236(c), even though he was not immediately taken into custody by the Service when he was released from his criminal custody.

     In order to resolve the issue before us, we must   determine whether an ``alien described in paragraph (1)'' is a statutory reference to any alien who falls simply within the discrete language of subparagraphs (A), (B), (C), or (D), or whether it additionally refers to an alien who is taken into Service custody ``when the alien is released.'' In other words, we must determine whether or not the phrase ``when the alien is released'' is a necessary part of the description of the alien in paragraph (1).

     The respondent has not disputed that he is deportable by reason of having committed an offense covered  in sections 237(a)(2)(A)(iii) and (B)(i) of the Act. In addition, the record reflects that he was released  from criminal custody after the expiration on October 8, 1998, of the Transition Period Custody Rules   (``TPCR''), which were enacted by section 303(b)(3) of the Illegal Immigration Reform and Immigrant   Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 (``IIRIRA'').   *See Matter of Adeniji,* Interim Decision 3417 (BIA 1999) (holding that section 236(c) requires mandatory   detention of a criminal alien only if he or she is released from criminal custody after October 8, 1998, the   last day that the TPCR   were in effect).

     In *Matter of Adeniji, supra,* we did not address the question whether section 236(c)(2) directs mandatory   detention only if the Service immediately takes custody of the alien ``when the alien is released'' from   criminal incarceration (the ``when released'' language). *Id.* at 8. We did note, however, that the effect of   the ``when released'' clause would appear to be of concern principally in the case of an alien who was   released after the expiration of the TPCR, but who was not promptly taken into Service custody. *Id.* at 8-9 n.2. This is such a case.

## V. PRINCIPLES OF STATUTORY CONSTRUCTION

     Proper statutory construction must begin with the words used by Congress. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 431 (1987). We must start with the language of the statute, and the words

---

Immigration Precedent Decisions                                    3

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved

should be given their "'ordinary or natural' " meaning. *Bailey v. United States,* 516 U.S. 137, 145 (1995) (quoting *Smith v. United States,* 508 U.S. 223, 228-29 (1993)); *INS v. Phinpathya,* 464 U.S. 183, 189 (1984). Where the language of the statute is clear, the inquiry is ended. The unambiguously expressed intent of Congress must be given effect. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). However, if an ambiguity is perceived when a provision is read in isolation, it is often clarified when it is interpreted in the context of the remainder of the statutory scheme. *Bailey v. United States, supra,* at 146; *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988). The meaning assigned to statutory language should be the one that emerges from a reading of the statute as a whole, taking into account its object and policy. *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 94-95 (1993).

In the context of this case, the literal language of section 236(c)(2) of the Act, which provides for the detention of "an alien described in paragraph (1)," does not unambiguously tell us whether it encompasses the "when the alien is released" clause in section 236(c)(1) or merely references the four categories of aliens described in subparagraphs (A) through (D). We find the statutory provision, when read in isolation, to be susceptible to different readings. We therefore find it necessary to examine more than the language in question, and we turn in part to the remainder of the statutory scheme, taking into account its objectives and policy in order to resolve the issue before us. *See Bailey v. United States, supra; John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, supra.*

## VI. BOARD INTERPRETATION OF SECTION 236(c) OF THE ACT
### A. Ordinary Meaning

The natural reading of the statutory language of section 236(c)(2) of the Act is not without importance, even though more than one reading may be permissible. The statutory reference to "an alien described in paragraph (1)" seems to us most appropriately to be a reference to an alien described by one of four subparagraphs, (A) through (D). The "description" of the alien does not naturally appear to include any or all of the concluding clauses of paragraph (1), namely the clauses directing that a described alien be taken into custody "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."

In *Matter of Noble,* 21 I. & N. Dec. 672 (BIA 1997), we analyzed the "when released" clause contained in the TPCR. We concluded that this statutory language imposed a duty on the Service to assume the custody of certain criminal aliens and specified the point in time at which that duty arises. In other words, we read the phrase "when the alien is released" in the TPCR as modifying the command that the "Attorney General shall take into custody" certain criminal aliens by specifying that it be done "when the alien is released" from criminal incarceration.

The structure of section 236 is identical, in this respect, to the structure of the TPCR. The "when released" clause is no more a part of the description of an alien who is subject to detention than are the other concluding clauses. Those other concluding clauses simply make it plain that the duty to detain is not affected by the character of an alien's release from criminal incarceration or the possibility that an alien may be rearrested on criminal charges. All of these concluding clauses, including the "when released" clause, address themselves to the statutory command that the "Attorney General shall take into custody" certain categories of aliens, rather than to the description of those categories.

### B. Overall Statutory Context

The other statutory provisions pertaining to the removal process place no importance on the timing of an alien's being taken into custody by the Service.

A number of the amendments made by the IIRIRA were aimed at expediting the removal of aliens, and that is especially true for criminal aliens such as those who fall within subparagraphs (A) through (D) of section 236(c)(1) of the Act. For example, Congress made various forms of relief unavailable to

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

criminal   aliens and significantly restricted judicial review for criminal aliens. *See, e.g.,* section 240A(a)(3) of the   Act, 8 U.S.C. § 1229b(a)(3) (Supp. V 1999) (barring permanent residents convicted of aggravated felonies from eligibility for cancellation of removal); section 242(a)(2)(C) of the Act, 8 U.S.C. § 1252(a)(2)(C) (Supp. V 1999) (restricting judicial review for certain criminal aliens).

There is no connection in the  Act between the timing of an alien's release from criminal incarceration, the assumption of custody over the alien by the Service, and the applicability of any of the criminal charges of removability. Furthermore, the Act does not tie an alien's eligibility for any form of relief from removal to the timing of the alien's release from incarceration and the assumption of custody by the Service. In other words, the ``when released'' issue is irrelevant for all other immigration purposes. The changes made by the IIRIRA to expedite removal are not limited to aliens coming into Service custody immediately upon release from criminal incarceration. Instead, the amendments made by the IIRIRA cover criminal aliens regardless of when they were released from criminal confinement and regardless of whether they had been living within the community for years after their release.

We understand, in this regard, that Congress was frustrated with the ability of aliens, and particularly   criminal aliens, to avoid deportation if they were not actually in Service custody when their proceedings   were completed. *See* S. Rep. No. 104-48 (1995) (stating that many criminal aliens who are released    pending deportation  never appear for their proceedings, and that some criminal aliens abscond after being issued a final order of deportation); 141 Cong. Rec. S7803, S7823 (daily ed. June 7, 1995) (statement of Sen. Abraham); *see also Ofosu v. McElroy,* 98 F.3d 694, 702 (2d Cir. 1996) (stating that released aliens who abscond calculate correctly that the Service lacks the resources to conduct a dragnet). The statute does direct the Attorney General to take custody of aliens immediately upon their release from criminal confinement. But Congress was not simply concerned with detaining and removing aliens coming directly out of criminal custody; it was concerned with detaining and removing *all* criminal aliens.

In sum, we discern that the statute as a whole is focused on the removal of criminal aliens in general, not   just those coming into Service custody ``when... released'' from criminal incarceration. The objectives   and design of the statute as a whole are therefore not consistent with reading the ``when released''   clause as being part of the meaning of ``an alien described in paragraph (1),'' as that phrase is understood   in section 236(c)(2) of the Act.

## C. Predecessor Provisions

The history of the statutory mandate to detain criminal aliens does not indicate to us that Congress had   a different meaning in mind, even though various predecessor provisions contained ambiguous language   similar to the provision we interpret today. Mandatory detention was first introduced in the Anti-Drug   Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (``ADAA''). *See ADAA* § 7343, 102 Stat. at 4470.   The *ADAA* added former section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (Supp. I 1989), which   provided as follows:

The Attorney General shall take into custody any alien convicted of an aggravated felony *upon completion of the alien's sentence for such conviction.* Notwithstanding subsection (a), the Attorney General shall not release such felon from custody. (Emphasis added.)

The second sentence of this statute mandated the detention of any ``such felon,'' which could readily be   understood as ``any alien convicted of an aggravated felony.'' Nevertheless, the ``upon completion'' clause   of this original provision raises uncertainty as to the scope of its coverage that is comparable to the   uncertainty raised by the ``when released'' clause   in the present statute. Similar uncertainty exists   in amendments made by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996,    Pub. L. No. 104-132, 110 Stat. 1214, 1277 (``AEDPA''), further amended by section 306(d) of the IIRIRA, 110 Stat. at 3009-612, as well as in section 303(b)(3) of the IIRIRA, 110 Stat. at 3009-586, which gave   us the TPCR. These statutory changes are not of substantial guidance.

---

Immigration Precedent Decisions                                                                                          5

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

However, former section 242(a)(2) was amended, in a manner that we find instructive, by section 504 of   the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5049 (``1990 Act''), and by section 306(a)(4) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L.   No. 102-232, 105 Stat. 1733, 1751 (effective as if included in the 1990 Act). Section 242(a)(2) of the   Act, as amended by these 1990 and 1991 enactments, provided as follows:

(A) The Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect   of the same offense). Notwithstanding paragraph (1) or subsections (c) and (d) but subject to subparagraph (B), the Attorney General shall not release such felon from custody.

(B) The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings.

We find this version of the statute to be particularly instructive. This version separates the provision requiring the Attorney General to assume the custody of aliens coming out of criminal incarceration from the provision governing the release of criminal aliens. Subparagraph (A) includes the ``upon release of the alien'' language that is comparable to the ``when released'' clause of the current statute. It requires the Attorney General to assume custody of criminal aliens at the time of their release from criminal custody.

Subparagraph (B), however, specifies that the Attorney General may not release ``any lawfully admitted   alien who   has been convicted of an aggravated felony'' unless certain conditions are met. Importantly, those conditions extended to *all* aliens convicted of aggravated felonies, regardless of whether the aliens actually came into Service custody ``upon release'' from criminal incarceration. In other words, the groups of criminal aliens subject to mandatory detention were not affected by the timing of their release from criminal custody or the timing of the Service's acquisition of custody. Under this provision, all aliens convicted of aggravated felonies who had *not* been lawfully admitted were subject to mandatory detention.

In sum, the statute has contained different phrases over the years, from ``upon completion of the alien's   sentence'' to ``upon release of the alien'' to ``when the alien is released.'' Some of the statutory versions   contain the ambiguity we face now. But the version stemming from the 1990 and 1991 amendments does   not. That version is strong evidence that Congress was not attempting to restrict mandatory detention   to criminal aliens taken immediately into Service custody at the time of their release from a state or   federal correctional institution.

D. Practical Considerations

In *Matter of Noble, supra,* at 681-82, we identified a variety of practical considerations affecting the statutory analysis, some of which apply to this case as well. We see no need to repeat that discussion here. *Id.* at 679-82. We merely observe that these practical concerns reinforce the reading that emerges from the structure of the statute as a whole and from the history of the mandatory detention provision itself.

There are, however, additional analytical problems arising from the respondent's interpretation of the   ``when released'' clause. For example, it is not clear where the line would be drawn under his reading of   the statute. Would mandatory detention apply only if an alien were literally taken into custody ``immediately'' upon release, or would there be a greater window of perhaps 1 minute, 1 hour, or 1 day?

Such questions are not relevant to any other aspect of removal proceedings. It would therefore be inconsistent with our understanding of the statutory design to construe section 236(c) of the Act in a   way that permits the release of some criminal aliens, yet mandates the detention of others convicted of   the

---

Immigration Precedent Decisions                                                                                      6

Copyright (c) 2001 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved.

same crimes, based on whether there is a delay between their release from criminal custody    and their apprehension by the Service.

### E. Summary

We construe the phrasing ``an alien described in paragraph (1),'' as including only those aliens described in    subparagraphs (A) through (D) of section 236(c)(1) of the Act, and as not including the ``when released''    clause. Our interpretation is derived from the natural meaning of the statutory language, from the object    and design of the statute as a whole, and from the history of the mandatory detention provisions. It is    reinforced by practical concerns that would otherwise arise.

### VII. JUDICIAL RESPONSE TO *MATTER OF NOBLE*

The federal district courts appear to be divided on our interpretation of the TPCR in *Matter of Noble, supra.* Our analysis has been rejected by several district courts that have followed the lead taken in *Pastor-Camarena v. Smith,* 977 F. Supp. 1415 (W.D. Wash. 1997). *See, e.g., Alikhani v. Fasano,* 70 F. Supp. 2d 1124 (S.D. Cal. 1999); *Aguilar v. Lewis,* 50 F. Supp. 2d 539 (E.D. Va. 1999); *Alwaday v. Beebe,* 43 F. Supp. 2d 1130 (D. Or. 1999); *Rivera v. Demore,* No. C 99-3042 TEH, 1999 WL 521177 (N.D.    Cal. July 13, 1999); *Grodzki v. Reno,* 950 F. Supp. 339 (N.D. Ga. 1996); *see also Grant v. Zemski,* 54 F. Supp. 2d 437 (E.D. Pa. 1999); *Velasquez v. Reno,* 37 F. Supp. 2d 663 (D.N.J. 1999). The respondent relies heavily on the reasoning of *Pastor-Camarena v. Smith* and on other district court decisions that have followed its approach.

We do not agree with the *Pastor-Camarena* court's reasoning. The petitioner in that case had argued    that immigration law historically distinguished between persons taken into custody from the community at    large and those taken into custody directly upon release from the criminal justice system. In rejecting    *Noble*'s reading of the statute, the court appeared to accept the petitioner's ``historical'' argument by    pointing to the ``upon release'' clause in former section 242(a)(2) of the Act, as amended by section 440(c) of the AEDPA. [1.] The court found that the plain meaning of the phrase ``upon release of the alien    from incarceration'' is that it applies only to aliens ``immediately after release from    incarceration, not to aliens released many years earlier.'' *Pastor-Camarena v. Smith, supra,* at 1417.

The court in *Pastor-Camarena* accepted an incorrect ``historical'' argument. Our earlier discussion of    former section 242(a)(2) of the Act, after the 1990 and 1991 amendments, demonstrates that the statute was focused on the detention of certain aliens convicted of aggravated felonies and not on the timing of when they came into Service custody. Moreover,    the structure of former section 242(a)(2), as amended by the AEDPA, is largely the same as it was after the 1990 and 1991 amendments. The principal difference, for our purposes, is that section 440(c) of the AEDPA eliminated    subparagraph (B), which had authorized bond for aliens convicted of aggravated felonies if those aliens    had been lawfully admitted. It is the second sentence of former section 242(a)(2), as amended by the    AEDPA, that contains the mandatory detention requirement, and it applies to ``such felon.''

We read ``such felon'' as describing those aliens convicted of the covered criminal offenses, just as it had    similarly described an ``alien convicted of an aggravated felony'' in the version of the statute preceding    the AEDPA amendments. We do not read the term ``such felon'' as also including the ``upon release'' clause.    Rather, as set forth in *Matter of Noble, supra,* we read the ``upon release'' clause as a direction pertaining    to when the duty arises to take the alien into custody. Indeed, the structure of the statute after the 1990 and 1991 amendments clarifies that ``such felon'' is a reference to an alien ``convicted of an    aggravated felony'' and, importantly, that it is not also a reference to the ``upon release'' clause.    The analysis in *Pastor-Camarena* and the decisions that follow a similar approach do not, therefore, lead    us to reject the interpretation that we otherwise find appropriate in view of the statute as a whole.

Moreover, other courts have upheld the analysis set forth in *Matter of Noble. See Saucedo-Tellez v.*

---

Immigration Precedent Decisions                                                                                          7

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

*Perryman,* 55 F. Supp. 2d 882 (N.D. Ill. 1999) (deferring to *Noble* and concluding that the mandatory detention provision in section 236(c) of the Act includes aliens released from criminal custody after the TPCR expired who are later detained by the Service); *see also Okeke v. Pasquarell,* 80 F. Supp. 2d 635 (W.D. Tex. 2000) (agreeing with *Noble* that ``when the alien is released'' specifies the time at which the duty to detain a criminal alien arises).

As noted by the dissent, some district courts have found mandatory detention to be unconstitutional.   However, even the dissent's construction of the statute would not eliminate the constitutional concerns   raised in those decisions. Rather, the dissent's approach would merely reduce the number of   aliens who are subject to mandatory detention. The dissent also relies on a line of district court cases   that conclude that section 236(c) of the Act and its predecessors do not apply retroactively to aliens released from criminal custody prior to the date of enactment of the relevant mandatory detention provisions. We are not, however, applying section 236(c) to aliens who were released from criminal custody prior to the date on which the provision went into effect. We have previously determined that   such aliens are beyond the reach of section 236(c). *See Matter of Adeniji, supra* (holding that section 236(c) of the Act does not apply to aliens released from criminal custody prior to the expiration of the   TPCR on October 8, 1998).

## VIII. CONCLUSION

We find that the respondent is subject to mandatory detention pursuant to section 236(c) of the Act, despite the fact that he was not taken into Service custody immediately upon his release from state custody. The regulations do not give Immigration Judges bond jurisdiction over aliens who are properly subject to mandatory detention. *See* 8 C.F.R. § 3.19(h)(2)(i)(D). Accordingly, the Immigration Judge properly determined   that he did not have jurisdiction to redetermine the custody conditions   imposed by the Service in this case. *See Matter of Adeniji, supra.* The respondent's appeal will be   dismissed.

ORDER: The appeal is dismissed.

**Concur by**

CONCURRING AND DISSENTING OPINION: Anthony C. Moscato, Board Member, in which Gustavo D. Villageliu, Board Member, joined

**Concur**

I respectfully concur in part and dissent in part.

I concur in the result reached by the majority and find that the respondent is subject to mandatory detention pursuant to section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. V 1999). However, I disagree with the analysis used by the majority to reach that conclusion.

In several recent decisions, this Board has considered the impact of what has come to be called the   ``when released'' clause. This clause was directly considered in *Matter of Noble,* 21 I. & N. Dec. 672 (BIA 1997), tangentially considered in *Matter of Adeniji,* Interim Decision 3417 (BIA 1999), and *Matter of West,* Interim Decision 3438 (BIA 2000), and is once again considered directly in the instant case. In all   of those decisions, including both the majority and   dissenting opinions here, the Board has proceeded--virtually as a given--on the premise that the ``when released'' clause modifies the verb phrase ``*shall take into custody.*'' Section 236(c)(1) of the Act.

As a result of that conclusion, we have been left with a difficult question: does the ``when released'' clause, as it modifies the verb phrase ``shall take into custody,'' *require* that the Attorney General (or his delegate, the Immigration and Naturalization Service) be literally at the jailhouse door to take custody at the instant of release in order to create an alien ``described in paragraph (1)'' for purposes of mandatory

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

detention, as set forth in section 236(c)(2) of the Act?

The dissent asserts that this is precisely the meaning and the required result. The majority engages in a   lengthy legal and historical analysis of predecessor provisions to demonstrate, in the end, that the language of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, demonstrates that the ``when released'' clause, as it modifies the words ``shall take into custody,'' does not require the taking of an alien into custody at the instant of   release.

It is difficult to conclude that Congress meant to premise the success of its mandatory detention scheme   on the capacity of the Service to appear at the jailhouse door to take custody of an alien at the precise   moment of release. It was, as the majority documents, primarily its frustration with the Service's inability    to achieve the deportation of aliens not in detention that led Congress to create this scheme in the first    place. It therefore does not seem likely that Congress would have based the success of its newly created    scheme on a requirement that the Service perform at a very high level of efficiency. Nor do I believe that   Congress did so.

Proper statutory construction must begin with the words used by Congress. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 431 (1987). Where the language of the statute is clear, the inquiry is ended. *Chevron, U.S.A.,   Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). The language of this   statute is clear.

The text of section 236(c) of the Act is set forth below, divided into sections by parentheses for ease of   reference:

DETENTION OF CRIMINAL ALIENS.--

(1) CUSTODY.--

[1] (The Attorney General shall take  into custody)

[2] (any alien who -- (A) is inadmissible by reason of having committed any offense covered in section 212(a)(2)[1182], (B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) [1227], (C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at   least 1 year, or (D) is inadmissible under section 212(a)(3)(B) or deportable under  section 237(a)(4)(B),)

[3] (when the alien is released),

[4] (without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.)

In general, English usage seeks to place the modifier as close to the object being modified as possible. To   achieve the conclusion reached by the majority and the dissent, section 3 above must leap over the   lengthy section 2, which defines the categories of aliens subject to mandatory detention, in order to   modify section 1. This is possible, but less than likely.

It is more likely that Congress meant to do something simpler and clearer, namely,   to make section 3 modify the section immediately preceding and abutting it, section 2. Read in this fashion, we   find the following:

(1) If, when the alien is released (section 3), he or she falls into one of the four categories,  (A)-(D) (section 2), the Attorney General shall take the alien into custody (section 1). That's it. Under this reading, it doesn't matter when the Service takes an alien into custody--at the time of release, the

---

9

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

next day, 2 months later, or 5 years later.

(2) The ``when released'' clause thus serves two clear purposes in defining an alien who is subject to mandatory detention: a) it requires that the alien fall into one of the four defined   categories *when he or she is released;* and b) it limits the definition of an alien subject to mandatory detention to one who has been ``released.'' Thus, the Attorney General may not assume custody until the state has ``released'' the alien from incarceration.

(3) Finally, the remainder of the statute, encompassed by section 4, modifies the last word of section 3, ``released,'' and asserts that the form of release is irrelevant. In essence, while the definition of an alien subject to mandatory detention *does not include*   one who is incarcerated (*see* paragraph 2, above), it *does include* an alien who has been released from incarceration but is still subject to the other, lesser controls of federal or state criminal correctional systems.

If we adopt this reading, which comports more closely with preferred English usage, each word and clause   in the section has its natural meaning, and each works together to create a clear and harmonious whole--a whole that supports the overall statutory intent to place aliens who fall into certain categories   into mandatory detention. In addition, we are rid of the difficult issue regarding the temporal reach of the ``when released'' language; it simply disappears if the ``when released'' clause does not modify the verb phrase.

Finally, it has been suggested that there are serious due process concerns regarding both mandatory   detention, in general, and the broad scheme of mandatory detention set forth here, in particular. *See   Matter of Rojas,* 23 I. & N. Dec. 117 (BIA 2001) (Rosenberg, dissenting). That may well be true.   Mandatory detention, especially when it is imposed within the immigration law--a system that is clearly   *civil* in nature--must always be the subject   of concern and, where appropriate, be subject to limited application. However, as discussed above, Congress has spoken clearly on this matter. This  statute can fairly be read, according to the plain meaning of the words and usages employed, to require mandatory detention, without any requirement that the Service take an alien into custody at the moment of release.

In light of that clarity, and the extraordinary deference paid by the United States Supreme Court to the   plenary authority of Congress in the area of immigration, it is beyond the authority of this Board to consider the due process concerns generated by mandatory detention.


**Dissent by**

DISSENTING OPINION: Lory Diana Rosenberg, Board Member, in which Paul W. Schmidt, John Guendelsberger, Neil P. Miller, Noel A. Brennan, Cecelia M. Espenoza, and Juan P. Osuna, Board Members,   joined

**Dissent**

I respectfully dissent.

The ultimate issue before us is whether the respondent can obtain a change in immigration custody status or whether he must remain in immigration detention during the entire time that removal proceedings are pending against him. *See* section 236(*c*) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. V 1999). The   resolution of that question depends on whether the respondent is   ``*an alien described* in paragraph (1)'' who is subject to mandatory detention due to a criminal offense,   despite the fact he was not taken into custody by the Attorney General when he was released from   criminal incarceration. Section 236(c)(2) of the Act (emphasis added).

The majority concludes that, under the statute, the respondent is ineligible for a change in custody

---

Immigration Precedent Decisions                                                                    10
Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

Matter of Bartolome Johnny SORIANO a.k.a. Bartolome Soriano
A-9 196 067 - Napanoch
Board of Immigration Appeals
16 Immigr. Rptr. B-227  21 I. & N. Dec. 516, 1996 BIA LEXIS 29; 21 I. & N. Dec. 516, BIA 1996
June 27, 1996

**Editorial information: index**

Index: Deportation (Applicability of other statutes)

**Editorial information: summary**

### SUMMARY OF ISSUES

<u>DEPORTATION</u>: INA § 212(c), 8 U.S.C. § 1182(c); Amendments made to the Immigration and Nationality Act (``INA'') by the  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) which bar certain aliens from  obtaining relief from deportation under INA § 212(c) will not be applied retroactively to bar applications filed prior to the AEDPA's effective date.

**Editorial information: Syllabus**

### BIA SYLLABUS

(1) The 1996 amendments to section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994), bar relief to aliens deportable by reason of having  committed any of the criminal offenses described in the amended section 212(c).

(2) The bar  to relief under the amended section 212(c) applies only to applications filed after the April 24, 1996, date of enactment of the amendments.

(3) The respondent remained eligible for  relief under the amended section 212(c) of the Act because his application for that relief had  been filed by CROSS-REFERENCES

Immigration Law and Procedure §§ 74.04, 140.02

**Counsel**

ON BEHALF OF RESPONDENT:
Barry F. Kenyon, Esquire
45 White Street, 3rd Floor
New York, New York 10013
ON BEHALF OF SERVICE:
David M. Dixon
Chief Appellate Counsel

**Opinion**

---

Immigration Precedent Decisions                                                                 1
Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

**Opinion by**

Michael J. Heilman for the BOARD

**Opinion**

In a decision dated October 12, 1995, an Immigration Judge found the respondent deportable as charged, denied his application for a waiver of inadmissibility pursuant to section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994), and ordered him deported from the United States to the Dominican Republic. The respondent appealed from that decision on October 23, 1995. Subsequent to the respondent's appeal, Congress amended section 212(c) of the Act, and the Immigration and Naturalization Service has now filed a supplemental brief in response to the respondent's argument, asserting that the recent legislative amendments preclude the respondent from demonstrating his continuing eligibility for section 212(c) relief. [1] Thus, we are faced with the issue regarding the effective date of section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (``AEDPA''). We find the respondent eligible for section 212(c) relief, but will deny his appeal as a matter of discretion.

## I. PROCEDURAL HISTORY

The respondent is a native and citizen of the Dominican Republic. He entered the United States on March 28, 1985, as a lawful permanent resident. On May 20, 1992, the respondent was convicted under the law of the State of New York of the offense of attempted criminal sale of a controlled substance. Based on this conviction, the Service initiated deportation proceedings against the respondent with the issuance of an Order to Show Cause and Notice of Hearing (Form I-221) dated June 3, 1994. On April 28, 1995, the respondent filed an Application for Advance Permission to Return to Unrelinquished Domicile (Form I-191) pursuant to section 212(c) of the Act. By order dated October 12, 1995, the Immigration Judge found that the respondent was eligible for relief under section 212(c) of the Act, but denied that application in the exercise of discretion. On appeal, the respondent argues that the Immigration Judge erred in the exercise of that discretion.

## II. APPLICABLE LAW

Prior to considering the respondent's appeal of the Immigration Judge's discretionary determination, this Board must first address the Service's contention that the recent amendments to section 212(c) of the Act statutorily bar the Board from considering the merits of the respondent's appeal from his section 212(c) application. We note initially that the respondent was clearly eligible for such relief under the law in effect at the time the Immigration Judge rendered his decision. [2]

However, during the pendency of the respondent's appeal from the Immigration Judge's discretionary denial of his application, Congress amended section 212(c) of the Act to read as follows:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of section (a) (other than paragraphs (3) and (9)(C). Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion invested in [her] under section 211(b). *This section shall not apply to an alien who is deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i).*

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

Section 440(d) of the AEDPA, 110 Stat. at 1277 (emphasis added).

The respondent, deportable by reason of having committed an offense covered by sections 241(a)(2)(A)(iii) and (B) of the Act, falls within the last sentence of the AEDPA amendment. Thus, we must decide whether Congress intended the respondent to remain eligible for section 212(c) relief after April 24, 1996.

## III. EFFECTIVE DATE

Congress did not incorporate an express provision regarding the effective date of section 440(d) of the AEDPA. Initially, then, we must discern the date on which this section of law became effective, and, if effective immediately, whether it applies to those aliens already in proceedings as of April 24, 1996. If it does so apply to those aliens in proceedings, we must further determine whether the amendment applies to those aliens who filed their section 212(c) applications prior to April 24, 1996. In resolving these issues of the AEDPA's temporal applicability, we first look to the language of the statute itself. We begin by noting that the paramount index of congressional intent is the plain meaning of the words used in the statute taken as a whole. *See Matter of Grinberg*, 20 I. & N. Dec. 911 (BIA 1994) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (stating that in ascertaining the ``plain meaning'' of a statute, one ``must look to the particular statutory language at issue, as well as the language and design of the statute as a whole'').

### A. Section 440(d) and Pending Proceedings

Initially, we find persuasive evidence to conclude that Congress intended section 440(d) to apply immediately, regardless of whether the Service had placed an alien in proceedings prior to April 24, 1996. Both general statutory construction and an examination of Congress' inclusion of other effective dates in the AEDPA lead us to this result. General rules of statutory construction hold that the lack of an effective date for legislation indicates that the law should be effective on the date of passage. *See generally* 2 C. Sands, *Sutherland Statutory Construction* § 33.08 (4th ed. 1973). We find no obstacle to the application of this rule in the language of the AEDPA; rather, we find such an interpretation buttressed by Congress' decision to expressly delay the effective date of other subsections of the AEDPA. For example, in section 414(b) of the AEDPA, 110 Stat. at 1270, Congress expressly provided that this amendment ``shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of [the AEDPA].'' Similarly, in section 442 of the AEDPA, 110 Stat. at 1280, Congress amended section 242A(b) of the Act with regard to certain procedural aspects of deportation hearings and stated, in subsection 442(d), that those amendments ``shall apply to all aliens against whom deportation proceedings are initiated after the date of the enactment of [the AEDPA].'' The absence of similar language in section 440(d) supports the conclusion that Congress intended section 440(d) of the AEDPA to apply to aliens already in proceedings on April 24, 1996. These express declarations in other subsections of the AEDPA, in conjunction with Congress' silence in section 440(d) of the AEDPA, lead us to conclude that section 440(d) was effective immediately upon enactment and was *not* limited in applicability to those aliens whose proceedings were initiated after that date.

### B. Pending Applications

However, this finding that section 440(d) of the AEDPA was effective immediately and not limited in application to those aliens brought into proceedings after April 24, 1996, does not finally resolve whether this respondent is barred from section 212(c) relief. There remains a subcategory of aliens, including the respondent, who already had applications for section 212(c) relief pending on April 24, 1996. Such aliens include those deportable aliens awaiting their section 212(c) merits hearings, as well as those aliens who have appealed the Immigration Judge's denial of their applications, and those who, having received a grant of section 212(c) relief, are subject to a Service appeal of the Immigration Judge's decision. In determining congressional intent from the language and design of the AEDPA as a whole, we do not find that Congress' silence regarding the effective date of section 440(d) reflects an intent for the amendment to bar pending applications for section 212(c) waivers. In reaching this conclusion, we note that in section 413 of the AEDPA, which bars alien terrorists from most forms of relief from deportation, Congress

Copyright (c) 2001 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved.

expressly indicated that those bars to relief "shall take effect on the date of enactment of [the AEDPA] and shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date." *See* section 413(g) of the AEDPA, 110 Stat. at 1269-70.

Another basic rule of statutory construction instructs that no provision of law should be so construed as to render a word or clause surplusage. *See Kungys v. United States*, 485 U.S. 759 (1988); *Colautti v. Franklin*, 439 U.S. 379 (1979). By adding the effective date found at section 413(g) of the AEDPA, Congress expressed its clear intent that section 413 of the AEDPA apply specifically to pending applications of alien terrorists. To construe this same intent by Congress' silence in section 440(d) of the AEDPA would require us to conclude that the "before, on, or after" language of section 413(g) of the AEDPA is unnecessary and irrelevant to whether that section applies to applications for asylum pending before the AEDPA's enactment. This we decline to conclude. Rather, we interpret Congress' omission of the "before, on, or after" language in section 440(d) to indicate its intent that aliens with applications pending on April 24, 1996, should not be statutorily barred from section 212(c) relief by operation of the AEDPA. [3].

This conclusion is consistent with the approach to statutory interpretation set forth by the United States Supreme Court in *Landgraf v. USI FilmProducts*, 114 S. Ct. 1483 (1994). In that case, the Supreme Court observed that when deciding whether changes in law should be applied to pending controversies in the absence of express congressional directive, "settled expectations should not be lightly disrupted." *Landgraf v. USI Film Products, supra*, at 1497. By applying section 440(d) of the AEDPA to only those applications for section 212(c) relief filed on or after the date of the enactment of the AEDPA, the unique expectations of aliens whose applications for section 212(c) relief were pending prior to the enactment of the AEDPA are not disrupted. Such aliens demonstrated, with the filing of their pre-AEDPA applications, their expectation that although they were deportable under various provisions of the Act, they would be able to present evidence of favorable social and humane considerations that might countervail evidence of their undesirability as lawful permanent residents. *See generally Matter of Marin* , 16 I. & N. Dec. 581 (BIA 1978). The interpretative approach enunciated by the Supreme Court in *Landgraf* supports the conclusion that Congress did not intend by its silence to disrupt the expectations of those aliens whose applications for section 212(c) relief were pending prior to April 24, 1996.

Moreover, this conclusion is consistent with the approach adopted by Congress with its amendment of section 212(c) of the Act by the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, in which a statutory 5-year aggravated felony bar to that relief was made applicable to aliens who applied after the date of the enactment of that 1990 amendment. *See Matter of Gomez-Giraldo*, 20 I. & N. Dec. 957, 963 (BIA 1995).

## C. Applicability to Respondent's Section 212(c) Request

The respondent applied for section 212(c) relief on April 28, 1995, prior to the April 24, 1996, enactment of the AEDPA. Accordingly, the bar to section 212(c) relief added by the amendment of that section by section 440(d) of the Act does not apply to the respondent's application for relief. There is no question that the respondent is eligible for section 212(c) relief by the version of that section that was in effect prior to its amendment by section 440(d) of the Act. That is, the respondent is not an alien convicted of an aggravated felony who served for such felony a term of imprisonment of at least 5 years. Thus, we find the respondent eligible for relief under section 212(c) of the Act, and we proceed to the question of whether he merits that relief in the exercise of discretion.

## III. DISCRETION

Notwithstanding the respondent's continued eligibility for a waiver of inadmissibility, we ultimately disagree with his appellate argument that the Immigration Judge erred in finding that he did not warrant a discretionary waiver pursuant to section 212(c) of the Act. As the Immigration Judge correctly noted, the respondent's attempted criminal sale of cocaine, in addition to his three other drug-related felonies, require a demonstration of outstanding or unusual equities before the respondent may receive a section 212(c)

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

waiver of inadmissibility. *See Matter of Marin, supra; cf. Matter of Burbano*, 20 I. & N. Dec. 872, 879 (BIA 1994). We agree with the Immigration Judge that the respondent has failed to demonstrate such equities so that he may overcome his serious and recent drug trafficking crimes.

The respondent testified at the hearing that he has various family ties in the United States, including his mother, two siblings, and his United States citizen son. Moreover, the respondent explained that his son lives with his ex-wife, and that his family assists them financially. The respondent's mother and sister also testified on his behalf, and while we find it noteworthy that the respondent's family members attended the hearing, we do not find that this familial support alone rises to the level of outstanding or unusual. The respondent maintains various family ties in the Dominican Republic, including three daughters and four siblings. He arrived in the United States only 10 years ago as a 25-year-old adult, and his employment during his residence in the United States has been sporadic.

Regarding his rehabilitative efforts, we note that the respondent testified that he has participated in a drug rehabilitation program while he has been incarcerated, and that after 18 years of drug use, he has maintained a drug-free lifestyle while in prison. Moreover, he testified that he has also received his GED while incarcerated, and he has recently strengthened his religious beliefs. We agree with the Immigration Judge that the respondent has demonstrated a willingness to continue his progress towards a drug-free and crime-free lifestyle and has taken steps towards rehabilitation. *See Matter of Arrequin*; Interim Decision 3247 (BIA 1995). However, considering these factors in conjunction with his family ties here and abroad, and his relatively short period of residence in the United States, we can not find that the respondent has demonstrated sufficient equities to overcome his four recent drug-trafficking felonies. *Cf. Matter of Burbano, supra*. Accordingly, we will dismiss the respondent's appeal.

ORDER: The appeal is dismissed.


**Dissent by**

DISSENTING OPINION: Fred W. Vacca, Board Member, in which Mary Maguire Dunne, Vice Chairman, Gerald S. Hurwitz, Lauri S. Filppu, and Patricia A. Cole, Board Members, joined.

**Dissent**

I respectfully dissent.

As stated by the majority, the issue before us is to determine the effective date of section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (enacted Apr. 24, 1996) (``AEDPA''), and if effective on enactment, to decide which aliens who were eligible for relief under section 212(c) of the Immigration and nationality Act, 8 U.S.C. § 1182(c) (1994), are affected by the amendment. I agree with the majority's finding that general principles of statutory construction lead directly to the conclusion that the amendment took effect on the date of enactment, absent the inclusion of an alternative effective date. Therefore section 440(d) of the AEDPA applies immediately to aliens in proceedings. *See Matter of U-M-*, 20 I. & N. Dec. 327, 332 (BIA 1991), *aff'd*, 989 F.2d 1085 (9th Cir. 1993).

However, I part company with the remainder of the analysis employed by the majority with respect to the applicability of section 440(d) to pending applications for section 212(c) relief. I do not view the fact that Congress specifically barred pending applications for relief by alien terrorists, as set forth in section 413(g) of the AEDPA, 110 Stat. at 1269-70, to in any way dictate or even guide us in determining whether section 440(d) applies to pending section 212(c) applications. For comparison purposes, I cannot determine the relevant effective date from looking at the four corners of the statute to the extent that Congress employed a wide variety of effective dates throughout the AEDPA, including prospective dates. I conclude that we are compelled to apply the provisions of section 440(d) to all pending section 212(c) applications.

This Board has consistently held that an application for relief from deportation is an ongoing application.

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

*Matter of U-M-, supra*, at 332. The law that applies to the application is the law that exists at the time the final administrative decision is made. *Ziffrin v. United States*, 318 U.S. 73 (1943); *Matter of U-M-, supra*. A final administrative decision is made when the Board renders its decision in a case on appeal or certification, or where no appeal is taken, the right to appeal is waived, or the time allotted for appeal has expired. *See Matter of Lok*, 18 I. & N. Dec. 101 (BIA 1981), *aff'd*, 681 F.2d 107 (2d Cir. 1982); 8 C.F.R. §§ 3.1(d)(2), 3.39 (1995).

This Board has also held that an application for section 212(c) relief filed in the context of deportation proceedings is equivalent to one made at the time an alien physically seeks admission into the United States. *Matter of A-A-*, 20 I. & N. Dec. 492, 502 n.22 (BIA 1992). Thus, in addition to qualifying as a person whose ongoing application for relief is subject to the existing law while under administrative review, the section 212(c) applicant also stands as an individual seeking entry to the United States, and his admissibility is determined on the basis of the facts and the law that exist at the time the application is finally considered. *Matter of Alarcon*, 20 I. & N. Dec. 557 (BIA 1992).

Furthermore, like the majority, I find additional support for my position in *Landgraf v. USI Film Products*, 114 S.Ct. 1483 (1994). In *Landgraf* the Supreme Court stated:

> Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive.

*Id.* at 1501.

Prospective relief has been defined by the Supreme Court as relief that operates in futuro, such as injunctive relief. *See American Steel Foundaries v. Tri-City Central Trades Council*, 257 U.S. 184 (1921). This is in contrast to relief that operates ``retroactively,'' such as damages and restitution. *See Hutto v. Finney*, 437 U.S. 678, 695 n. 24 (1978).

The Supreme Court has specifically held that statutory provisions that alter or affect forms of prospective relief are to be given effect upon the effective date of the legislation and should be applied to pending suits. *American Steel Foundries v. Tri-City Central Trades Council, supra*, at 201; *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 464 (1921); *see also Hall v. Beals*, 396 U.S. 45 (1969). The Court has further held that parties to an action do not have vested rights to prior judgments conferring forms of prospective relief while their cases remain subject to appellate review. *See American Steel Foundries v. Tri-City Central Trades Council, supra; Duplex Co. v. Deering, supra; see also Raferty v. Smith Bell & Co.*, 257 U.S. 226 (1921). Therefore, the ultimate right to prospective relief must be determined at the time of final administrative or judicial review.

Like injunctive relief, relief from deportation under section 212(c) of the Act is prospective in nature. *See Matter of K-L-*, 20 I. & N. Dec. 654, 658 (BIA 1993), *aff'd, Lee v. INS*, 12 F.3d 1102 (8th Cir. 1993) (referring to section 212(c) relief as prospective). Under the Immigration and Nationality Act, an alien's right to benefit from a waiver under section 212(c) can only be determined at the time of a hearing and upon a finding of excludability or deportability. Relief under section 212(c) therefore operates in futuro and does not nullify the fact that the alien, prior to applying for the waiver, was either excludable or deportable. Convictions alleged to be grounds for excludability or deportability do not disappear from an alien's record for immigration purposes upon a grant of relief under section 212(c). *Matter of Balderas*, 20 I. & N. Dec. 389 (BIA 1991). Hence, section 440(d) of the AEDPA amends a prospective form of relief and accordingly should be applied to all cases before this Board that remain subject to our appellate review. *See Landgraf v. USI Film Products, supra; American Steel Foundaries v. Tri-City Central Trades Council, supra*.

In light of the above case law, I am hard pressed to identify a basis for not applying section 440(d) of the AEDPA to all section 212(c) applications that are pending adjudication or review. The weight of authority clearly requires the Board to apply the new law, as the law was changed before a final administrative

---

Immigration Precedent Decisions                                                                 6

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

decision had been rendered. Furthermore, applying the amended section 212(c) provisions to pending applications does not offend any of the concerns underlying the retroactive operation of new statutes. *Matter of Gomez-Giraldo,* 20 I. & N. Dec. 957, 963 (BIA 1995).

Due to the nature of an application for a waiver under section 212(c), which is a continuous application until the conclusion of final administrative action, the effect of applying section 440(d) to pending applications is not retroactive. The only expectation an alien seeking to apply for section 212(c) waiver can rely on is that his application will be considered according to the law and facts as they stand at the time of final administrative review. In this context, it has long been true that an alien whose circumstances improve through the acquisition of an additional equity can move the Board to remand a pending matter for reconsideration of the discretionary aspect of his section 212(c) application in light of the new evidence. *Matter of Coelho,* 20 I. & N. Dec. 464 (BIA 1992).

Finally, I am concerned with the majority's preferred choice of the date of filing the section 212(c) application as being determinative of which applications can be evaluated under the pre-AEDPA statutory provisions. This effective date is not contained elsewhere in the AEDPA. Moreover, there are numerous other dates that could be selected, e.g., the date the crime giving rise to the ground of deportability occurred, the date of issuance of the Order to Show Cause, the date on which a finding of deportability was rendered, and the date of filing the application.

The majority claims support for its selected effective date in the Supreme Court's analysis in *Landgraf v. USI Film Products, supra.* However, under *Landgraf,* we consider whether the new statute ``would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed" in determining whether a statute would have retroactive effect. *Id.* at 1505. These concerns of retroactivity, as enunciated in *Landgraf,* apply to the relevant past act. For section 440(d) purposes, this act occurs when the alien committed the crim that underlies the charge of deportability.

The majority appears to neglect this aspect of the retroactivity issue in its determination that applications filed prior to the date of enactment of the AEDPA are to be adjudicated under the former section 212(c) provisions so as not to unfairly disrupt the ``unique expectations" of aliens at the time of filing. In my opinion, the expectations that an alien has at the time of filing an application under section 212(c) of the Act are largely irrelevant in determining whether section 440(d) does not alter the rights an alien had at the time he committed the crime. Upon the commission of a criminal act that triggers deportability, an alien now stands, as he would have stood before, facing the prospect of criminal liability, as well as deportation from the United States. *See Scheidemann v. INS,* 83 F.3d 1517 (3d Cir. 1996).

In the face of congressional silence as to the effective date of section 440(d), the judicial default rules direct us to apply the law as of the date of enactment absent retroactive effect, which is not implicated here. The majority offers no persuasive analysis to support its conclusion that the traditional default rules do not govern here. Accordingly, I dissent.

**Dissent by**

CONCURRING/DISSENTING OPINION: Lory D. Rosenberg, Board Member

**Dissent**

I respectfully concur in part and dissent in part.

Our decision today seeks to resolve the ambiguity presented by section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (enacted Apr. 24, 1996) (``AEDPA"), which amends the category of otherwise eligible lawful permanent resident aliens precluded

---

Immigration Precedent Decisions                                                                          7

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

from a waiver under section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994).

The text of this section, as set forth by the majority, contains no express provision specifying an effective date for this amendment. The majority opinion properly recognizes that the fact that the AEDPA became law on April 24, 1996, is not dispositive of the effect of section 440(d) on an alien who ``is deportable" on the grounds of deportability designated in that section prior to April 24, 1996. [1.]

In essence, we hold that two related factors, traditional principles of statutory construction and Supreme Court law interpreting the application of new statutes to pre-existing circumstances, must control the reach of this provision of the AEDPA. *See Landgraf v. USI Film Products*, 114 S.Ct. 1483 (1994). In the context of the appeal before us, it is necessary only to find, as the majority does, that the amendment does *not* apply to pending applications already filed by aliens in deportation proceedings. Thus, the respondent,who is deportable by reason of a conviction for a covered offense, remains eligible to have his pending application for a waiver of deportability under section 212(c) determined. For purposes of the scenario presented in this appeal, I concur.

## I. THE SILENCE OF THE STATUTE

The silence of the statute with regard to its impact upon conduct and other events which already have taken place is significant. Nothing in the text or the legislative history of the AEDPA indicates that section 440(d) should be applied retroactively to pending cases or pre-amendment circumstances, or that this silence was due to an ``accident of draftsmanship." *INS v. Phinpathya* , 464 U.S. 183, 191 (1984). By contrast, as the majority discuss, other sections of the AEDPA expressly address the effect of the particular provision on circumstances existing prior to its enactment. *See, e.g.*, section 413(g) of the AEDPA, 110 Stat. at 1269-70.

As recognized consistently by the Supreme Court, retroactivity is not favored in the law. *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988). A presumption against retroactivity generally is consistent with legislative and public expectations as a safeguard against unfairness. *Landgraf v. USI Film Products, supra*, at 1501. This principle dates back to English common law, and even to Roman law. *See, e.g., United States v. Heth*, 7 U.S. (3 Cranch) 399, 413 (1806); *Dash v. Van Kleeck*, 7 Johns. 477, 502-03, 505 (N.Y. 1811) (the prince may enact a retrospective law as long as it is done expressly). [2.]

In *Landgraf v. USI Film Products, supra*, the Supreme Court restated the principle that a statute shall not be given retroactive effect unless expressly provided by Congress. Specifically, the Supreme Court cautioned that ``[a] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct which occurred prior to that date." *Id.* at 1493.

To the extent that the majority decision is understood to mean either that the language in the statute as a whole is reconciled or that the *Landgraf* principles, discussed below, are properly observed only by finding that aliens who have *filed applications* for section 212(c) waivers prior to April 24, 1996, are not subject to 440(d), I must differ. I write separately because I believe this Board's decision requires clarification on these points.

## II. STATUTORY CONSTRUCTION AN RETROACTIVITY

As the agency implementing the statute, we recognize that a statutory construct involving silence in one provision but not another requires us to give effect to each provision. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (holding that the Board may not blur the distinctions between two related but separate statutory standards or reduce them into one); *Matter of Hou*, 20 I. & N. Dec. 513 (BIA 1992) (recognizing that Congress' use of different terminology in two sections of the statute requires the Board to give each independent effect).

In fact, this is precisely what was done by this Board in *Matter of A-A-*, 20 I. & N. Dec. 506 (BIA 1992),

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

where we looked to the statutory language in various sections of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, in order to determine the applicability of the amendment of section 212(c) contained in that enactment. Although the section was silent as to its applicability to prior convictions, the express language of the statute made that amendment applicable to pending applications. [3.]

Coupled with the principle enunciated by the Supreme Court in *Landgraf v. USI Film Products, supra*, at 1497, that when new provisions attach new legal consequences to prior events, "settled expectations should not be lightly disrupted" (unless Congress expressly states such an intent), these precepts mitigate in favor of adjudicating the respondent's waiver application according to the law in effect prior to April 24, 1996. For the sake of brevity, I will refer to these two considerations -- the requirement that we must interpret silence in a provision so as to give effect to the whole statute, and the doctrine of settled expectations as foreclosing the retroactive application of a new or amended statute to prior conduct -- as the "*Landgraf* principles."

Semantic sparring over whether a new provision can be retroactive because it is being applied to an adjudication we are conducting in the present is not a useful exercise. Nonetheless, the dissent focuses on the application, which is a continuing one, rather than on past events and expectations which are settled, and avoids addressing the issue. The issue is whether the new provision *operates* retroactively. That is, does it affect the settled expectations of the parties, in this case, the respondent, as best described in the *Landgraf* principles. [4.] Moreover, this Board previously has acknowledged that eliminating section 212(c) relief *does* have retroactive effect. *Matter of Gomez-Giraldo*, 20 I. & N. Dec. 957, 963 (BIA 1995); *Matter of A-A-, supra*.

In this instance, even though the determination of eligibility for a waiver under section 212(c) may be prospective, the restriction in the amended provision has a retroactive operation or effect as it constitutes a new legal consequence which attaches, at a minimum, to any lawful permanent resident already subject to an Order To Show Cause or otherwise in the agency "pipeline." It is arguable that the legal consequences attach, in fact, to the conviction itself and even to the commission of the offense. Thus, as I discuss below, I believe that to find the amended provision applicable to all applications, as does the dissent, or only to already-filed and pending applications, as does the majority, falls short of the proper observance of the *Landgraf* principles.

### A. *Landgraf* Principles and Board Precedent

Previously, the Board held that where new statutory provisions affecting eligibility for relief from deportation come into effect during the pendency of a deportation hearing or an administrative appeal to this Board, and there exists no statutory directive to the contrary, the new statutory provisions shall be applied to the application for relief before us, and the application may be denied on the basis of the statutory amendment. *Cf. Matter of U-M-*, 20 I. & N. Dec. 327 (BIA 1991), *aff'd*, 989 F.2d 1085 (9th Cir. 1993). Although the dissent clings to this position, it simply is not applicable here.

Since our decision in *Matter of U-M-, supra*, the United States Supreme Court issued its decision in *Landgraf v. USI Film Products, supra*, in which it comprehensively discussed the issue of the application of statutory amendments to pending controversies. As I understand the dissent to assert that a silent statute is not only effective when signed by the President, but applies to all prior or pending events or conduct, I note that in *Landgraf*, the Supreme Court reconciled the apparent conflict between the presumption that "a court must apply the law in effect at the time it renders its decision," and the presumption against retroactivity. *Landgraf v. USI Film Products, supra*, at 1486-87 (citing *Bradley v. Richmond School Board*, 416 U.S. 696, 711 (1974)).

In fact, in *Matter of Gomez-Giraldo, supra*, in which we last visited the impact of the Supreme Court's reasoning in *Landgraf v. USI Film Products, supra*, we held that the aggravated felony bar added to section 212(c) of the Act by a previous amendment implicated none of the concerns enunciated in *Landgraf*. We reasoned that, because that amendment, but its express terms, applied only to those applications for relief

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

made on or after the effective date of the amendment, it would not disturb a lawful permanent resident's settled expectations that he or she could apply for and be granted a waiver under section 212(c). *Matter of Gomez-Giraldo, supra,* at 963-64. Our holding today, relating to an amendment with no express language, is entirely consistent with that decision and the reasoning underlying it.

### B. *Landgraf* Principles and Factual Scenarios Under Section 440(d)

In *Landgraf*, the Supreme Court set out a basic test to determine whether a statute would operate ``retroactively'' or ``retrospectively'' if applied to a case pending at the time of the statute's enactment. The Court stated that the question a body must ask is ``whether the provision attaches new legal consequences to events completed before its enactment.'' *Id.* at 1499.

The first question presented is, which cases, if any, in the agency ``pipeline'' are affected? The majority limits its determination to persons who have already filed applications for relief under section 212(c). There remains an open question, however, whether the amendment applies to all potential candidates for the waiver already ``in the pipeline''.

Arguably, the ``pipeline'' could include various categories of individuals who are alleged to be deportable under the pertinent sections of the statute, and who are otherwise eligible for and require the grant of a waiver under section 212(c) in order not to be deported. Assuming the main, more comprehensive group to be putative candidates who have been identified by the Immigration and Naturalization Service as deportable aliens is consistent with the *Landgraf* principles.

This could encompass aliens who are the subject of a ``detainer'' placed against them during their incarceration for a criminal offense as the result of a request by the Service; it could include those served with an Order to Show Cause issued by the Service; and it could include those subject to an Order to Show Cause against whom deportation proceedings have commenced as defined under the regulations. It could include those who have filed an application for a waiver under section 212(c) in proceedings before an Immigration Judge; those who are seeking to reopen to apply for 212(c) relief; and it could include those who have received an order from an Immigration Judge from which an appeal has been taken to the Board and/or to the circuit courts of appeal.

In particular, this Board only recently recognized decisions of the United States Courts of Appeals for the Second, Seventh, and Ninth Circuits, which hold that the statutory language of section 212(c) makes plain that an alien may establish lawful domicile while in a status other than that of a permanent resident. *See Matter of Cazares;* Interim Decision 3262 (BIA 1996) (holding that a temporary resident under section 245A of the Act may accrue time towards 7-year lawful domicile requirement of section 212(c)). Further, the Fifth Circuit held specifically that temporary residents under both the legalization (section 245A) and special agricultural worker (``SAW'') (section 210) provisions may accrue lawful domicile while in that status. *See White v. INS,* 17 F.3d 475 (1st Cir. 1994).

This Board has remanded appeals from decisions arising in those circuits to allow applications for section 212(c) to be filed and heard in the first instance or for a hearing on the merits when such was pretermitted by the Immigration Judge. The majority overlooks these cases; while not explicitly implicated in our decision today, the truncated interpretation of the majority leaves unresolved hundreds of cases of individuals who we found to have been entitled to consideration at least under controlling circuit law, but whose applications were unlawfully pretermitted and foreclosed. In my view, such applicants are entitled to the opportunity to seek relief from deportation under section 212(c) whether or not they have a pending application on file. *See Snajder v. INS,* 29 F.3d 1203 (7th Cir. 1994).

The next question is whether the amendment applies to aliens convicted of any offense which would render them subject to deportation proceedings on charges referenced in section 212(c), as amended, and ineligible to apply for or be granted a waiver under that section. In the first published opinion on a provision of the AEDPA, the District Court of Massachusetts, construing section 440(c), posited that it was untenable that Congress could have intended that the terms of the provision apply other than to persons convicted on

---

Immigration Precedent Decisions                                                                                                  10

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

or after the April 24, 1996 effective date. *Demelo v. Cobb*, No. 96-10903-REK (D. Mass. June 19, 1996). Section 440(c) refers to custody requirements applicable to the exact same categories of aliens affected by the operation of section 440(d).

One difference between the language in section 440(c) and that in section 440(d) is that the plain language of section 440(c) amends section 242(a)(2) of the Act, which mandates the Attorney General to take into custody any alien "*convicted of* [the same offenses specified in amended section 212(c)] ... upon release of the alien from incarceration." (Emphasis added.) By contrast, the language of section 440(d) amends section 212(c) to read that the provision "shall not apply to an alien who *is deportable* by reason of having committed an offense." (Emphasis added.)

As the majority states, silence cannot reasonably be interpreted as supporting a "settled expectation" of being able to engage in criminal activity without consequences. However, I part ways with the majority when they declare that individuals may not have "settled expectations" with regard to an opportunity to seek a section 212(c) waiver that affects a plea of guilty or other trial or appellate choices.

### III. LANDGRAF PRINCIPLES AND MANIFEST INJUSTICE

In the absence of specific language, the reach of the statute depends upon settled expectations. This doctrine is different from but enhanced by, that of "manifest injustice."

The human consequences of the AEDPA which are implicated by the legal question before us are compelling. I believe this is especially important to note in light of the fact that our decision today denies the requested relief from deportation. Waivers under section 212(c) are not easily obtained; to the contrary, they are perhaps the most difficult and hard won of any forms of discretionary relief over which we exercise our jurisdiction. At stake is an alien's ability to remain in this country as a permanent resident, which is determined by balancing the good of society as a whole against the individual social and humane considerations that may pertain to any one case. *Matter of Marin*, 16 I. & N. Dec. 581 (BIA 1978).

Such waiver applications are individual and fact bound, and they are properly left to the exercise of discretion by Immigration Judges in individual cases, subject to the de novo review authority of this Board. While applicants for section 212(c) waivers share the adverse factor of having been convicted of a criminal or other immigration offense or offenses which renders them subject to deportation, they are as individual as humans can be and as human experience allows.

Applicants for waivers under section 212(c), until now, have included persons convicted of a single, possibly victimless or nonviolent crime or crimes over a discrete period of their stay in the United States, who have acknowledged their wrongdoing and changed their behavior. They include individuals who came to this country with their families as infants; adults who have neither spoken their native language nor been in their native country since childhood; fathers, mothers, and single parents of United States citizen children; businessmen and women who employ United States citizen workers in legitimate occupations; caretakers of elderly United States citizen parents; victims of domestic violence; and refugees. While they are not free of responsibility for their mistakes, the have paid, often dearly, for their transgressions in the criminal justice system, and they cannot all be said to unilaterally present a menace or threat to our society such that deportation is warranted.

I find compelling policy and practical reasons to go beyond such a limited interpretation as the one the majority proposes in this case. All of these people, and no doubt many others, had settledexpectations to which they conformed their conduct. *Landgraf v. USA Film Products, supra*, at 1497, instructs that those "settled expectations should not be lightly disrupted." "Retroactive application of laws is undesirable where advance notice of the change in the law would motivate a change in an individual's behavior or conduct." *Griffon v. United States Dept. of Health and Human Services*, 802 F.2d 146, 153 (5th Cir. 1986) (citing *Alexander v. Robinson*, 756 F.2d 1153 (5th Cir. 1985)).

Statutes may not be applied retroactively where doing so would result in manifest injustice to those

---

Immigration Precedent Decisions                                                                                          11

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

affected. *Bradley v. Richmond School Board*, 416 U.S. 696 (1974). Here, manifest injustice would result to a significant number of legal residents, because, while otherwise eligible, their right to apply for a section 212(c) waiver will have been infringed. Moreover, I note the inevitable disparity in treatment accorded different individuals that would result, because otherwise eligible legal residents requiring a waiver have no control over when proceedings are commenced or how quickly or in what order hearings and appeals are set or adjudicated. *See Dion v. Secretary of Health and Human Services*, 823 F.2d 669, 672 (1st Cir. 1987) (finding a retroactive application inappropriate where a disparity among applicants would result).

Further, although no legal resident has the absolute right to be granted section 212(c) relief, eligible residents do have a vested right to apply and be considered for such relief. *See, e.g., Rabiu v. INS*, 41 F.3d 879 (2d Cir. 1994); *Snajder v. INS, supra*, at 1207-08; *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993). For example, a respondent's counsel might have been ineffective in failing to file a section 212(c) application on behalf of an otherwise eligible respondent. *Rabiu v. INS, supra*. The Service may have violated a regulation denying the respondent the right to counsel. *Snajder v. INS, supra; Batanic v. INS, supra*. The Immigration Judge might have wrongfully denied the respondent's motion for a change in venue that prejudiced his or her rights to a fair hearing. *Campos v. Nail*, 43 F.3d 1285 (9th Cir. 1994). The Immigration Judge might have failed to notify the respondent of relief to which he or she was apparently eligible. *Bui v. INS*, 76 F.3d 268 (9th Cir. 1996).

In any of these cases, I believe due process and fundamental fairness would dictate that we accept the case for consideration of section 212(c) relief, nunc pro tunc. Even while acknowledging the absence of statutory authority to do so, this Board has long granted nunc pro tunc relief to cure various defects in proceedings, if such treatment would dispose of a case. *Matter of Garcia-Linares*; Interim Decision 3268 (BIA 1996); *see also Matter of Lok*, 18 I. & N. Dec. 101, 107 (BIA 1981), *aff'd*, 681 F.2d 107 (2d Cir. 1982).

## IV. CONCLUSION

I would find that section 440(d) of the AEDPA operates retroactively if applied not only to pending section 212(c) applications, but to other prior events. It would attach a new legal consequence to both a pre-amendment charge or finding of deportability under most of the provisions found at section 241(a)(2) of the Act. Prior to the amendment, a person entering into plea agreements or found deportable under those sections who were otherwise eligible could rely upon an opportunity to present evidence of social and humane considerations to countervail evidence of their undesirability as a permanent resident in order to demonstrate that the granting of section 212(c) relief appeared to be in the best interest of the United States. *Matter of Marin, supra*, at 584. To upset those settled expectations by retroactively applying section 440(d) of the AEDPA, without the express directive of Congress requiring such an application, attaches a new legal consequence to conduct and events already completed prior to April 24, 1996. It would require us to disregard the concerns articulated by the Supreme Court in *Landgraf v. USI Film Products, supra*, and, in my view, would contravene both practical considerations and fundamental fairness.

expectations to which they conformed their conduct. *Landgraf v. USA Film Products, supra*, at 1497, instructs that those ``settled expectations should not be lightly disrupted.'' ``Retroactive application of laws is undesirable where advance notice of the change in the law would motivate a change in an individual's behavior or conduct.'' *Griffon v. United States Dept. of Health and Human Services*, 802 F.2d 146, 153 (5th Cir. 1986) (citing *Alexander v. Robinson*, 756 F.2d 1153 (5th Cir. 1985)).

Statutes may not be applied retroactively where doing so would result in manifest injustice to those affected. *Bradley v. Richmond School Board*, 416 U.S. 696 (1974). Here, manifest injustice would result to a significant number of legal residents, because, while otherwise eligible, their right to apply for a section 212(c) waiver will have been infringed. Moreover, I note the inevitable disparity in treatment accorded different individuals that would result, because otherwise eligible legal residents requiring a waiver have no control over when proceedings are commenced or how quickly or in what order hearings and appeals are set or adjudicated. *See Dion v. Secretary of Health and Human Services*, 823 F.2d 669, 672 (1st Cir. 1987)

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

(finding a retroactive application inappropriate where a disparity among applicants would result).

Further, although no legal resident has the absolute right to be granted section 212(c) relief, eligible residents do have a vested right to apply and be considered for such relief. *See, e.g., Rabiu v. INS*, 41 F.3d 879 (2d Cir. 1994); *Snajder v. INS, supra*, at 1207-08; *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993). For example, a respondent's counsel might have been ineffective in failing to file a section 212(c) application on behalf of an otherwise eligible respondent. *Rabiu v. INS, supra*. The Service may have violated a regulation denying the respondent the right to counsel. *Snajder v. INS, supra; Batanic v. INS, supra*. The Immigration Judge might have wrongfully denied the respondent's motion for a change in venue that prejudiced his or her rights to a fair hearing. *Campos v. Nail*, 43 F.3d 1285 (9th Cir. 1994). The Immigration Judge might have failed to notify the respondent of relief to which he or she was apparently eligible. *Bui v. INS*, 76 F.3d 268 (9th Cir. 1996).

In any of these cases, I believe due process and fundamental fairness would dictate that we accept the case for consideration of section 212(c) relief, nunc pro tunc. Even while acknowledging the absence of statutory authority to do so, this Board has long granted nunc pro tunc relief to cure various defects in proceedings, if such treatment would dispose of a case. *Matter of Garcia-Linares*; Interim Decision 3268 (BIA 1996); *see also Matter of Lok*, 18 I. & N. Dec. 101, 107 (BIA 1981), *aff'd*, 681 F.2d 107 (2d Cir. 1982).

## IV. CONCLUSION

I would find that section 440(d) of the AEDPA operates retroactively if applied not only to pending section 212(c) applications, but to other prior events. It would attach a new legal consequence to both a pre-amendment charge or finding of deportability under most of the provisions found at section 241(a)(2) of the Act. Prior to the amendment, a person entering into plea agreements or found deportable under those sections who were otherwise eligible could rely upon an opportunity to present evidence of social and humane considerations to countervail evidence of their undesirability as a permanent resident in order to demonstrate that the granting of section 212(c) relief appeared to be in the best interest of the United States. *Matter of Marin, supra*, at 584. To upset those settled expectations by retroactively applying section 440(d) of the AEDPA, without the express directive of Congress requiring such an application, attaches a new legal consequence to conduct and events already completed prior to April 24, 1996. It would require us to disregard the concerns articulated by the Supreme Court in *Landgraf v. USI Film Products, supra*, and, in my view, would contravene both practical considerations and fundamental fairness.

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

Matter of Valentin VALDEZ-Valdez, Respondent
A34 450 528   San Antonio
Board of Immigration Appeals
Interim Pts 3321 Dec & Ord 703 ID 3302 BIA 1997
January 20, 1997

**Editorial information: index**

Index: Deportation (Bond redetermination)

**Editorial information: summary**

## SUMMARY OF ISSUES

BOND REDETERMINATIONS; INA § 242(a)(1), 8 U.S.C. § 1252(a)(1): The Transition Period Custody Rules govern bond  redeterminations of aliens falling within nonaggravated felony criminal grounds of deportation  covered in those rules, regardless of when the criminal offenses and convictions occurred.

**Editorial information: Syllabus**

## BIA SYLLABUS

(1) The Transition Period Custody Rules invoked on October 9, 1996, govern  bond redeterminations of aliens falling within the nonaggravated felony criminal  grounds of deportation covered in those rules, regardless of when the criminal offenses  and convictions occurred.

(2) The Transition Period Custody Rules govern bond  redetermination appeals of otherwise covered criminal aliens who are not now in custody by virtue of  immigration bond rulings rendered prior to the October 9, 1996, invocation of those rules.

**Editorial information: cross-ref**

Immigration Law and Procedure §§ 72.03[4][f], 72.04[3][e][iii].

**Counsel**

ON BEHALF OF RESPONDENT:
Alberto Cruz
Accredited Representative
AS AMICUS CURIAE: [1].
Marc Van Der Hout,  Esquire
San Francisco, California
Kelly McCown, Esquire
San Francisco,  California
ON BEHALF OF SERVICE:
Scot M. Rosen
Appellate Counsel

Immigration Precedent Decisions                                        1

Copyright (c) 2001 Matthew Bender & Company, Inc , a member of the LexisNexis Group.  All rights reserved

**Judges**

Before: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice-Chairman; HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, and MATHON, Board Members. Dissenting Opinion: ROSENBERG, Board Member, joined by VACCA and GUENDELSBERGER, Board Members.

**Opinion**

**Opinion by**

FILPPU, Board Member:

**Opinion**

This is a bond redetermination case originally appealed to the Board by the Immigration and Naturalization Service. While the appeal was pending, Congress enacted the Transition Period Custody Rules (``transition rules'') in section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of the Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act for 1997, Pub. L. No. 104-208, 110 Stat. 3009, _ (enacted Sept. 30, 1996) (``IIRIRA''). Effective on October 9, 1996, the transition rules set forth new standards for releasing criminal aliens from immigration detention pending proceedings respecting their removal from this country. In *Matter of Noble*; Interim Decision 3301 (BIA 1997), we held that bond redeterminations of detained deportable aliens convicted of an aggravated felony are presently governed by the transition rules, irrespective of how or when the alien came into immigration custody.

The case before us is a companion case to *Noble*. It presents two issues. The first issue is whether the transition rules govern bond redeterminations of aliens who are presently not detained, but were freed from immigration custody before the transition rules took effect on October 9, 1996. The second issue is whether the transition rules apply to aliens falling within a nonaggravated felony criminal ground of deportation covered by the transition rules, even if the criminal offenses and convictions occurred before those rules became effective.

The Board requested supplemental briefing from the parties and amici on these issues. The Service submitted a brief arguing its position that the transition rules applied to this case. But, in the last sentence of its brief, the Service made a perfunctory request to withdraw the appeal. Notwithstanding this request, we take the case on certification pursuant to our authority in 8 C.F.R. § 3.1(c) (1996) to resolve these important issues. Upon certification, we hold that the transition rules govern this case. The record will be remanded to the Immigration Judge.

## I. PROCEDURAL HISTORY

The respondent is a 25-year-old native and citizen of Mexico who entered the United States as a lawful permanent resident in 1973 at the age of 2. His family ties to this country include his wife and three United States citizens children. In 1993, the respondent was convicted under Texas law for the offense of possession of marijuana. For this offense, he was sentenced to 7 years' probation with no incarceration.

The respondent was subsequently placed in deportation proceedings. In an Order to Show Cause and Notice of Hearing (Form I-221) dated September 11, 1995, the Service charged the respondent with deportability as having been convicted of a controlled substance violation under section 241(a)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(B)(i) (1994). The record indicates that the respondent was taken into Service custody in September of 1995. Shortly thereafter, he successfully posted a $1000 bond, evidently set by the district director pursuant to the then-governing release

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

standards. [2.] *See Matter of Patel,* 15 I. & N. Dec. 666 (BIA 1976).

On May 1, 1996, the respondent was taken back into Service custody when he appeared at the Immigration Court for a deportation hearing. His $1000 bond was apparently canceled. At a custody redetermination hearing on May 3, 1996, the Service argued before an Immigration Judge that the respondent was not eligible for release on bond. According to the Service, the respondent's controlled substance violation triggered the then newly enacted mandatory detention requirement contained in section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (enacted Apr. 24, 1996) (``AEDPA''). [3.] The Immigration Judge disagreed and authorized the respondent's release on the previously set $1000 bond.

After the Service filed motion to stay and reconsider, the Immigration Judge prepared a written memorandum dated June 3, 1996, explaining her reasons for setting a bond. The Immigration Judge concluded that the mandatory detention requirement of section 242(a)(2) of the Act, as amended by the AEDPA's section 440(c), did not apply to the respondent because it covered, according to the reading of the statutory language adopted by the Immigration Judge, only those aliens released from criminal incarceration after the AEDPA's April 24, 1996, effective date. The immigration Judge further concluded that an increase in the bond amount was not warranted, based on a finding that the respondent's risk of flight was minimal. She recognized that the respondent was ordered deported in separate proceedings on May 30, 1996, but noted that the responded had reserved appeal in that case. There is nothing in the record demonstrating that the Immigration Judge considered whether the respondent was a danger to the community. The Immigration Judge denied the Service's motions to stay and reconsider her prior order releasing the respondent on bond. The record reflects that the respondent posted the bond and was out of immigration custody shortly after the Immigration Judge's written decision was entered.

The Service's appeal ensued. It argued on appeal that the Immigration Judge erred in finding the respondent was not subject to the mandatory detention requirement enacted by the AEDPA. While the appeal was pending, however, the transition rules became effective on October 9, 1996, and replace section 440(c) of the AEDPA on that date. [4.] *See Matter of Noble, supra,* at 5.

In light of the change in governing standards, this Board requested supplemental briefs from the parties and amici addressing the question of whether the transition rules applied to this case and, if not, what standards would apply. The record reflects that the respondent remains out of immigration custody and that his appeal of his separate deportation case is currently pending before this Board.

## II. LEGAL BACKGROUND

Since the respondent's 1993 conviction, Congress has twice changed the civil immigration detention and release standards governing criminal aliens. These statutory amendments occurred in April and September of 1996. Prior to April 1996, custody determinations for aliens deportable on nonaggravated felony grounds were governed by the general bond provisions found in section 242(a)(1) of the Act, under which it was presumed that an alien would not be detained or required to post bond unless there was a finding that the alien is a threat to the national security or a poor bail risk. *Matter of Patel, supra.*

In April 1996, however, Congress eliminated the Attorney General's authority to release from detention most criminal aliens. Pursuant to the AEDPA's amendments to section 242(a)(2) of the Act, the Attorney General had no authority to release any alien convicted of an aggravated felony, a controlled substance offense, a firearms offense, any miscellaneous criminal offense described in section 241(a)(2)(D), or two crimes of moral turpitude, as long as any of these offenses brought an alien within one of the ``covered'' grounds of deportation. *See* section 440(c) of the AEDPA.

In the IIRIRA, enacted in September 1996, Congress temporarily restored some discretionary authority to the Attorney General to release from custody most of the criminal aliens previously subject to

---

Immigration Precedent Decisions                                                                                        3

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

mandatory detention. *See* section 303(b)(3) of the IIRIRA, 110 Stat. at _, *Matter of Noble, supra*, at 5-6. The transition rules became effective on October 9, 1996, and authorize, under specified conditions, the release of aliens convicted of offenses covered in the deportation grounds listed in the transition rule statute. For nonaggravated felons, however, the release standards under the transition rules are more restrictive than the bond provisions which governed prior to the AEDPA's enactment. Under the new standards, the alien must demonstrate that he was either lawfully admitted or cannot be removed because the designated country will not accept him, that he will not pose a danger to safety of persons or of property, and that he will likely appear for any scheduled proceeding.

In *Matter of Noble, supra*, we read the transition rules as governing all detained criminal aliens irrespective of how or when the alien came into immigration custody, unless applying the new standards would have a prohibited retroactive effect under *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483 (1994). In *Noble*, we found no retroactivity problem as applied to aggravated felons.

We left open several questions in *Noble* regarding the transition rules. We explicitly reserved deciding whether it would be impermissible to apply the transition rules retroactively to an alien deportable on a criminal offense covered in the specified grounds of deportation, when the offense was not an aggravated felony. We also did not reach the question of whether the transition rules applied to nondetained aliens who posted immigration bonds prior to the October 9, 1996, invocation of those rules, and whose bond cases were on appeal to us at that time.

We now turn to these questions. [5]

### III. ISSUES PRESENTED

The issues presented in this case are as follows:

1. Whether the Transition Period Custody Rules govern a pending bond redetermination appeal of an alien who has posted bond and was freed from immigration custody prior to the October 9, 1996, invocation of those rules.

2. Whether applying the Transition Period Custody Rules to a criminal alien who is deportable for having committed a nonaggravated felony offense covered in the statute would be impermissibly retroactive, when both the commission of the offense and the conviction took place before either the AEDPA amendments or the transition rules went into effect.

### IV. THE TRANSITION RULES COVER BONDS APPEALS OF ALIENS PREVIOUSLY RELEASED FROM SERVICE CUSTODY

We proceed first with the question of whether the transition rules govern a bond redetermination appeal involving an alien who posted bond and was out of immigration custody prior to the date those rules took effect, assuming the alien otherwise falls within those rules. We find that they do.

The new release standards are contained in section 303(b)(3)(B) of the IIRIRA. The statute provides that the Attorney General ``may release [an] alien'' described in either subparagraph (A)(ii) or (A)(iii) only if the alien makes certain showings. The statute does not *directly* address the subject of aliens previously freed under the prior immigration bond law. Nothing in the new law appears to require the Attorney General to rearrest and confine aliens previously released on bond or on their own recognizance pending reassessment under the new law.

For our purposes, however, we read the statutory language to govern any present bond redetermination, whether the alien is physically in Service custody or not. *See Ziffrin v. United States*, 318 U.S. 73 (1943) (finding that an administrative body must apply current law to future acts). This is because new law generally applies to cases pending on appeal at the time of enactment (absent retroactivity concerns), and because the ``may release'' language of the statute affects our authority to authorize the

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

alien's continued release from custody today.

As an administrative adjudicatory body, we do not assume physical custody of aliens but rather enter bond orders carried out by other governmental officials. As applied to Board adjudications, the ``may release'' language of the statute speaks to our authority to authorize the release of certain deportable criminal aliens. A simple affirmance of the Immigration Judge in this case would amount to an order authorizing release under a showing that Congress no longer permits for aliens falling in the respondent's circumstances. The setting of a new bond amount would also affect the respondent's detention. If he failed to meet the new amount, for example, and were taken into custody, the alien could be released when he satisfied the new amount pursuant to standards at odds with existing law. We thus find that the transition rules, properly construed, apply to present bond redeterminations of aliens deportable by virtue of convictions covered by the statute, including to cases of aliens released from Service custody prior to our adjudication of the appeals.

Our reading of the statutory language is most consistent with congressional intent. As we indicated in *Noble, supra*, the legislative history reflects that the detention provisions of the IIRIRA were geared toward ensuring community safety and the criminal alien's appearance at all deportation hearings. It is not apparent why these same concerns would not extend to the cases of previously bonded aliens with live appeals pending before us.

Nothing in the language of the transition rules appears to prevent us from applying the new standards on appeal in the case of an alien erroneously granted bond in a hearing taking place after the October 9, 1996, invocation date of those rules. The mere fact that an alien has bonded out of custody, therefore, would not exempt that alien from the constrains of the new law when the case is entertained on appeal by us. And, we see nothing in the statutory language to distinguish the cases of aliens erroneously bonded out under the new law from cases of aliens either rightly or wrongly bonded out under prior law, as long as their appeals were still pending before us when the law was changed.

We thus conclude that the transition rules govern bond redetermination appeals before this Board involving aliens who posted bond and were freed from immigration custody prior to the October 9, 1996, invocation of those rules.

## V. APPLYING TRANSITION RULES DOES NOT IMPLICATE RETROACTIVELY CONCERNS FOR NONAGGRAVATED FELONS

We next address whether, given the absence of guiding instructions from Congress, the transition rules apply to an alien who was convicted of a criminal offense, which does not amount to an aggravated felony, before the AEDPA amendments and the transition rules took effect. We find that the transition rules govern such cases. Our conclusion is consistent with the Supreme Court's established framework for determining retroactive of a statute, as well as federal circuit case law dealing with amendments to bond provisions in the criminal context. *See Landgraf v. USI Film Products, supra.*

Pursuant to the teachings of *Landgraf*, when Congress does not prescribe the temporal reach of a newly enacted statute, it is presumed that the statute does not apply to events antedating its enactment if doing so would impair substantive rights in place before that date. The *Landgraf* Court noted that deciding retroactively is not a simple or mechanical task, but one that should be guided by considerations of fair notice, reasonable reliance, and settled expectations. *Landgraf*, 114 S.Ct. at 1498-99. A statute, however, is not impermissibly retroactive simply because it applies to conduct predating its enactment. *Id.* at 1499. Rather, retroactivity arises only if its application ``would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'' *Id.* at 1505.

### A. Release Under the Transition Rules Constitutes Prospective Relief

We find at the outset that the new statute is not subject to retroactivity concerns because an alien's

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

eligibility (or continued eligibility) for release on bond should be considered a form of prospective relief in the context of *Landgraf*. We read the statutory language of the transition rules as regulating the Attorney General's authority to detain and to release deportable criminal aliens presently, not as regulating the respondent's past conduct. *See Matter of Noble, supra*, at 17. The new release statute, for example, does not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt. The respondent's conduct is relevant in the operation of the statute, but only insofar as it bears on the Attorney General's present authority to make a custody or bond determination.

Bond determinations, in one sense, routinely involve antecedent events, because one of the factors pertains to the ground of deportability. But they primarily involve future considerations, such as whether the alien will appear at this hearing, or whether the alien will pose a threat in some respect if released. *See, e.g., Carlson v. Landon*, 342 U.S. 524 (1952); *Matter of Drysdale*, 20 I. & N. Dec. 815 (BIA 1994); *Matter of Ellis*, 20 I. & N. Dec. 641 (BIA 1993); *Matter of Patel, supra; Matter of San Martin*, 15 I. & N. Dec. 167 (BIA 1974); *Matter of Moise*, 12 I. & N. Dec. 102 (BIA 1967). Importantly, bond is a prospective benefit because the question of its availability only arises after the alien is in custody. To the extent that antecedent events come into play, they bear either upon the question of present deportability itself or on predicting future behavior from past courses of conduct, such as the inferences that may be drawn in immigration bond proceedings respecting an alien who failed to show up for earlier criminal proceedings. *See generally United States v. Salerno*, 481 U.S. 739, 747-753 (1987); *Schall v. Martin*, 467 U.S. 253 (1984). Thus, release on bond should be considered a form of prospective relief within the *Landgraf* context, even though facts in the operation of the statute draw from a time antecedent to its effective date. *See Landgraf*, 114 S.Ct. at 1499 n.24 (noting that a statute `` "is not made retroactive merely because it draws upon antecedent facts for its operation`` ") (quoting *Cox v. Hart*, 260 U.S. 427, 435 (1922)).

It is the fact of present deportability that is the real underlying concern of the statute, not simply whether the particular alien was ``convicted" of a certain offense. The transition rules impose certain limitations on the release of aliens who have committed certain offenses ``covered" in the specific grounds of deportation. Not all convictions for even the same crime will lead to actual deportability on account of such convictions, if for no other reason than the existence of temporal restrictions on the applicability of the deportability charge. *See, e.g.*, section 435 of the AEDPA, 110 Stat. at 1274-75 (providing that crime involving moral turpitude amendments apply to aliens against whom deportation proceedings are initiated after the date of enactment); section 241(a)(2)(A)(i) of the Act, 8 U.S.C. § 1251(a)(2)(A)(i) (1994) (providing that single crime of moral turpitude, pertinent to the *permanent* custody provision of the IIRIRA, must occur within 5 years after entry to lead to deportability under this subsection).

It is not the simple fact of the conviction which leads to the application of the custody provisions of the statute, but whether the particular conviction is actually ``covered" by the grounds of deportation, including any prospective effective date provisions specified by Congress. Consequently, in the end, the custody provisions of the new statute are inherently tied to the question of present deportability, not to the mere fact of the past convictions themselves. *Cf. Plaut v. Spendthrift Farm Inc.*, 115 S.Ct. 1447, 1456 (1995) (identifying retroactive legislation as including ``legislation that prescribes what the law *was* at an earlier time, when the act whose effect is controlled by the legislation occurred").

B. Expectations Stemming From Criminal Proceedings Do Not Lead to Retroactivity Problems

We find further that applying the transition rules to the respondent would not have an impermissible ``retroactive effect" within the meaning of *Landgraf*. Amici's assertion that the pre-AEDPA standards should govern this case rests on vested rights and fairness principles. Having considered these arguments, however, we do not find that they represent a correct synthesis of *Landgraf* retroactivity principles. We find that the transition rules, if applied to this case, would not take away any rights possessed by the respondent, increase liability, or attach new legal consequences to past conduct.

We are not convinced that the respondent has the sort of vested right or settled expectation which the Supreme Court sought to describe in *Landgraf*. The new law deprives the criminal alien of nothing to

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group   All rights reserved.

which he was entitled under old law. It would be odd to think that by committing a crime, an alien acquires a vested right to be treated in a particular way in subsequent deportation proceedings, or that in deciding whether to commit the crime the respondent relied to his detriment on the continued application of the existing custody law.

The new standard may make release more difficult for a nonaggravated felon than under the pre-AEDPA standards. This, however, at most creates a practical disadvantage, not an impairment of protected rights. A criminal alien is no different from other aliens in being subject to the will of Congress when it comes to matters associated with his continued presence within our society. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 586-87 (1952) (stating that resident alien's ability to remain in this country is not a matter of ``right'' but of ``permission and tolerance''); *Ng Fung Ho v. White*, 259 U.S. 276, 280 (1922) (stating that Congress has power to order at any time deportation of aliens whose presence in the country it deems hurtful); *see also Scheidemann v. INS*, 83 F.3d 1517 (3d Cir. 1996) (holding that application of aggravated felony statutory bar to criminal alien convicted before statute's effective date was not impermissible retroactive); *Samaniego-Meraz v. INS* , 53 F.3d 254, 256 (9th Cir. 1995) (same); *Matter of Gomez-Giraldo*, 20 I. & N. Dec. 957 (BIA 1995) (same). *See generally Felker v. Turpin*, 116 S.Ct. 2333 (1996) (deciding a habeas corpus case under the AEDPA, even though the conviction preceded the amendments).

Amici's contrary argument rests to a significant extent on the assertion that ``an individual who is convicted under prior law has a right to have that law applied to him.'' Concerns of unfair surprise by changed law, and settled expectations in prior law, are attenuated in the case of bond relief in the immigration context. Whatever the criminal alien's practical expectations may have been, his conviction (even if entered upon a guilty plea) did not give him a legally enforceable interest in having the civil immigration laws remain static as to how he would be treated in future determinations affecting the deportation process. The alien's freedom was not guaranteed under prior law. Any expectation in this regard was, at best, a hope that changed circumstances may or may not let him realize. *See New York Central R.R. Co. v. White*, 243 U.S. 188, 198 (1917) (stating that ``[n]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit'').

It has not been shown that the commission of a crime is the sort of event that gives rise to vested rights or settled expectations such that changes in the law, outside the confines of criminal law itself, cannot be made without impairing ``rights'' possessed by the criminal when he or she acted, or without ``increasing liability'' for past conduct. The civil immigration detention of criminal aliens is not intended to ``punish'' any past criminal conduct. Rather, the bond provisions exist in order to preserve the government's ability to carry out its present responsibilities over immigration matters. *See Carlson v. Landon, supra*, at 541 (upholding detention without bail of lawfully admitted alien who posed ``a menace to the public interest''); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896) (stating that detention is a part of a valid and necessary means to give effect to the provisions for the exclusion and deportation of aliens); *Doherty v. Thornburg*, 943 F.2d 204, 209-11 (2d Cir. 1991) (upholding detention without bond of criminal alien pending deportation, even though detention was prolonged for 8 years), *cert. denied sub nom. Doherty v. Barr*, 503 U.S. 901 (1992). Indeed, it would be quite anomalous if, absent explicit legislative direction to impose statutory changes retroactively, either a criminal act or the results of the criminal justice process froze the noncriminal legal system entirely in place for the perpetrator of the crime.

Our conclusion is not changed by the fact this respondent posted bond and was no longer in immigration detention on the date the new bond provision took effect. To be ``vested,'' a thing must be ``[f]ixed; ... settled; absolute ...; not contingent.'' *Black's Law Dictionary* 1401 (5th ed. 1979). The immigration bond at issue here lacks these characteristics; it is a privilege extended, as even the statutory language of pre-AEDPA law evidenced, on a contingent, nonabsolute basis, entirely subject to change. *See* section 242(a)(1) of the Act (stating that the Attorney General may ``at any time'' revoke the alien's bond and take him back into custody); 8 C.F.R. § 242.2(e) (1996) (stating that the district director may revoke the alien's release ``at any time'' and detain him). The respondent, in particular, was put on notice by the Service's appeal that his bond was subject to dispute and reexamination. He cannot claim any

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

vested interest in the ruling of the Immigration Judge in this respect.

Lastly, we find unpersuasive amici's assertion that the retroactively question also depends on any general ``remedial'' legislative purpose of the new law. It is asserted, for example, that the new statute would permissibly apply to aliens placed in a better or the same position than they would have been had the new law not been enacted. Conversely, amici argues that the new law would not apply to aliens made worse off than under prior law. Amici's test, however, does not appear to represent a correct application of retroactivity principles enunciated by the Supreme Court. *See Rivers v. Roadway Express*, 511 U.S. 298 (1994) (finding that a general remedial or restorative purpose does not alone answer the retroactivity question); *see also Plaut v. Spendthrift Farm Inc.*, *supra*, at 1462 (noting that a vaguely remedial purpose of a statute would not, in and of itself, defeat the presumption against retroactivity); *Landgraf*, 114 S.Ct. at 1507-08 (stating that simply because the application of a new statute would vindicate its purpose more fully is not sufficient reason to rebut the presumption against retroactivity).

## C. Criminal Bond Law Indicates No Retroactivity Problem

Our conclusion finds support in the criminal bond context. The federal courts have found no retroactivity problems when applying changed bail standards to detained criminal defendants convicted before the passage of the new law. *See United States v. Angiulo*, 755 F.2d 969, 970-74 (1st Cir. 1985) (holding change in pretrial detention standards not impermissibly retroactive, since defendant could not have reasonably relied on promised freedom under old law); *United States v. Miller*, 753 F.2d 19, 21 (3d Cir. 1985) (holding that change in bail standards was not unconstitutional, since change was merely procedural and did not alter any substantive right; *United States v. Crabtee*, 754 F.2d 1200, 1201-02 (5th Cir.) (same), *cert. denied*, 473 U.S. 905 (1985); *United States v. Molt* 758 F.2d 1198, 1200-01 (7th Cir. 1985) (same), *cert. denied*, 475 U.S. 1081 (1986); *United States v. McCahill*, 765 F.2d 849, 849-51 (9th Cir. 1985) (same); *United States v. Affleck*, 765 F.2d 944, 947-51 (10th Cir. 1985) (same); *United States v. Ballone*, 762 F.2d 1381, 1382-83 (11th Cir. 1985) (same); *see also De Veau v. United States*, 454 A.2d 1308 (D.C. App. 1982) (finding mandatory pretrial detention of defendants charged with first degree murder not ex post facto as applied to defendant who committed crime before effective date), *cert. denied sub nom. Holmes v. United States*, 460 U.S. 1087 (1983), *overruled on other grounds, Lynch v. United States*, 557 A.2d 580 (D.C. App. 1989).

These cases arose before *Landgraf*, but they are remarkably consistent, and seem to reflect the sound judicial instincts described in *Landgraf*, 114 S. Ct. at 1499. If retroactivity is not a problem in the criminal bond context, it is difficult to imagine why it would be a problem in the civil immigration context.

The fact that a defendant was not in custody at the time of the enactment created some additional uncertainty in the criminal bond area, as this is the point on which there was a conflict among the courts of appeals that had addressed the question under the Bail Reform Act of 1984. *Compare United States v. Zannino*, 761 F.2d 52 (1st Cir. 1985) (holding that newly enacted bond provisions applied to defendant released on bail before effective date of Act where defendant's expectation of remaining free on bail was minimal), *with United States v. Fernandez-Toledo*, 749 F.2d 703, 705 (11th Cir. 1985) (holding that newly enacted bond provisions did not apply to defendant released on bail before effective date of Act where defendant's rights to bail had already vested).

As previously discussed, however, this respondent was put on notice by prevailing law and the Service's appeal that his continued release on the $1000 bond was subject to revision at any time prior to his deportation. Thus, unlike the defendant in *Fernandez-Toledo*, the respondent cannot claim any justified reliance or vested interest in the ruling of the Immigration Judge in this respect.

Consequently, we see no impediment arising from *Landgraf* in applying the new law to the respondent's present custody determination. *See Ziffrin v. United States, supra* (holding that law as amended during appeal process is to be applied by appellate body in relation to future acts).

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

## VI. Conclusion

In sum, we hold that the Transition Period Custody Rules govern pending bond appeals before this Board involving aliens freed from immigration custody prior to the October 9, 1996, effective date of the transition rules. We also hold that the transition rules apply to aliens falling within the criminal grounds of deportation, not involving an aggravated felony, covered in the transition rule statute, those rules took effect. *See Matter of Noble, supra* (applying transition rules to aliens deportable as aggravated felons).

The Immigration Judge released the lawfully admitted respondent under pre-AEDPA bond standards. *See Matter of Patel, supra.* She determined that a $1000 bond was sufficient to ensure the respondent's future appearance at any scheduled hearing. The Immigration Judge did not make a finding regarding dangerousness to the community. We will therefore remand this case to the Immigration Judge to give the respondent the opportunity to demonstrate that he ``will not pose a danger to the safety of other persons or of property.'' *See* section 303(b)(3)(B)(i) of the IIRIRA. If the respondent satisfies this condition, the Immigration Judge should also reassess the amount of the bond in accordance with the requirements of the transition rules. The Immigration Judge should then enter a new decision.

ORDER: The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion.

## Dissent by

DISSENTING OPINION: Lory D. Rosenberg, Board Member, in which Fred W. Vacca, and John Guendelsberger, Board Members, joined

## Dissent

I respectfully dissent.

Let me acknowledge at the outset: the Board's decision in *Matter of Noble*; Interim Decision 3301 (BIA 1997), is now precedent by which we are bound. [6.] With that in mind, I nonetheless respectfully dissent from both the reasoning and the conclusion reached by the majority, viewing their opinion in this case as the inevitably erroneous progeny of a fundamentally erroneous construction of the relevant sections of the statute set forth in *Matter of Noble, supra,* at 1-22. *See also id.* at 23-45 (Rosenberg, dissenting).

Principally, I disagree with the application of the explicit language of the transition rules to this respondent for the reasons which I discussed in my dissent in *Matter of Noble, supra.* While I realize I am in a minority, I find that the facts of this case make even more prominent the flaws in the majority's construction of the language of sections 303(b)(2) AND 303(B)(3)(A) and (B) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of the Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act for 1997, Pub. L. No. 104-208, 110 Stat. 3009, _ (``IIRIRA'').

The propriety of determining this respondent's release from Immigration and Naturalization Service detention under stricter statutory provisions which do not expressly refer to one such as the respondent, who was convicted before the recent amendments of the statute, who has not been convicted of an aggravated felony, and who never has been incarcerated, is doubtful. In my view, it compounds the majority's questionable observance of the canons of statutory construction, which favor interpretations that give meaning to plain language and take into account the design of the statute as a whole, which disfavor retroactive applications of the law, and which instruct us to adhere to the principle of lenity in construing ambiguous deportation statutes.

---

Immigration Precedent Decisions                                                                                    9

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

## I. FACTUAL AND LEGAL BACKGROUND

The respondent, who was lawfully admitted to this country, has resided lawfully in the United States for over 20 years since the age of 2. He was convicted in 1993 for possession of marijuana, which was not then and is not now an aggravated felony. *Compare* section 101(a)(43) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(43) (1994), *with* section 321 of the IIRIRA, 110 Stat. at __; *see also Matter of L-G-;* Interim Decision 3254 (BIA 1995). He was sentenced to probation and was never incarcerated pursuant to any sentence. He has been living with his family and working and participating in his community before, during, and since the criminal proceedings resulting in his conviction.

In 1993, when this respondent's eligibility for release from detention on bond was initially considered, there existed two standards for such determinations. At that time, eligibility for release from detention in the case of an alien convicted of an aggravated felony offenses after November 18, 1988, was determined under section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1994). *Matter of A-A-*, 20 I. & N. Dec. 492, 497, 499 (BIA 1992); *Matter of De La Cruz*, 20 I. & N. Dec. 346 (BIA 1991). That section required an alien who had been lawfully admitted to demonstrate that he did not pose a flight risk or a threat to the community before he could be released from detention; an alien who had not been lawfully admitted was ineligible for release. *See Matter of Drysdale*, 20 I. & N. Dec. 815, 817-18 (BIA 1994); *Matter of Ellis*, 20 I. & N. Dec. 641 (BIA 1993).

However, the respondent was not subject to this provision. The respondent's bond was determined under section 242(a)(1) of the Act, which governs the terms of release from detention for criminal aliens, including certain aliens convicted of aggravated felony offenses before November 29, 1990, as well as for aliens whose immigration violations were unrelated to any criminal activity. *Matter of Andrade*, 19 I. & N. Dec. 488, 489 (BIA 1987); *Matter of Patel*, 15 I. & N. Dec. 666 (BIA 1976).

When the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (``AEDPA''), was enacted on April 24, 1996, section 242(a)(2) of the Act was effectively repealed and replaced by the terms of section 440(c) of the AEDPA, which required mandatory detention. In addition to the aggravated felony offenses described in former section 242(a)(2), section 440(c) of the AEDPA provided for mandatory detention of any alien deportable for a criminal offense of almost any kind. Section 242(a)(1), under which the respondent's bond was determined, has not been repealed, either by section 440(c) of the AEDPA or by any provision of the IIRIRA.

Following the date of this enactment, the respondent appeared for a deportation hearing (in compliance with the terms of his release from detention) and was taken into custody by the service. The Service claimed the respondent was ineligible for release because, although he was not convicted of an aggravated felony, his conviction came within the broader category of offenses included in the newly enacted AEDPA mandate.

The Immigration Judge correctly found the respondent was not subject to section 440(c) of the AEDPA and the Service appealed. In the meantime, Congress enacted the IIRIRA, containing its own discrete provisions pertaining to custody and detention, including the Transition Period Custody Rules (``transition rules''), which were activated by the Attorney General's notification on October 9, 1996, that the Service had inadequate personnel and detention space to detain the number of aliens who would be subject to detention after enactment of the IIRIRA.

## II. STATUTORY LANGUAGE CONSIDERATIONS

The specific provisions of the IIRIRA in issue, section 303(b)(2) and 303(b)(3) of the Act, refer to two other statutory provisions: amended section 236(c) of the Act which takes effect on April 1, 1997, and section 440(c) of the AEDPA, enacted on April 24, 1996, and in effect at the time of IIRIRA's enactment. In determining the scope of the transition rules, we recognize that those subject to its terms are individuals who were or will be subject to the provisions for which the rules temporarily substitute. *Matter of Noble,*

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

*supra*, at 12-13; *see also id.* at 33-34 (Rosenberg, dissenting).

A. Prospective Application *and* Operation of the Provision

I do not differ from the majority in concluding that the transition rules now governing certain bond determinations are prospective. Certainly, they apply to bond determinations subject to their terms which are made following the date of enactment. *Matter of U-M-*, 20 I. & N. Dec. 327 (BIA 1991), *aff'd*, 989 F.2d 1085 (9th Cir. 1993). Where I do differ is in the application of those rules.

First, I read the provision as a unitary one, describing aliens to be taken into custody by the Attorney General and detained subject to eligibility for release under the terms of section 303(b)(3)(B) of the IIRIRA. Similarly, I read section 440(c) of the AEDPA as a unitary provision describing the ``[such] felons'' to be taken into custody upon their release from incarceration and held in detention. *Matter of Noble, supra*, at 35-39 (Rosenberg, dissenting).

Second, I view these provisions as clearly prospective, as expressed by the use of the word ``when'' in the transition rules, and the use of the word ``upon'' in the AEDPA. In the context of the terminology of the respective provisions, the phrases ``when the alien is released'' and ``upon release from incarceration,'' refer to specific events which will take place in the future. Therefore, I understand a prospective application, not to mean the self-evident fact that custody determinations are taking place now, but to mean that the statutory amendments are applicable to persons now being taken into custody when they are released from incarceration. *Id.*

Third, I conclude that the language is plain and its scope does not reach the respondent because he was not an alien who was taken into custody by the Attorney General when released from incarceration after October 9, 1996. Similarly, he would not have been covered by the AEDPA because he was not taken into custody upon release from incarceration after April 24, 1996. Therefore he does not come within the transition rules ``instead of'' the provisions of the AEDPA.

The insistence of the majority on divorcing the Attorney General's function in taking certain criminal aliens into custody upon their release from incarceration from her role in applying specific terms of release to them, is directly contrary to the canons of construction. It fragments sections 303(b)(3)(A) and (B) as though these provisions deal with two distinct groups of individuals or two unrelated processes, rather than interrelated aspects of custody and release. As I emphasized in *Matter of Noble*, an interpretation of the statute which gives effect to the language of each provision and construes the statute as a whole is essential. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988); *COIT Independence Joint Venture v. Federal Sav. and Loan Ins. Corp.*, 489 U.S. 561 (1989); *Matter of W-F-*; Interim Decision 3288 (BIA 1996).

I also emphasized that the canons require us to avoid interpretations which raise questions of constitutional infirmity. For example, we must be mindful to give a restrictive meaning to a provision ``if a broader meaning would generate constitutional doubts.'' *United States v. Witkovich*, 353 U.S. 194, 199 (1957); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46, (1988).

B. Application of the Transition Rules to the Respondent Is Improper

The question before us in this case is whether we can apply the transition rules to an individual who has not been convicted of an aggravated felony, who was never incarcerated as the result of a criminal sentence, who was never taken into custody by the Service upon release from incarceration, and who has never even been held in Service detention. *Compare* section 303(b) of the IIRIRA *with* section 440(c) of the AEDPA. Again, while this lawfully admitted respondent, by virtue of the majority decision in this case, now becomes subject only to increased scrutiny under a standard which shifts the burden to him, the ramifications of the majority's decision are far more broad.

Today, an affirmative answer means the imposition of a more harsh standard for release should the Service revoke the bond of an alien deportable on criminal grounds, as it has done here. Tomorrow, it

---

Copyright (c) 2001 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved.

means mandatory detention for such a respondent, since the transition rules are just that -- rules to ease a transition to a system of mandatory custody of any alien convicted of a criminal offense or charged with a security violation which renders him deportable.

In both *Matter of Noble, supra*, and in the case before us today, the majority has laid the predicate for a broad and overreaching interpretation, ultimately paving the way to detain, without any hope of release, any alien ever convicted of any crime at any time. This adversely affects both longtime lawful residents and other applicants of long residence or significant equities who qualify for discretionary relief. Such mandatory detention will be imposed without regard to either their conditions or their circumstances, including whether we would ultimately finds them exceptionally qualified to remain as a member of our society. *See, e.g., Matter of Pena-Diaz*, 20 I. & N. Dec. 841 (BIA 1994) (granting suspension of deportation to an alien with a several year old drug conviction, who was not lawfully admitted, on the basis of his lengthy residence of 18 years and strong family ties, which were found to constitute exceptional and extremely unusual hardship).

This increasing encroachment on the liberty interests of such aliens raises critical questions concerning our interpretation of the reach of the transition rules. *See Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 1505 (1994). To determine the amendment's effect in the instant case we turn once again to the language of the statute.

The thrust of the dissent in *Matter of Noble, supra*, is that the statutory language itself is *expressly prospective* as to whom it applies, and that by its terms, the statute limits a retroactive application of the transition rules, except where specifically provided by the language of the statute itself. In fact, the statute refers to section 440(c) of the AEDPA, which previously governed the release of most criminal aliens, as now having been replaced ``instead,'' by the transition rules which were activated effective October 9, 1996. Thus, the IIRIRA provides specifically for a discrete retroactive application, indicating that Congress is perfectly capable of indicating quite clearly a retroactive application when Congress desires one. *See* section 303(b) of the IIRIRA.

The silence of the statute with regard to any other retroactive impact upon conduct or events which already have taken place is significant. Nothing in the text or the legislative history of the AEDPA, and nothing underlying enactment of section 303(b)(3)(A) and (B) of the IIRIRA, indicates that either section should be applied retroactively to pending cases or pre-amendment circumstances other than as specified. There is no basis to conclude that this silence was due to an ``accident of draftsmanship.'' *INS v. Phinpathya*, 464 U.S. 183, 191 (1984).

As recognized consistently by the Supreme Court, retroactivity is not favored in the law. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). A presumption against retroactivity generally is consistent with legislative and public expectations as a safeguard against unfairness. *Landgraf*, 114 S.Ct.at 1499, 1501 (citing *United States v. Heth*, 7 U.S. (3 Cranch) 399, 413 (1806), for the proposition that the Supreme Court has long declined to give retroactive effect to statute burdening private rights unless Congress has expressed its intent through `` "clear, strong and imperative`` " language).

The effort to reconcile the canon that the law to be applied is the law in effect at the time of adjudication, with the canon that retroactive applications of the law are disfavored, resulted in the Supreme Court's decision in *Landgraf*. There, the presumption against retroactivity trumped the application of the law in effect at the time of application, when that would offend the ``traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment.'' *Id.* at 1504. Further, as the dissent in *Matter of Noble, supra*, makes clear, the canon that ambiguities in deportation statutes are to be construed in favor of the alien is particularly relevant in determining the reach of a statute such as this one.

When faced with a choice between two readings of a deportation-related provision, the courts and this Board have relief upon the sound principle that we resolve doubts in statutory construction in favor of

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

the alien. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *INS v. Errico*, 385 U.S. 214 (1966); *Barber v. Gonzales*, 347 U.S. 637, 642 (1954); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *Matter of Tiwari*, 19 I. & N. Dec. 875, 881 (BIA 1989). To my knowledge this canon  operates with equal force as the other canons, as no hierarchy of canons exists which  relegates this canon to a position of less significance in our analysis. The majority nevertheless  chose to persist in rationalizing what ultimately, to my mind, is a retroactive application of a  prospective provision whose language reflects it was intended to apply to events occurring in the  future.

In the past 6 months, over 10 federal courts have found, contrary to the thesis  advanced by the majority, that applying the amended rules to an alien such as the respondent not only  offends constitutional considerations, but results in an impermissibly retroactive application. Most  recently, in *United States v. Igbonwa*, No. 90-375-1, 1996 WL 694178, at 3 (E.D. Pa. 1996), the court stated in no uncertain terms, ``The key issue is whether ... the  revised statute, mandating detention, may be retroactively imposed.'' The court determined that  given the ``strong presumption against giving retroactive effect to statutes burdening private rights,  unless Congress has made clear its intent[,] [citing *Landgraf*] ...  the pre-AEDPA version of [the statute] should apply ....'' *Id.* In  addition, in *DeMelo v. Cobb*, 936 F.Supp. 30 (D. Mass. 1996), the court found it  improperly retroactive to apply section 440(c) of the AEDPA to the case of an alien who  both was convicted and served his sentence prior to its effective date.

Furthermore, in *Montero v. Cobb*, 937 F.Supp. 88 (D. Mass. 1996), the court found that an alien who had  been convicted of a controlled substance violation in 1981 and released from  incarceration prior to enactment of the AEDPA, and who was taken into custody and detained by the  Service on April 18, 1996, was not precluded by section 440(c) of the AEDPA from a bond hearing  to determine if release was appropriate. In *Villagomez v. Smith*, No. C96-1141C, 1996 WL 622451 (W.D. Wa. July 31, 1996), the court found ``straightforward'' the  language mandating that the Attorney General shall take into custody any alien ``upon release from  incarceration,'' and ordered the permanent resident, who already had served his sentence for a 1989  conviction for possession of heroin before the enactment of AEDPA, released from custody. *See also Flanigan v. Reno*, 96-6179-WJR (E) (C.D. Cal. Oct. 1, 1996); *Grodski v.  Reno*, No. 1:96-cv-3202-ODE (N.D. Ga. Sept. 20, 1996); *Almaguer-Almaguer v. Reno* , No. 96 C 5637 (N.D. Ill. Sept. 6, 1996).

In the absence of an express  retroactive provision, and given the considerations discussed above, I do no believe that even under our  decision in *Matter of Noble, supra*, the application of the transition rules to this  respondent is authorized.  Furthermore, I am unpersuaded by the analysis relief upon by the majority in reaching its conclusion that no retroactive application of the law, such as those  discussed in *Landgraf*, exists here.

What is at issue here is the respondent's  right not to be detained subject to a provision whose language does not apply to his  circumstances. This respondent is a lawfully admitted resident who lived here since infancy.  Although he was convicted of an offense, his conviction predated enactment of both the AEDPA  and the IIRIRA, his conviction was not an aggravated felony, he never was incarcerated for it,  and he has remained at liberty in his community. Yet the majority insists that now he must  be held subject to a standard which presumes that he shall be maintained in detention.

The  interpretation proposed by the dissent in *Matter of Noble, supra*, would have avoided these problems. As we stated in *Matter of A-A-, supra*, it is not merely  whether a new law is prospective in operation, but whether its terms otherwise set limitations  on the scope of its temporal application. *Id.* at 499. In assessing the applicability of the  transition rules, the better course is to acknowledge that the terms of the statute nowhere  indicate a retroactive application of the sort reached by the majority. Instead they are expressly  prospective, applying only to person who are taken into custody by the Attorney General once  released from incarceration after the relevant effective dates. Prudence dictates that the  additional restrictions on liberty contained in the amendments be limited to such persons.

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved

MATHON, GUENDELSBERGER, and JONES, Board Members.  Concurring and Dissenting Opinion: HOLMES, Board Member, joined by DUNNE, Vice Chairman; HURWITZ, FILPPU, GRANT, and SCIALABBA, Board Members. Board Member Anthony C. Moscato did not participate in the decision in this case.

**Opinion**

**Opinion by**

HEILMAN, Board Member:

**Opinion**

We have jurisdiction over this timely appeal pursuant to 8 C.F.R. § 3.1(b) (1998). The respondent has appealed the Immigration Judge's January 29, 1998, ``decision,'' which ordered his removal to Laos. We have reviewed the regulations relevant to the form and content of Immigration Judges' decisions in removal proceedings, and we have additionally considered the principles of fundamental fairness, adequate notice, and the efficient administration of appeals.  Because we conclude that a proper decision has not been issued in this case, we will remand the record to the Immigration Judge for preparation of an appropriate decision.

## I. SUMMARY OF FACTS

At a hearing before the Immigration Judge, the 22-year-old respondent, who was at that time unrepresented by counsel, admitted to the allegations in the Notice to Appear (Form I-862).  His admissions to the factual allegations establish that, after he was paroled into the United States as a refugee and subsequently adjusted his status to that of a lawful permanent resident, he was convicted on May 3, 1995, in the District Court of Sedgwick County, Kansas, of two counts of aggravated assault, for which he was sentenced to concurrent 16-month terms of imprisonment.

The respondent did not expressly concede that this offense rendered him removable as charged under sections 237(a)(2)(A)(iii) and (C) of the Immigration and Nationality Act, 8 U.S.C. §§ 1227(a)(2)(A)(iii) and (C) (Supp. II 1996). [1.]  After the respondent expressed his fear of persecution should he be required to return to his native country of Laos, the Immigration Judge considered both oral testimony from the respondent and documentary evidence of his conviction.  The transcript of the hearing reflects that the Immigration Judge advised the respondent that he was statutorily ineligible for asylum due to his conviction for an aggravated felony.  The transcript also includes a brief discussion by the Immigration Judge of the circumstances of the respondent's offense, which concludes with the Immigration Judge's determination that the respondent's conviction was for a particularly serious crime,  rendering him ineligible for the relief of withholding of removal.

At the conclusion of the hearing, the Immigration Judge issued a document captioned ``Order of the Immigration Judge'' (``Order'').  The text of the January 29, 1998, Order simply states:

> Upon the basis of the respondent's admissions, I have determined that the respondent is subject to removal on the charge(s) in the Notice to Appear.
>
> Respondent has made no application for relief from removal.
>
> It is HEREBY ORDERED that the respondent be removed from the United States to LAOS on the charge(s) contained in the Notice to Appear.

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group   All rights reserved.

The Order concluded with the requisite ``boilerplate'' warnings pertaining to the future immigration consequences of failure to appear for removal when so ordered by the Immigration and Naturalization Service. The Order was signed and dated by the Immigration Judge. The respondent's timely appeal followed.

## II. REGULATIONS PERTAINING TO DECISIONS BY IMMIGRATION JUDGES IN REMOVAL PROCEEDINGS

Concomitant with the creation of the new removal proceedings now codified at section 240 of the Act, 8 U.S.C. § 1229a (Supp. II 1996), came the implementing revisions to Title 8 of the Code of Federal Regulations. While 8 C.F.R. § 3.37 (1998) remains in effect as the general regulation pertaining to decisions of Immigration Judges, a regulation specific to the decisions of Immigration Judges in removal proceedings may now be found at 8 C.F.R. § 240.12 (1998). That regulation provides:

(a) *Contents.* The decision of the immigration judge may be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. The formal enumeration of findings is not required. The decision shall also contain reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) *Summary decision.* Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to § 240.10(b) [sic] [2.] and the respondent does not make an application under § 240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision or, if voluntary departure is granted, a summary decision with an alternate order of removal.

(c) *Order of the immigration judge.* The order of the immigration judge shall direct the respondent's removal, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When removal is ordered, the immigration judge shall specify the country, or countries in the alternate, to which the respondent's removal shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

8 C.F.R. § 240.12.

Paragraph (a) of the regulation provides general guidelines for the required content of a full oral or written decision. Paragraph (b) permits Immigration Judges, in the limited circumstances described below, to issue a decision in a more abbreviated format. The regulation refers to such decisions as ``summary decisions'' but is silent as to their required content. Paragraph (c) pertains to the Immigration Judge's order, which historically, and by regulation, has been recognized as separate from the Immigration Judge's decision on the issues of removability and relief. Based on the title and content of the document issued in this case, we would view it as the ``order of the immigration judge'' described in § 240.12(c), rather than as a decision. However, it appears that the Immigration Judge intended that his January 28, 1998, Order serve as a summary decision under 8 C.F.R. § 240.12(b). We will review the regulatory requirements that must be satisfied before a decision in summary form pursuant to § 240.12(b) is permitted. Further, because we find that those requirements have not been met in this case, we will discuss whether the Immigration Judge's discussion within the transcript suffices as a proper oral decision under § 240.12(a).

### III. REGULATORY REQUIREMENTS FOR ISSUING SUMMARY DECISIONS

While the regulations authorize an Immigration Judge to issue summary decisions in specifically defined circumstances, we have found increasingly that their use has not been confined to those specific circumstances authorized by the regulations. The Immigration Judge's issuance of a summary decision in the circumstances presented in this case may be consistent with prior practice. However, the conditions imposed by the new regulations for the use of summary decisions have not been satisfied. The regulation at 8 C.F.R. § 240.12(b) expressly limits the use of summary decisions to cases where ``inadmissibility or

---

Immigration Precedent Decisions                                                                                           3
Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group   All rights reserved.

deportability is determined on the pleadings pursuant to § 240.10[c]." *See supra* note 2.

The regulations define when removability has been determined on the pleadings as follows:

*Pleading by respondent.* The immigration judge shall require the respondent to plead to the notice to appear by stating whether he or she admits or denies the factual allegations and his or her removability under the charges contained therein. *If the respondent admits the factual allegations and admits his or her removability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that removability as charged has been established by the admissions of the respondent....* When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

8 C.F.R. § 240.10(c) (1998) (emphasis added).

When read in conjunction with § 240.12(b), § 240.10(c) confines the Immigration Judge's authority to issue a ``summary decision'' to those cases where the respondent admits to the factual allegations and the charges of removability, and ``the immigration judge is satisfied that no issues of law or fact remain.'' In such circumstances, removability has been ``determined on the pleadings'' without the need for any further evidentiary hearing. We emphasize the requirement stated in § 240.10(c) that the alien ``admits his or her removability under the charges'' in order for removability to be considered determined on the pleadings. This requirement is one that is frequently overlooked when Immigration Judges issue documents that they consider to be appropriate summary decisions under § 240.12(b). The requirement is not met when an Immigration Judge determines that an alien is removable based solely on his or her admissions to the factual allegations, as the regulation is specific in requiring an admission to the charges of removability. 8 C.F.R. § 240.10(c). We also note that, in removal proceedings, which are initiated for the purpose of determining whether an alien will be removed from this country, remaining ``issues of law or fact,'' which would preclude the use of a summary decision under the regulation, would necessarily include issues related to the alien's apparent eligibility for relief from removal.

We note that 8 C.F.R. § 240.11(a)(2) (1998) imposes on Immigration Judges the duty to ``inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make  application during the hearing.'' We therefore read the regulations pertaining to removal proceedings as providing for the use of a summary decision format only in cases where, based on the alien's admissions to the factual allegations and to the charges of removability, it can be determined without further inquiry or analysis that he or she is ineligible for any form of relief; or, after the Immigration Judge has advised the alien regarding any forms of relief for which he or she appears to be eligible, the alien does not seek to apply for relief from removal; or the alien has sought and has been granted only the relief of voluntary departure. 8 C.F.R. §§ 240.10(c), 240.12(b). Accordingly, we find that the regulations impose the following requirements for the issuance of a summary decision in lieu of a full oral or written decision:

(1) The respondent expressly admits to the factual allegations in the Notice to Appear;

(2) the respondent expressly admits that he or she is removable as charged; and

(3) one of the following conditions applies:

(a) The respondent does not apply for any form of relief after having been advised by the Immigration Judge, in compliance with 8 C.F.R. § 240.11(a)(2), of any form of relief for which he or she is apparently eligible based on the pleadings and afforded an opportunity to apply for such relief at the hearing; or,

(b) the respondent applies only for the relief of voluntary departure after having been advised by the Immigration Judge, in compliance with 8 C.F.R. § 240.11(a)(2), of any other form of relief for which he or she is apparently eligible based on the pleadings and afforded an opportunity

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

to apply for such relief at the hearing, and voluntary departure is granted by the Immigration Judge; or

    (c) the respondent's ineligibility for any form of relief is clearly established by the pleadings themselves, without the need for further fact-finding or analysis.

## IV. APPLICATION OF THE REGULATORY REQUIREMENTS FOR SUMMARY DECISIONS TO THE FACTS OF THIS CASE

In the present case, the respondent did not expressly admit that he was removable as charged, as is required before a summary decision may be issued in lieu of a full oral or written decision. Further, even if the respondent had expressly admitted to the charges, issues relating to his eligibility for withholding of removal would have remained unresolved. When an alien has been convicted of an aggravated felony or felonies, unless the pleadings establish that the aggregate term of confinement imposed is at least 5 years, the admissions and concessions to the pleadings do not in themselves establish statutory ineligibility for the relief of withholding of removal. *See* section 241(b)(3) of the Act, 8 U.S.C. § 1231(b)(3) (Supp. II 1996). [3.] The proceedings must continue to resolve the question of whether or not the alien's aggravated felony conviction is for a particularly serious crime, rendering him or her statutorily ineligible for withholding of removal. [4.] The Immigration Judge's findings in this regard should be set forth in his or her decision. The regulations do not confer authority to the Immigration Judges to issue a summary decision when further fact-finding or analysis is necessary to resolve an issue that remains after the respondent has admitted to the factual allegations and charges of removability. *See* 8 C.F.R. §§ 240.10(c), 240.12(b).

We also note that the Immigration Judge's ``decision'' does not completely portray what transpired at the hearing. The ``Order'' states that the ``Respondent has made no application for relief from removal.'' In actuality, what happened was that the Immigration Judge pretermitted an application for withholding of removal after concluding, upon his consideration of matters beyond the pleadings, that one of the grounds for mandatory denial applied. While it is arguably correct that in one sense the respondent did not formally apply for relief, it was clear that he desired to have his removal to Laos withheld, but that his opportunity to do so was pretermitted following an evidentiary hearing. [5.] We do not find that this is a circumstance under which the regulations would contemplate a summary decision being entered, rather than a decision that explains to the respondent why he or she is being found ineligible for the desired relief from removal.

## V. CONTENTS OF SUMARY DECISIONS

Additionally, although the regulations are silent regarding the form and content of a summary decision in removal proceedings, we expect even these abbreviated decisions to link the admitted factual allegations to the section or sections of the Act which determine the respondent's removability, and which determine his or her apparent eligibility for relief. In those specified situations where the regulations provide for the use of a summary decision, a full discussion of the relevant facts and lengthy analysis of the law is not necessary. However, the Immigration Judge's decision is the means by which an alien is notified of the basis for the Immigration Judge's decision. A ``generic'' form like the one used in this case, which does not meaningfully reflect any individualized assessment of the law applicable to the respondent's case, undermines the very crucial role played by Immigration Judges in the implementation of our nation's immigration laws. An Immigration Judge's decision that lacks reference to the controlling law may not provide an adequate opportunity to the alien, who in many cases is unrepresented, to contest the Immigration Judge's determinations on appeal. *See generally Matter of M-P-*, 20 I. & N. Dec. 786 (1994). As a result, this Board may be left without adequate means of performing its primary appellate function of reviewing the bases stated for the Immigration Judge's decision in light of the arguments advanced on appeal. *Id.*

Accordingly, even when the regulatory requirements for the issuance of a summary decision have been met, including the requirement that the respondent admit to the charges of removability, a summary decision should adequately link the respondent's admissions to the statutory provisions and/or legal

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved

precedent that are dispositive of the issues of his or her removability and relief. A summary decision, when used as contemplated by the regulation, may be very brief. It may well be possible that forms may be developed that allow the Immigration Judge to annotate relevant individual information in such a way that there is a sufficient link between the admitted factual allegations and charges and the applicable law. For example, in cases where an alien has admitted to the charge that he or she has been convicted of an aggravated felony, we would expect the Immigration Judge to annotate the specific paragraph in section 101(a)(43) of the Act, 8 U.S.C. § 1101(a)(43) (1994 & Supp. II 1996), within which the alien's conviction falls.

Regarding the availability of relief from removal, we would consider it appropriate for the Immigration Judge to make specific and pertinent annotations which advise the alien of the basis for the determination that he or she is ineligible for relief. This connection between the alien's admissions to the pleadings and the specific statutory provision that renders the alien ineligible for relief would provide the alien some measure of notice of the basis for the Immigration Judge's decision. [6.] When there is a controlling legal precedent interpreting the relevant statute, that precedent should also be noted. Alternatively, in those cases where the regulatory requirements for the use of a summary decision are met and the alien's admissions have not foreclosed the possibility of relief, the summary decision should specify the forms of relief for which the alien may be eligible, note that the alien was properly advised of and provided an opportunity to apply for those forms of relief, and state either that the alien did not seek to apply for relief, or that he or she sought only the relief of voluntary departure and such relief was granted. 8 C.F.R. §§ 240.10(c), 240.11(a)(2), 240.12(b).

## VI. REFERENCE TO THE TRANSCRIPT TO DETERMINE THE BASIS FOR AN IMMIGRATION JUDGE'S ``DECISION''

Although it is apparent on this record that the Immigration Judge intended that the January 29, 1998, Order serve as a summary decision under 8 C.F.R. § 240.12(b), the Service takes the position that the Immigration Judge has issued a factually and legally correct oral decision. Although § 240.12(a) does not describe the physical aspects of a proper oral decision, we find that the appellate process is best served when the oral decision is set apart from the transcript of the proceedings such that it is readily identifiable as the Immigration Judge's complete decision. In the case before us, the transcript contains scattered findings of fact and conclusions of law, but there is no clearly defined ``decision'' by the Immigration Judge.

``The Board is an appellate body whose function is to review, not to create, a record.'' *Matter of Fedorenko*, 19 I. & N. Dec. 57, 74 (BIA 1984). The regulation pertaining to the contents of the record in removal proceedings, 8 C.F.R. § 240.9 (1998), provides that ``[t]he hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case.'' We view § 240.9 as contemplating an Immigration Judge's decision that is a separate and distinct part of the record from the transcript of the testimony.

Additionally, aliens facing removal from this country, this Board, and reviewing federal circuit courts of appeals should not be required to pore through the transcript of proceedings to find the Immigration Judge's decision. We note that, in many cases, an Immigration Judge will make determinations on the issue of removability at the master calendar hearing and will make determinations regarding the respondent's eligibility for various forms of relief at subsequent hearings. We have increasingly been confronted with instances where the Immigration Judge's findings of fact and conclusions of law are scattered throughout the transcript and made piecemeal during hearings that take place on different days. Even when the Immigration Judge states his or her oral decision at the conclusion of the final hearing, it is frequently not clearly identified as the oral decision in the transcript, and at times is set forth in a manner that leaves the parties and the Board to speculate as to where the decision begins and ends, and whether additional legal and factual determinations have been pronounced elsewhere in the transcript.

Accordingly, when an oral decision is rendered, the record should include a complete decision of

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

the Immigration Judge in a manner that clearly separates it from the transcript of the proceedings. [7.] In addition to being required to separate the decision from the transcript of the hearing, the Immigration Judge is also responsible for the substantive completeness of the decision. Although there is no formal requirement for the Immigration Judge to list each factual finding, an oral decision must accurately summarize the relevant facts, reflect the Immigration Judge's analysis of the applicable statutes, regulations, and legal precedents, and clearly set forth the Immigration Judge's legal conclusions.

## VII. CONCLUSION

As we have discussed, the regulatory requirements for the issuance of a summary decision under 8 C.F.R. § 240.12(b) have not been met in this case. Additionally, to the extent that the Immigration Judge may have intended that his discussion in the transcript alternatively serve as an oral decision under § 240.12(a), we find that the overlapping concerns of fundamental fairness and the efficient administration of the appellate process require that when an oral decision is rendered, it be identified as such and separated from the transcript of proceedings. Accordingly, this record is remanded to the Immigration Judge for the inclusion of an appropriate oral or written decision. The respondent and the Immigration and Naturalization Service should be served with a copy of the decision. The record should then be forwarded to the Board for the setting of a briefing schedule, as provided in 8 C.F.R. § 3.3(c)(1) (1998), and for our subsequent consideration of the appeal. [8.]

ORDER: The record is remanded to the Immigration Court for further proceedings consistent with this opinion.

## Concur by

CONCURRING AND DISSENTING OPINION: David B. Holmes, Board Member, in which Mary Maguire Dunne, Vice Chairman; Lauri Steven Filppu, Edward R. Grant, Gerald S. Hurwitz, and Lori L. Scialabba, Board Members, joined

## Concur

I respectfully concur in part and dissent in part.

The majority opinion sets forth the regulatory requirements that must be satisfied before an Immigration Judge may issue a summary decision under the provisions of 8 C.F.R. § 240.12(b) (1998) and concludes that, in this case, the use of a summary decision was improper. The majority further discusses what should be contained in a summary decision in those cases where the regulatory requirements for issuing a summary decision have been met. Finally, the majority provides a general discussion of oral decisions, concluding that oral decisions should be separate documents, rather than part of the transcript. The majority finds that a proper decision was not issued in this case and remands the record for the preparation of a full oral or written decision.

I concur that remand is appropriate in the circumstances presented in this case. However, I write separately to express my understanding of the regulatory requirements for the issuance of summary decisions; to dissent from those parts of the majority opinion in which I believe that the majority has unnecessarily imposed requirements on Immigration Judges beyond those stated or contemplated by the current regulations; and to clarify that I would adhere to the principle of ``harmless error'' and ordinarily would not remand a record solely on the basis of the format of the Immigration Judge's decision, in the absence of some prejudice to the respondent, particularly where no challenge to the adequacy of the Immigration Judge's decision is raised on appeal.

## I. REGULATORY REQUIREMENTS FOR THE ISSUANCE OF A SUMMARY DECISION

---

Immigration Precedent Decisions                                                              7

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved

I generally agree with the majority's discussion regarding the circumstances under which the issuance of a summary decision is appropriate under the provisions of 8 C.F.R. § 240.12(b). That regulation specifically requires that removability must be determined on the pleadings ``pursuant to [8 C.F.R.] § 240.10[c].'' 8 C.F.R. § 240.12(b) (altered to include correct subsection). In addition to requiring an admission to the factual allegations, a requirement that was satisfied in this case, 8 C.F.R. § 240.10(c) (1998) requires an admission that the alien is removable under the charges, a concession that was lacking in this case. I agree with the majority that a summary decision should not be entered under 8 C.F.R. § 240.12(b) unless ``the respondent admits the factual allegations and admits his or her removability under the charges.'' 8 C.F.R. § 240.10(c).

The regulations also require that the Immigration Judge must be ``satisfied that no issues of law or fact remain'' before determining removability based on a respondent's admissions. 8 C.F.R. § 240.10(c). I do not agree with the majority's view of the meaning of this language. The majority finds that this phrase ``necessarily include[s] issues related to the alien's apparent eligibility for relief from removal.'' *Matter of A-P-,* Interim Decision 3375, at 6 (BIA 1999). However, particularly when read in context, it would seem clear that the ``issues of law or fact'' language refers to issues *pertinent to removability,* rather than to relief. This language is most reasonably read as meaning that, irrespective of an alien's admission to removability, an Immigration Judge should not order an alien removed on the basis of the pleadings alone when the Immigration Judge has reason to believe that the respondent may not, in fact, be subject to removal. For example, if, in the course of the proceedings, an alien raises facts which suggest a claim to United States citizenship, or which indicate that the conviction on which removability is premised is on direct appeal, the regulations do not contemplate that an order of removal would be entered ``on the pleadings'' without such issues of law or fact being resolved. In such situations, where the Immigration Judge must go beyond the pleadings to determine removability, the regulations do not permit the issuance of a summary decision. Rather, a decision should be entered that addresses and resolves these remaining issues of law or fact.

Interpreting the ``issues of law or fact'' phrase as referring only to issues related to removability is supported by the manner in which the general regulations relating to procedures in removal proceedings are structured. *See* 8 C.F.R. §§ 240.10, 240.11, 240.12 (1998). Matters pertaining to relief from removal are separately and specifically covered in § 240.11(a)(2), which discusses the Immigration Judge's duty to inform the alien of his or her apparent eligibility for relief, and to afford the alien an opportunity to apply for such relief.

The principal point of the § 240.12(b) requirement that removability must be ``determined on the pleadings,'' as ``pleading by the respondent'' is defined in § 240.10(c), is that a summary decision is *not* appropriate in cases where an alien either does not specifically admit his removability, or where removability is admitted, but the Immigration Judge nonetheless determines that issues of law or fact relating to the alien's removability remain to be resolved.

The regulation itself treats the precondition that removability be established on the pleadings as separate from the requirement that there be no issues regarding the alien's eligibility or desire to apply for relief. Under § 240.12(b) a summary decision may be entered by the Immigration Judge ``in any case where inadmissibility or deportability is determined on the pleadings pursuant to § 240.10(b) [sic] *and* the respondent does not make an application under § 240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application.'' (Emphasis added.) Thus, the issue of relief appears to be a distinct question from the determination of removability on the pleadings when assessing whether a summary decision may be issued.

Satisfaction of the additional requirements in § 240.12(b) for the issuance of a summary decision presents its own set of problems, as the phrases ``the alien is statutorily ineligible for relief'' and ``the respondent does not make an application'' are open to differing interpretations. For example, turning first to the ``statutorily ineligible'' language, if pushed to its extreme, an argument could be made that, after determining removability on the pleadings, an Immigration Judge could hold extensive evidentiary hearings on the issue of relief, conclude that the alien did not meet his or her burden of establishing statutory

---

Immigration Precedent Decisions                                                                                    8

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

I respectfully dissent from Part V of the majority decision, which discusses what the content of a summary decision should be when a summary decision *is permitted* under the provisions of § 240.12(b). The term ``summary decision'' and the Immigration Judges' authority to issue such a decision are not new to the regulatory aftermath of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (``IIRIRA''). In fact, summary decisions have a long history in deportation proceedings dating back at least to 1956. *See* 8 C.F.R. § 242.17(b) (1956). *See generally Matter of You Fu Wang, supra.* The most recently superseded regulation pertaining to summary decisions, 8 C.F.R. § 242.18(b) (1997), which specifically referred to the outdated Forms I-38 and I-39, had its origins in the regulations promulgated in 1956; and even the present regulation governing procedures in deportation proceedings, 8 C.F.R. § 240.50(b) (1998), references the use of Forms EOIR-6 and EOIR-7. The content of these various form decisions is not meaningfully different from that of the decision entered by the Immigration Judge in this case. Thus, summary decisions historically have been just that concise, conclusory decisions similar in format and content to the decision entered by the Immigration Judge here. The regulation that we are interpreting today, § 240.12(b), does not specify the forms to be used for issuing summary decisions in removal proceedings, but I find no basis to conclude that a fundamentally different ``summary decision'' was contemplated from that which has been used for many decades.

One can argue that the regulations should be revised to incorporate the content requirements discussed by the majority in section V of their decision. However, looking to the recently redrafted regulations pertaining to Immigration Judge's decisions, I find nothing in the regulations themselves, or in the published regulatory summary of the regulations, which either expressly or implicitly adds new requirements for the content of summary decisions. Since the present regulations neither mandate nor contemplate that summary decisions contain information beyond that which has historically been included, I would not impose on the Immigration Judges the content requirement discussed in the majority opinion.

What is most important, in my opinion, is that *the record* support the accuracy and appropriateness of the conclusory statements made in the summary decision. A summary decision should not state that an alien ``did not apply'' for relief when he or she in fact sought to do so, but was precluded from applying, or when the Immigration Judge failed to advise the alien of his or her apparent eligibility for relief. The error in such circumstances is not that the summary decision says too little, but that what it does say does not fairly reflect what occurred during the proceedings. However, in those cases where a summary decision is appropriately issued, for example, where the record confirms that the Immigration Judge properly advised the alien of the forms of relief for which he or she appeared eligible, and the alien stated that he or she did not want to apply for any relief, then I would find no error under the existing regulations in the issuance of a summary decision that says no more than the Immigration Judge's decision in this case. In my view, the regulations incorporate fundamental fairness principles by only allowing the use of a summary decision in narrow circumstances where a conclusory order, in the nature of those that have historically been issued, is sufficient.

Accordingly, I dissent from Part V of the majority opinion.

### III. LOOKING TO THE TRANSCRIPT FOR THE IMMIGRATION JUDGE'S DECISION

Part VI of the majority opinion, which addresses the manner in which an oral decision should be included in the record, is largely dicta in this case. Although the Immigration and Naturalization Service argues that the Immigration Judge issued an oral decision that is included in the transcript, it seems clear to me that the Immigration Judge did not intend his discussion in the transcript as his decision. Rather, the Immigration Judge concluded that it was appropriate in this case to issue a summary decision, which he then entered. Given the general high quality of this Immigration Judge's decision-making, I have little doubt that, had he not concluded that a summary decision was appropriate, he would have issued a more formal decision than the limited discussion found in this transcript.

I am not entirely certain of what the majority is requiring in its discussion in Part VI. I note at the outset that I find that the general standard of Immigration Judge decision-making is extremely high, despite

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

the often very demanding conditions under which those decisions are made. However, I certainly concur with the majority to the extent that they are saying that an Immigration Judge's oral decision should be entered ``[a]t the conclusion of the proceedings'' and should be recognizable as such. *See* section 240(c)(1)(A) of the Act, 8 U.S.C. § 1229a(c)(1)(A) (Supp. II 1996). I would also agree that having the Immigration Judge direct the transcriber to prepare the oral decision in a separate, formally-captioned format is the preferred approach, which normally results in a more professional at least in appearance decision, and one which can better serve the potential appellate process.

That being said, however, I recognize that oral decisions are not always entered in such a manner. Rather, at times, at the conclusion of the hearing, Immigration Judges enter oral decisions, which are transcribed as part of the entire transcript of the proceedings, without separate captioning. I find no statutory or regulatory prohibition against this approach, nor do I find it inherently unfair, so long as the transcript reflects that an adequate oral decision was, in fact, entered at the conclusion of the proceedings. I think it is fair to state that this practice has a long history that has not resulted in reversal of an Immigration Judge's decision for reasons of form alone. Thus, I do not concur in the majority's seeming requirement that the oral decision be ``separate'' from the transcript. Perhaps it is a matter of semantics, but I view oral decisions as inevitably a part of the ``transcript of proceedings,'' irrespective of whether they are readily amenable to separate transcription in a formally-captioned document. I do not agree that the failure to follow the more formal approach necessarily implies ``error'' by the Immigration Judge, and I would not remand cases simply for the preparation of a more formally formatted oral decision.

What I do find problematic are those cases in which an Immigration Judge signs a form which indicates that it is a ``summary of the oral decision,'' and which advises that if the case is appealed, the oral decision will be transcribed and serve as the Immigration Judge's decision in the case; but, when the hearing is transcribed it does *not* reflect a cohesive or identifiable oral decision. Such cases are far from the norm, but they do occur. An alien in proceedings as serious as those routinely presided over by Immigration Judges is entitled to a ``decision'' that is recognizable as such. And the statute and the regulations, as well as professionalism, common sense, and simple fairness require more than a series of disjointed and/or unsupported findings spread throughout the transcript that, in practical effect, would require the alien or an appellate authority to construct an after-the-fact ``decision.''

I finally note in this regard that I am principally concerned with the substance, rather than the format, of an Immigration Judge's decision. If an Immigration Judge enters a decision of the nature described in footnote 7 of the majority opinion, that is, a comprehensive decision entered at the conclusion of the hearing, I would not find such a decision to be issued in a manner that is contrary to the statute, the controlling regulations, or principles of fundamental fairness simply because it was not entered as a more formal, separately captioned document. To the extent that the majority may be holding otherwise, I dissent.

## IV. ``HARMLESS ERROR'' RULE SHOULD BE APPLIED

As a final matter, I note that I do not understand the majority, in deciding to remand on the facts of this case, to have abandoned the principle of ``harmless error,'' the principle that not all errors dictate a reversal or remand in the absence of prejudice. *See, e.g., Matter of Santos,* 19 I. & N. Dec. 105 (BIA 1984); *Matter of Sibrun,* 18 I. & N. Dec. 354 (BIA 1983), and cases cited therein; *cf. Matter of Charles,* 16 I. & N. Dec. 241 (BIA 1977) (remanding a case that involved a myriad of procedural errors). In the circumstances presented here, I am not satisfied that the Immigration Judge's error in issuing a summary decision was harmless. Accordingly, I concur that remand is appropriate. However, in cases where the error is simply one of form, with no prejudice evident, I would not remand for the entry of a new decision.

## V. CONCLUSION

I concur that on the facts of this case the issuance of a summary decision was not appropriate, and that the record should be returned to the Immigration Judge for further proceedings related to the respondent's eligibility for withholding of removal, and for the issuance of an oral or written decision under 8 C.F.R. § 240.12(a). I dissent from those portions of the majority opinion that impose on Immigration Judges

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

requirements for which I find no support in the current regulatory scheme, and which I do not find to be essential to fairness in these proceedings. Specifically, in the absence of a change in the regulations, I would not require that Immigration Judges expand the content of summary decisions beyond what they have historically included, nor would I conclude that the law or regulations mandate that the oral decision must be separated from the transcript. Finally, even in cases where it is determined that an Immigration Judge erred in the manner in which a decision was issued, I would adhere to the principle of ``harmless error,'' and ordinarily I would not remand unless it was evident that the erroneous format of the decision prejudiced the alien in some meaningful way.

---

Copyright (c) 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.